# EXHIBIT 2

2005 03/29 11:50 FAX 2123084844          EDWARDS ANGELL                    ☑003/022
·  ·  03/29/05  08:53 FAX                   JUDGE BERMAN                       ☑003

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

KINGSWAY FINANCIAL SERVICES, INC.,          :

                 Plaintiff,                       :

                                :

   -against-                                  :               03 Civ. 5560 (RMB)

                                :

PRICEWATERHOUSECOOPERS, LLP.,               :                    **ORDER**
MILLER, HERBERS, LEHMAN &                    :
ASSOCIATES, INC., MARTIN L. SOLOMON,        :
EDWIN W. ELDER, WILLIAM J. BARRETT,         :
WILMER J. THOMAS, JR., ROBERT SILVER,       :
JOHN A. DORE, and KARLA VIOLETTO,           :

               Defendants                  :

---------------------------------------------------------X

## I.     Introduction

      Plaintiff Kingsway Financial Services, Inc. ("Plaintiff" or "Kingsway") filed a (117-page)

Second Amended Complaint on March 5, 2004 ("Complaint") asserting claims of securities

fraud under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78j(b)

("Exchange Act"), and Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), "controlling

person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), common law

fraud, negligence, negligent misrepresentation, and also seeking declaratory relief, in connection

with Kingsway's tender offer for and acquisition of American Country Holdings, Inc. ("ACHI"), a

publicly-held corporation.  The tender offer commenced on or before February 27, 2002 and

closed on or about April 1, 2002 ("Tender Offer" or "Acquisition").  Kingsway asserts claims

against ACHI officers and/or directors (including John A. Dore ("Dore"), Martin L. Solomon

("Solomon"), Edwin W. Elder ("Elder"), William J. Barrett ("Barrett"), Wilmer J. Thomas, Jr.

("Thomas"), Robert Silver ("Silver"), and Karla Violetto ("Violetto") ("Individual Defendants")),

Pricewaterhousecoopers, LLP. ("PwC"), ACHI's independent auditor, and Miller, Herbers,

2005 03/29 11:50 FAX 2123084844          EDWARDS ANGELL                      ☒004/022
_ _ 03/29/05  08:53 FAX                     JUDGE BERMAN                        ☒004

Lehman & Associates, Inc. ("Miller Herbers"), ACHI's outside actuarial consultant (collectively,

"Defendants").[1] Kingsway alleges that "[f]rom 1999 through 2002 (the 'Relevant Period'),

Defendants . . . fraudulently caused and maintained an inflated stock price of ACHI [by]

understating the insurance loss reserves ('reserves') of ACHI's wholly-owned subsidiary [ACIC]."

(Compl. ¶ 3.)[2]

On May 24, 2004, Defendants jointly moved to dismiss the Complaint for, among other

reasons, failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

("Fed. R. Civ. P."), and failure to plead fraud with particularity pursuant to Fed. R. Civ. P. 9(b)

and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1)-(2). (See Defendants'

Memorandum of Law, dated May 24, 2004 ("Def. Mem.").) On August 9, 2004, Plaintiff filed a

---

[1] Dore was Chairman of ACHI's Board of Directors ("Board"), Chief Executive Officer
("CEO"), President, and a Director from August 28, 2000 through April 15, 2003; Solomon was
Chairman and CEO from July 25, 1997 through August 28, 2000 and a Director and member of
the Board's audit committee ("Audit Committee") through the Acquisition; Elder was a Director
and Executive Vice President of ACHI and President of American Country Insurance Company
("ACIC"), ACHI's wholly-owned subsidiary, from July 25, 1997 through August 17, 2000, and
remained a Director of ACHI through the Acquisition; Barrett was a Director and Secretary of
ACHI from 1997 through 1999, and was Chairman of ACHI's Audit Committee from 1999
through the Acquisition; Thomas was a Director and Vice Chairman and a member of the Audit
Committee through the Acquisition; Silver was ACIC's Vice President of Operations Control
through at least November 2000; and Violetto was ACHI's Manager of Corporate Reporting and
Financing from July 1999 through March 2000, and Vice President and Chief Financial Officer
("CFO") through the Acquisition. (Compl. ¶¶ 15-32.)

[2] In addition to asserting claims as purchaser of ACHI stock under the Acquisition,
Kingsway also asserts claims on behalf of its wholly-owned subsidiaries (American Service
Insurance Company ("American Service"), Lincoln Insurance Company ("Lincoln"), and
Universal Casualty Company ("Universal")) which owned ACHI stock prior to and at the time of
the Acquisition including: (a) misrepresentations in ACHI's annual reports on Form 10-K filed
with the Securities and Exchange Commission ("SEC") prior to the Acquisition (Compl. ¶¶ 253,
278); (b) misrepresentations in connection with the subsidiaries' tendering of their ACHI stock
during the Tender Offer (Compl. ¶¶ 399-401); and (c) violation of Dore's employment contract
with ACHI ("Employment Contract Claim") (Pl. Mem. at 25).

Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem."), and on

September 30, 2004, Defendants filed a Reply Memorandum of Law ("Def. Reply").[3]  The Court

heard oral argument on March 15, 2005.  For the reasons set forth below, the Court grants in

part and denies in part Defendants' joint motion to dismiss.

**II.    Background**

For the purposes of this motion, the allegations of the Complaint are taken as true.

Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).

Kingsway is a "financial services holding company engaged in the business of property

and casualty insurance." (Compl. ¶ 12.)  ACHI was the holding company for ACIC, "a well

established insurance company that specialized in the underwriting and marketing of commercial

property and casualty insurance." (Id. ¶ 159.)

ACHI "set reserves for payment of losses and loss adjustment expenses [LAE] for [its]

line of insurance business," which reserves were "reflected as liabilities on [ACHI's] balance

sheet." (Id. ¶ 165.)  "Understatement of a reserve results in a company reporting lower

provisions for losses, thus increasing reported profits . . . ." (Id. ¶ 156.)[4]  "Due to the nature of

reserve adjustments, the true nature of a company's reserve deficiencies will not be discovered

until months or years after the initial reserves are set." (Id. ¶ 166.)

---

[3]Plaintiff has not requested leave to amend and has acknowledged that it "would not be
afforded the opportunity to amend."  (Declaration of Melissa Chernofsky, dated May 24, 2004,
Ex. A: Letter from Harold J. Ruvoldt to the Court, dated Jan. 29, 2004.)

[4]"In preparing periodic financial statements, [an insurance company] must treat . . .
amounts of future claims as offsets to current income.  These loss reserves often represent the
largest liability item on [an insurer's] balance sheet, and particularly the balance sheet of a
casualty risk [insurer]."  Delta Holdings, Inc. v. Nat'l Distillers and Chem. Corp., 945 F.2d 1226,
1229 (2d Cir. 1991).

2005 03/29 11:51 FAX 2123084844      EDWARDS ANGELL                Ø 006/022
03/29/05  08:53 FAX              JUDGE BERMAN                       Ø 006

Kingsway alleges, among other things, that "Defendants . . . fraudulently caused and maintained an inflated stock price of ACHI" by "understating the insurance loss reserves." (Id. ¶ 3.)[5] In early 1999, PwC presented to ACHI "preliminary actuarial findings conclud[ing] that . . . ACHI would have to increase reserves by at least $3.0 million [for Fiscal 1998] to be within PwC's actuarially sound reserve range." (Id. ¶¶ 177-78.) At a meeting on or about March 8, 1999, ACHI Audit Committee members Solomon, Barrett and Thomas discussed with PwC their "dissatisfaction" with PwC's preliminary findings "because of the negative effect [a higher reserve] would have on ACHI's stock price . . . ." (Id. ¶ 177.) Solomon "demanded that PwC amend its reserve range estimates," and, "[a]fter a discussion, during which the specter of replacing PwC with [Ernst & Young] was discussed with PwC, PwC changed their proposed reserve numbers to an actuarially unsound range acceptable to Defendants . . . ." (Id. ¶ 179.)

In late 1999, Violetto "informed" Solomon, Barrett, Elder, and Thomas that "in order to continue setting the reserve numbers at a range that would maintain the artificially high stock price," ACHI should "find an actuary willing to take unorthodox and actuarially unsound factors into account, such as . . . anecdotal information . . . ." (Id. ¶ 193.) Solomon, Barrett, Elder, Thomas and Violetto "began 'shopping around' for" an actuary who would agree to use these unsound reserve factors, and in November 1999 they retained Miller Herbers as ACHI's outside actuary. (Id. ¶¶ 196-99, 200, 217.) Employing the "'anecdotal factors' dictated by Defendants," Miller Herbers reviewed PwC's December 31, 1999 Reserve Report and set the reserve level at

---

[5] Because Plaintiff's principal allegation -- that Defendants materially understated ACHI's loss reserves -- "survives this motion to dismiss, this Court need not address whether plaintiff['s] remaining allegations also survive." In re Globalstar Secs. Litig., No. 01 Civ. 1748, 2003 WL 22953163, at *10 (S.D.N.Y. Dec. 15, 2003).

$91.3, which was $2.3 million less than PwC's estimate. (Id. ¶¶ 201-02, 217.) "PwC's actuarial and auditing partners met with Miller Herbers between December 1999 and January 2000," and PwC "determined that its numbers and Miller Herbers's numbers were too far apart, and PwC could never agree with Miller Herbers's actuarial certifications. PwC communicated to the Defendants but not to Kingsway, the regulators or to the investing public that they could 'never' agree with Miller Herbers's range." (Id. ¶ 204.) On or about March 30, 2000, Solomon, Barrett, Elder, Thomas and Violetto filed ACHI's Fiscal 1999 Form 10-K, which incorporated "Miller Herbers's unsound numbers" and also contained PwC's unqualified audit opinion. (Id. ¶¶ 205-06, 220-21.)

At a meeting held on or about November 14, 2000, (id. ¶ 243), Solomon, Thomas, Elder, Barrett, Dore and Violetto decided to "utilize[] Miller Herbers's reserve range in formulating the financial forecast" for Fiscal 2000 in connection with a "Private Placement" of stock, even though Defendants knew that Miller Herbers's reserve estimate was "unsound" (id. ¶ 244). Pursuant to a Preferred Stock Subscription Agreement, dated December 28, 2000, Kingsway subsidiaries American Service, Lincoln, and Universal Casualty purchased over 5% of ACHI's common stock at $10 per share. (Id. ¶ 253.)

On or about March 30, 2001, Defendants filed ACHI's Fiscal 2000 10-K (along with PwC's unqualified audit opinion) incorporating Miller Herbers's $95.4 million reserve estimate, even though Solomon, Barrett, Dore, Elder, Violetto, and Thomas "had been told by" PwC that Miller Herbers's reserve estimate was "grossly understated and actuarially unsound" and underreported reserves by $13 million. (Id. ¶¶ 256-257, 259, 261, 265.)

On or about July 2, 2001, after being assured by Solomon, Thomas and Barrett that

ACHI's publicly filed financial information was "accurate," Kingsway's wholly-owned subsidiaries, American Service, Lincoln, and Universal Casualty, acquired 555,471 shares of ACHI common stock from another ACHI stockholder for $1.9035 per share. (Id. ¶¶ 276-78.)

In August 2001, Solomon and Thomas informed Kingsway that ACHI would be receptive to a tender offer at $3 per share, and Dore met with Kingsway representatives on or about November 12, 2001 to discuss the possible acquisition. (Id. ¶¶ 280, 288-89.)

In a press release, dated November 14, 2001, ACHI announced, among other things, that it was increasing "prior year reserves" by $15 million in the quarter ended September 30, 2001, resulting in a net loss of $12.7 million for the quarter. (Id. ¶ 291.) On or about November 19, 2001, Kingsway offered to purchase ACHI's shares for $1.85 per share. (Id. ¶ 294.)

In or about December 2001, Best downgraded ACHI's rating from A- to C++ "due to failure of 'management's ability to restore profitability and maintain adequate reserves.'" (Id. ¶ 299.) Defendants "knew that any further reduction . . . by Best" would make ACHI "unmarketable." (Id. ¶ 300.)

In or about January 2002, ACHI's internal actuary, Christine Gennett ("Gennett"), "advised Dore that ACHI's reserves, as reported to the public were grossly actuarially unsound by at least $3 million" (id. ¶ 311), and at or around the same time, "Violetto informed Dore that ACHI's reserve estimates were still actuarially unsound" (id. ¶ 293). Nevertheless, during negotiations between and among Dore, Barrett, Kingsway's President, William Star, and Kingsway's CFO, Shaun Jackson, during the period January 16 through January 25, 2002, Dore and Barrett assured Star and Jackson that the reserve problem "had been corrected." (Id. ¶¶ 307-08; see id. ¶ 337.) Kingsway was "denied access to ACHI's non-public financial information"

and thus was forced to rely on ACHI's assurances and public statements. (Id. ¶¶ 2, 4, 310.)

On or about February 27, 2002, Kingsway "delivered a Tender Offer to ACHI to acquire all of ACHI's common stock for $2.10 per share" (id. ¶ 315), significantly higher than the stock's then market price (id. ¶ 316). Although Defendants "had an offer from at least one other suitor" at $2.20 per share (id. ¶ 317), Defendants "refused to seriously consider the higher offer because the potential purchaser required ACHI to provide it with non-public information" (id. ¶ 322).

On or about March 29, 2002, ACHI filed its Fiscal 2001 Form 10-K (along with PwC's unqualified audit opinion) which failed to disclose that, among other things, Gennett had informed ACHI's management "that the reserve estimates for the year[] ending December 31, 2001 did not accurately reflect ACHI's gross understatement of reserves . . . ." (Id. ¶¶ 328, 330.)

On or about April 5, 2002, the Tender Offer was completed. (Id. ¶ 338.) "Kingsway retained . . . Dore as the CEO of ACHI." (Id.) Kingsway first learned that ACHI's reserves were inadequate when, "[o]n or about June 30, 2002, [ACHI's] internal actuary" informed management "that reserves for [Fiscal] 2001 had been underreported and undervalued by at least $10 million and recommended immediately supplementing reserves in that amount." (Id. ¶ 341.) On or about December 31, 2002, ACHI, "at Gennett's recommendation, increased its reserves by approximately $10 million." (Id. ¶ 346.) "In or about 2003, Kingsway's own independent accountant [KPMG] discovered" that ACHI's reserves "were actuarially unsound by approximately $14.6 million, $21.0 million, $11.3 million, and $9.9 million for [Fiscal] 2001, 2000, 1999 and for the period prior to 1999, respectively." (Id. ¶ 348 & Ex. A.)

III.    Legal Standard

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable)

-7-

2005 03/29 11:53 FAX 2123084844                EDWARDS ANGELL                    ☑010/022
  03/29/05   08:54 FAX                        JUDGE BERMAN                                    ☑010

hurdle." Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999). "In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" Gant v. Wallingford Bd. of Educ., 69 F.3d 669 (2d Cir. 1995) (citation omitted). "Common sense requires that courts remember the purpose of a pleading -- to state a claim and provide adequate notice of that claim. A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." Gabriel Capital, L.P. v. Natwest Finance, Inc., 122 F.Supp. 2d 407, 411 (S.D.N.Y. 2000).

It has been said that "[t]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." Bower v. Weisman, 639 F. Supp. 532, 539 (S.D.N.Y. 1986) (citation omitted). At the same time, a Rule 10b-5 plaintiff must comply with Fed. R. Civ. P. 9(b) and plead fraud with particularity, so that defendants have "a reasonable opportunity to answer the complaint and . . . adequate information to frame a response." Ryan v. Hunton & Williams, No. 99 Civ. 5938, 2000 WL 1375265, at *6 (E.D.N.Y. Sept. 20, 2000) (citation omitted).

IV.    Analysis

A.    Real Party in Interest

Defendants argue, among other things, that Kingsway lacks standing to assert the following claims on behalf of its wholly-owned subsidiaries, American Service, Lincoln, and Universal Casualty: (1) the claim against Dore for breach of his employment contract with ACHI (Def. Mem. at 23-24 & n.33); and (2) the fraud claim with respect to the purchase of ACHI stock in December 2000 and July 2001 (id. at 21).

2005 03/29 11:53 FAX 2123084844          EDWARDS ANGELL                    ☒011/022
03/29/05  08:54 FAX                        JUDGE BERMAN                      ☒011

Plaintiff counters that, among other things: (1) as to the Employment Contract Claim, "Kingsway, as the parent company of wholly owned subsidiaries that were substantial shareholders of ACHI stock at the time Dore procured his employment contract through fraud, has standing to pursue its claim that Dore's agreement is void <u>ab initio</u>" (<u>id.</u> at 25); and, relatedly, in an Illinois state court action by Dore to enforce his employment agreement, the court denied a similar motion by Dore to void the contract <u>ab initio</u>, and therefore "Dore should be estopped from re-litigating here the very issue that he lost in an Illinois Court" (<u>id.</u> at 25 n.35); and (2) as to the fraud claim, Plaintiff "has standing to assert a . . . securities fraud claim on behalf of . . . ACHI shareholding subsidiaries as beneficial owner of the securities." (Pl. Mem. at 2 n.2.)

The Court finds no basis (under federal or state law) for Kingsway to assert contract or fraud claims on behalf of its wholly-owned subsidiaries.[6]  Kingsway does not appear to have standing with respect to the Employment Contract Claim, as it did not contract with Dore. <u>See, e.g.,</u> <u>Feinberg v. Katz</u>, No. 99 Civ. 45, 2002 WL 1751135, at *6-7 (S.D.N.Y. July 26, 2002) (parent company lacked standing to sue on behalf of subsidiary).  Nor is Kingsway's collateral estoppel argument persuasive, because Kingsway has not established: (1) that the instant contract claim is identical to the claim dismissed by the Illinois court; (2) the grounds upon which dismissal was sought; or (3) the grounds for dismissal.  <u>See</u> <u>Khandhar v. Elfenbein</u>, 943 F.2d 244, 247 (2d Cir. 1991).

**B.    Violetto Release**

Defendants argue, among other things, that when Violetto left Kingsway in April 2002,

---

[6]<u>See, e.g.,</u> <u>GTC Int'l Holdings, Inc. v. Burns</u>, No. 04 C 0570, 2004 WL 2211621, at *2 (N.D. Ill. Sept. 23, 2004) (holding parent company was not real party in interest to contract claim held by subsidiary).

"[a]s part of her severance, Violetto was released from all possible claims, including those of

Kingsway ...." (Def. Mem. at 24-25 & n.35.) Plaintiff counters, among other things, that "the

Release is an affirmative defense, not referenced in the [Complaint], and therefore inappropriate

for consideration in a motion to dismiss ...." (Pl. Mem. at 24-25.)

Consideration of a release on a "motion to dismiss [would be] improper since release is

an affirmative defense, Fed.R.Civ.P. 8(c), and the existence of a defense does not undercut the

adequacy of the claim." Deckard v. General Motors Corp., 307 F.3d 556, 560 (7th Cir. 2002);

accord Levine v. Columbia Labs., No. 03 Civ. 8943, 2004 WL 1392372, at *1 (S.D.N.Y. June

22, 2004).

C.      Section 14(e) Fraud

Kingsway, as noted, appears to assert the § 14(e) claim (1) on its own behalf, as the

successful offeror/purchaser under the Tender Offer, and (2) on behalf of its subsidiaries, i.e.,

ACHI stockholders that "tender[ed] their shares" under the Tender Offer.[7] To the extent that it

purports to assert the § 14(e) claim as the successful purchaser under the Tender Offer, Kingsway

lacks standing, as § 14(e) is intended to protect only "the shareholders of the Target corporation."

Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 39 (1977); accord Sedighim v. Donaldson, Lufkin &

Jenrette, Inc., 167 F. Supp. 2d 639, 650 (S.D.N.Y. 2001) ("Plaintiffs are not holders of the

security sought in the . . . tender offer, and, therefore, do not have standing to sue under §

14(e).").

And, to the extent Kingsway asserts claims on behalf of its subsidiaries for "tendering

their [ACHI] shares" under the Tender Offer, Kingsway has not pled loss causation. That is,

_____

[7]The parties have not explicitly moved with respect to the merits of the § 14(e) claim.

Kingsway appears to assert, on behalf of its subsidiaries, American Service, Lincoln, and Universal Casualty, that the subsidiaries were disadvantaged when they tendered their shares to Kingsway under the Tender Offer. (Compl. ¶ 401.) At the same time, the Complaint asserts that Defendants' misrepresentations "artificially inflated" the Tender Offer price, which would suggest that the subsidiaries are claiming a loss for selling their stock at too high a price. See Rediker v. Geon Indus., Inc., 464 F. Supp. 73, 82 (S.D.N.Y. 1978) ("Plaintiff must show [under § 14(e)] that there was a misrepresentation upon which she and other target shareholders relied and that this reliance was in fact the cause of their injury.").

**D.     Section 10(b) Fraud**

"To state a claim under § 10(b) and the corresponding Rule 10b-5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000). Defendants assert three principal grounds for dismissing the § 10(b) claim: (1) MH never made actionable public statements; (2) Defendants' statements were not false and were not made with scienter; and (3) Plaintiff did not rely upon Defendants' statements.

**1.     MH Statements**

Defendants argue that Kingsway alleges only that MH "prepared opinions on ACHI's reserves for ACHI's internal use that ACHI later used in its public filings," which, "at best . . . alleg[es] an impermissible claim for aiding and abetting." (Def. Mem. at 15.) Plaintiff counters that MH did make public "misstatements" regarding ACHI's reserves, including MH's "presentation" to Best on September 18, 2000. (Pl. Mem. at 21-22.) Plaintiff also asserts that

MH "consented to allow" ACHI to publish (in ACHI's filings with the State of Illinois) information derived from MH's reserve analysis. (Id.)

"[A] secondary actor (such as an accounting firm) cannot incur primary liability" under § 10(b) unless Plaintiff alleges that either: (1) the public statement "directly attributes" the statement to the secondary actor, i.e., the accounting firm, or (2) "the [secondary actor's] participation is substantial enough that it may be deemed to have made the statement and . . . investors are sufficiently aware of the [secondary actor's] participation that they can be found to have relied on it as if the statement had been directly attributed to the [secondary actor]." Teachers' Ret. Sys. of Louisiana v. ACLN Ltd., No. 01 Civ. 11814, 2004 WL 2997957, at *6-7 (S.D.N.Y. Dec. 27, 2004).

Kingsway does not allege that any actionable public statement was directly attributed to MH. Nor does the Complaint allege that Kingsway knew of MH's presentation to Best. As the Complaint alleges that Best did not believe MH's presentation (Compl. ¶ 242), there seems to be no basis to assert that Best relied upon MH's presentation. See In re NTL, Inc. Secs. Litig., 347 F. Supp. 2d 15, 36 (S.D.N.Y. 2004) ("To impute analyst statements to defendants, [plaintiff] must allege that analysts relied on specific information provided to them by defendants.").

As to the Illinois state filing, Plaintiff asserts (based upon documents outside the pleadings) that MH's Fiscal 2000 "Reserve Analysis" contained a consent provision allowing ACHI to "use . . . information from" the Analysis in ACHI's Illinois filings. (See Ruvoldt Aff.: Ex. B at 1.) The Complaint does not allege that any information from MH's Reserve Analysis was actually incorporated in the Illinois state filing, that MH "substantially participated" in the state filing, or that Kingsway knew of (or relied upon) MH's participation in the Illinois filings.

### 2.    Falsity and Scienter

Defendants argue that: (1) the Complaint fails to allege with particularity that Defendants' reserve estimates were false at the time made because, among other reasons, setting reserves involves "'uncertainty,' 'judgment calls,' 'conjecture' and 'informed guess work,'" and the Complaint does not "allege facts that would show that the reserves for those claims were objectively unreasonable in light of data available at the time" (Def. Mem. at 3-4); and (2) the Complaint fails to raise a strong inference of each Defendant's scienter, because, among other reasons, "the adjustment of a reserve does not establish either falsity or scienter," especially "where the plaintiff is the very party that later adjusted the reserves" (Def. Reply at 8).

Plaintiff counters that: (1) "while the process of setting reserves may be an inexact science, a plaintiff may allege that misrepresentations are 'false' as a matter of law where . . . a defendant intentionally set the reserves outside an actuarially sound range" (Pl. Mem. at 5); and (2) "when confronted with information concerning the Company's substantial reserve problems, the Individual Defendants not only ignored the problems, but actively sought to cover them up" (id. at 10-11), and PwC "intentional[ly] participat[ed] in and perpetuat[ed]" the fraud (id. at 17).

Pursuant to Rule 9(b), plaintiffs must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir.1999). The complaint shall "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2).

-13-

Because each of the misrepresentations alleged in the Complaint were made in specifically identified written financial disclosures, communications with analysts, press releases, or discussions with Kingsway personnel, Plaintiff has satisfied the first three prongs of Rule 9(b). See Globalstar, 2003 WL 22953163, at *5. With respect to "the fourth prong-- the 'why' prong — plaintiff[] must plead both that defendants made false statements and that they did so with the requisite scienter." Id. "When, however, as here, information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time [they] were made, the falsity and scienter requirements are essentially combined." In re Revlon, Inc. Secs. Litig., No. 99 Civ. 10192, 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001). Accordingly, if a plaintiff has "sufficiently pled facts to support scienter, [it has] also met the pleading requirements for falsity." Id. Plaintiff "must allege facts that give rise to a strong inference of fraudulent intent, . . . either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (citation omitted).

"[D]raw[ing] all reasonable inferences in favor" of Plaintiff, Suez Equity Invs., L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100 (2d Cir. 2001); Stevelman, 174 F.3d at 86,[9] the Court finds that Plaintiff has offered "strong circumstantial evidence of conscious misbehavior or

---

[9]But see Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002) ("[T]he court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."); Helwig v. Vencor, 251 F.3d 540, 553 (6th Cir. 2001) (drawing inferences in favor of plaintiff, but only when "most plausible of competing inferences").

-14-

recklessness."[9]  See Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).  Among other things,

Plaintiff alleges that each of the Defendants participated in one or more of the following

misrepresentations:  pressuring PwC to reduce its reserve estimates contained in the Fiscal 1998

Form 10-K by $3 million, which PwC presumably did; employing unsound reserve estimates in

ACHI's Fiscal 1999 Form 10-K, which Defendants knew to be understated by at least $2.3

million, and which PwC earlier stated it could "never agree with"; and assuring Kingsway

during negotiations prior to the Tender Offer that ACHI's reserve estimates were accurate,

despite learning in or around January 2002 that the reserves were "unsound by at least $3

million."  (See pages 3-7, supra.)  See, e.g., Ruskin v. TIG Holdings, Inc., No. 98 Civ. 1068,

2000 WL 1154278, at *2-7 (S.D.N.Y. Aug. 14, 2000) (denying motion to dismiss 10(b) claims

where one of insurance company's officers sent another officer a memo stating that "'[t]he

estimation of [the company's] loss and LAE reserves and therefore net loss and LAE incurred is

subject to significant uncertainty'").[10]

    Silver's situation is different.  That is, Plaintiff fails to allege with particularity either that

---

[9]The Court "need not . . . consider the motive and opportunity prong of scienter," except
with respect to Silver.  Ganino, 228 F.3d at 170.

[10]Even if one were to assume, arguendo, that ACHI's reserve estimates constituted
"forward-looking statements," but see Schnall v. Annuity and Life Re (Holdings), Ltd., No. 3:02
CV 2133, 2004 WL 367644, at *8 (D. Conn. Feb. 22, 2004) (NO. 3:02 CV 2133 (loan loss
reserve statements are not forward-looking statements covered by PSLRA safe harbor),
"[b]ecause plaintiff[] sufficiently allege[s] that defendants knew their misrepresentations were
false when made, . . . the safe harbor provision of the PSLRA and the 'bespeaks caution' doctrine
provide no relief for defendants."  Globalstar, 2003 WL 22953163, at *9; see Ruskin, 2000 WL
1154278, at *6-7 (estimates of insurance company's loss reserve were "not protected by either the
safe harbor provision or the 'bespeaks caution' doctrine" because "'cautionary language does not
protect material misrepresentations or omissions when defendants knew they were false when
made'").

Silver had motive and opportunity to commit the fraud or facts constituting strong circumstantial evidence of Silver's recklessness. Among other things, Silver left ACHI in November 2000, owned no ACHI stock, did not serve on ACHI's Board or sign ACHI's public filings, and Plaintiff has not alleged with particularity that Silver "personally knew of, or participated in, the fraud." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) (emphasis in original). (See pages 3-7, supra.)

3.    Reliance

Defendants assert that Kingsway has not adequately pled reliance upon ACHI's year-end reserve estimates for Fiscal 1999 and 2000 because, among other reasons, "on November 14, 2001, ACHI announced that its reserves were 'substantially' deficient, and added a $15 million charge to bolster these reserves." (Def. Mem. at 5-6.) Defendants also assert that Kingsway has not adequately pled reliance upon reserve estimates contained in ACHI's Fiscal 2001 Form 10-K because, among other things, (i) "before these figures were published, Kingsway had already extended its offer to ACHI's shareholders, and could have rescinded it only in the event of a 'material adverse event'" (Def. Mem. at 6); and (ii) the 2001 Form 10-K "came out one business day before the tender closed," and Kingsway "essentially concede[s] that [it] did not read [the 2001] 10-K until several days after the acquisition closed" (id.).

Plaintiff counters that, among other things: (1) "the $15 million increase in reserves was not a cure" (Pl. Mem. at 7); (2) Kingsway "considered the 2001 10-K prior to the tender offer closing" (id. at 8 n.10); and (3) Defendants' misrepresentations "constitute a 'materially adverse effect,' which would make the Tender Offer null and void" (id. at 9 n.11).

Although "[c]ourts impose a more stringent standard on sophisticated investors, holding

-16-

that they have an enhanced duty to obtain available information material to investment decisions," In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp.2d 371, 439-40 (S.D.N.Y. 2001), the reasonableness of a plaintiff's reliance "generally . . . implicates factual issues whose resolution would be inappropriate" on a motion to dismiss, Internet Law Library, Inc. v. Southridge Cap. Mgm't, LLC, 223 F. Supp.2d 474, 485 (S.D.N.Y. 2002); see Steed Finance LDC v. Nomura Secs. Intern., Inc., No. 00 Civ. 8058, 2001 WL 1111508, at *9 (S.D.N.Y. Sept. 20, 2001) ("we cannot say plaintiff's alleged sophistication prohibits recovery as a matter of law"). Accordingly, the Court does not find as a matter of law that the November 14, 2001 press release "cured" all prior misrepresentations regarding the reserve estimates. See Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 n.3 (2d Cir. 1991) ("Whether the subsequent disclosure . . . 'cured' the original omission is a question of fact that should not be resolved on the pleadings.").[11] The Court also cannot find as a matter of law that Kingsway could not have relied upon ACHI's Fiscal 2001 Form 10-K, as the Complaint alleges that the Form 10-K was filed on March 29, 2002, and that the Acquisition closing did not take place until April 5, 2002. (See page 7, supra.) Whether or not Defendants' alleged misrepresentations in the 2001 Form 10-K were material to justify Plaintiff's withdrawal of its Tender Offer is also a factual issue that cannot be resolved on this motion. See In re Regeneron Pharms. Secs. Litig., No. 94 Civ. 1785, 1995 WL 228336, at *5 (S.D.N.Y. Mar. 10, 1995).

E.    Section 20(a) Control Person Liability and Common Law Fraud

Plaintiff asserts that all of the Individual Defendants are liable as "Control Persons" under

---

[11] Accord Globalstar, 2003 WL 22953163, at *9 (later announcement was not curative); In re Interpublic Secs. Litig., No. 02 Civ. 6527, 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003).

Section 20(a) (Compl. ¶¶ 37-39, 383-86), and that all Defendants are liable for state common law fraud (id. ¶ 377-81). Defendants broadly assert that the § 20(a) and common law fraud claims "should be dismissed for the same reasons the 10b-5 claims fail." (Def. Mem. at 22.)

Defendants' conclusory assertion fails to satisfy their burden as movants with respect to the § 20(a) and the common law fraud claims. See Rosen v. Brookhaven Cap. Mgmt., Co., 194 F. Supp. 2d 224, 229 (S.D.N.Y. 2002). And, because Plaintiff's § 10(b) claim survives, Plaintiff's ancillary claims survive as well. See, e.g., Pits. Ltd. v. American Express Bank Int'l, 911 F. Supp. 710, 719 (S.D.N.Y. 1996) (The elements of common law fraud in New York are "essentially the same as those which must be alleged in order to establish a claim under Section 10(b) and Rule 10b-5.").

At the same time, because the § 10(b) claim is dismissed with respect to Silver, the § 20(a) and the common law fraud claims against him are dismissed as well.

F.    Negligence

Defendants assert that Kingsway's negligence and negligent misrepresentation claims against PwC, based upon alleged misleading statements in ACHI's Fiscal 1999-2001 Form 10-Ks, should be dismissed because Kingsway has failed to allege the requisite "privity of contract between the parties or a relationship so close as to approach privity." (Def. Mem. at 22.) According to Defendants, PwC's Form 10-K audit reports were "required by law" to be filed with the SEC and were not "prepared for the purpose of" the Tender Offer. (Id. at 23.) Kingsway counters that "[b]y addressing the ACHI's shareholders in [the Form 10-K audit reports], while contemporaneously knowing that Kingsway was relying upon that information for possible investment opportunities in the Company, PwC 'linked' itself with Kingsway sufficiently to

-18-

2005 03/29 11:56 FAX 2123084844    ⚫-⚫ EDWARDS ANGELL    ☑021/022
⸱ ⸱ 03/29/05  08:55 FAX                        JUDGE BERMAN                     ⸱ ☑021 ⸱

establish privity." (Pl. Mem. at 18-20.)

    A plaintiff alleging negligent misrepresentation under New York law against accountants with whom the plaintiff has no contractual relationship, must establish the following elements: "(1) the accountant must have been aware that the reports would be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) some conduct by the accountant 'linking' him or her to that known party." Securities Investor Protection Corp. v. BDO Seidman, LLP, 222 F.3d 63, 73 (2d Cir. 2000). Kingsway has not adequately alleged "linking conduct," or "some form of direct contact between the accountant and the plaintiff, such as face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties." Id. at 75 (citation omitted); see Houbigant, Inc. v. Deloitte & Touche LLP, 303 A.D.2d 92, 94, 753 N.Y.S.2d 493, 495 (1st Dep't 2003); see also Parrott v. Coopers & Lybrand, L.L.P., 263 A.D.2d 316, 320-21, 702 N.Y.S.2d 40, 44 (1st Dep't) (plaintiff must satisfy all three elements), aff'd, N.Y.2d 479, 718 N.Y.S.2d 709 (2000).

## V.   Conclusion and Order

    Defendants' joint motion to dismiss [39] is granted in part and denied in part. The Employment Contract Claim is dismissed with prejudice unless ACHI is joined as a named plaintiff within twenty days of the entry of this Order. See Refac Intern., Ltd. v. Lotus Dev. Corp., 131 F.R.D. 56, 58 (S.D.N.Y. 1990); Fed. R. Civ. P. 17(a). The § 10(b) fraud claim asserted on behalf of American Service, Lincoln, and Universal Casualty is dismissed with prejudice absent the joinder of those subsidiaries within twenty days of the entry of this Order. The Court also dismisses with prejudice the § 14(e), negligence and negligent misrepresentation claims against all Defendants; and it dismisses all claims against MH and Silver. The Court

2005 03/29 11:57 FAX 2123084844          EDWARDS ANGELL                    022/022
· 03/29/05  08:55 FAX                JUDGE BERMAN                         022

denies the motion to dismiss as to all remaining claims.

Counsel are requested to appear at a status/scheduling/settlement conference with the

Court on April 22, 2005, at 11:00 a.m., in Courtroom 706 of the Thurgood Marshall Courthouse,

40 Centre Street, New York, New York.  The Court directs the parties to engage in good faith

settlement negotiations prior to the conference with the Court.

Dated: New York, New York
          March 29, 2005

RICHARD M. BERMAN, U.S.D.J.

-20-