# EXHIBIT 4

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS
LONDON · MOSCOW · FRANKFURT · COLOGNE
ROME · MILAN · HONG KONG · TOKYO

Writer's Direct Dial: (212) 225-2550
E-Mail: lliman@cgsh.com

March 29, 2006

<u>BY HAND</u>

Hon. Henry B. Pitman
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 750
New York, New York 10007

> Re:  Kingsway Financial Services, Inc. v. PricewaterhouseCoopers LLP et al.,
> 03 Civ. 5560 (RMB) (HBP)

Dear Judge Pitman:

On behalf of the Outside Director Defendants (Martin L. Solomon, Edwin W. Elder, William J. Barrett, and Wilmer J. Thomas, Jr.), we respectfully submit this letter brief in support of our request that the Court overrule plaintiffs' specific objections to certain requests in the Outside Director Defendants' First Request for Production of Documents, dated August 5, 2005 (the "First Document Request")[1] and order the production of all non-privileged documents responsive to those requests.[2]  We respectfully request that this letter brief be filed with the Clerk of Court.

---

[1]  Copies of the First Document Request and Plaintiffs' Responses to Defendants' First Request for Production of Documents, dated September 6, 2005, are attached as Exhibits A and B for the Court's convenience.

[2]  Plaintiffs have represented that they have completed hard copy production of all documents responsive to Request Nos. 2-14, 16-17, 19-20, 25, 30-61, and 63-65. Defendants believe that such production is incomplete.  A meet-and-confer on that subject was scheduled for March 28, 2006, but was abruptly canceled by plaintiffs.

Hon. Henry B. Pitman, p. 2

## BACKGROUND

Plaintiff Kingsway Financial Services, Inc. ("Kingsway"), a large and sophisticated insurance company, claims that the Chief Executive Officer ("CEO"), the Chief Financial Officer ("CFO"), the outside directors, and the outside auditors of a small Chicago insurance company (American Country Holdings, Inc. ("ACHI")) committed securities fraud when ACHI's shareholders sold their stock to Kingsway in an unsolicited tender offer.[3] Kingsway made its tender offer to ACHI's shareholders and committed to a price in February 2002 (after ACHI increased its reserves by $15 million and A.M. Best downgraded ACHI's operating subsidiary American Country Insurance Company to C++, and before ACHI issued its Form 10-K for the fiscal year 2001. That offer closed successfully in April 2002. In September 2003 (17 months after the offer closed), Kingsway chose to restate the financial results of ACHI for, inter alia,[4] fiscal years 2001 and 2000 by increasing ACHI's expenses and decreasing its income for each of those years due to the bolstering of insurance reserves for earlier accident years.[5]

In the Third Amended Complaint ("TAC"), Kingsway claims (1) that ACHI's insurance reserves were improperly established in violation of generally accepted accounting principles ("GAAP") as of the end of each of fiscal years 1998, 1999, 2000, and 2001; (2) that each of the defendants (including the CEO, the CFO, PricewaterhouseCoopers LLP ("PwC"), and the outside directors) knew that the insurance reserves were improperly stated in violation of GAAP as of the time ACHI published financial statements containing those numbers; (3) that Kingsway relied upon those financial statements in deciding to launch its unsolicited tender offer and in establishing its offer price; and (4) that Kingsway was damaged as a result of its alleged reliance on the allegedly false statements. Kingsway seeks $106 million in damages from each of the defendants, over four times the purchase price of ACHI.

The Outside Director Defendants have vigorously challenged each of those claims and interposed significant answers, which are relevant to this request to compel the production of documents. Among the defenses and issues raised by the Outside Director Defendants are:

● Whether ACHI's reserves were established in accordance with GAAP as of the dates of each of the financial statements alleged to be false. ACHI's CEO, its CFO, its outside actuaries Miller Herbers and its outside auditor PwC all believed and opined that the reserves

---

[3]   Plaintiffs initially also claimed that ACHI's outside actuaries Miller, Herbers, Lehmann & Associates ("Miller Herbers") were complicit in a fraud, but that claim was dismissed by order of the Honorable Richard Berman. Kingsway Fin. Servs., Inc. v. PricewaterhouseCoopers LLP, et al., No. 03 Civ. 5560 (RMB) (S.D.N.Y. Mar. 29, 2005) (Order dismissing defendants Miller Herbers and Robert Silver).

[4]   Kingsway also restated ACHI's results for the first quarter of 2002.

[5]   Insurance companies are required to re-evaluate their reserves on a regular basis for earlier accident years and to bolster them if they are insufficient to cover anticipated claims. Ordinarily, such bolstering is accounted for as a current expense on the books of the company that holds the reserves. See Ex. C at 39-43 (Kingsway Form 40-F for the fiscal year 2002). The consequence is to reduce current income. A company can only restate its financials and avoid this impact on current income if there was an error in the earlier financial statements such that the reserves should have been bolstered in the earlier period based on known facts at the time but were not. See APB Opinion No. 20 (cited by the SEC in its letter to Kingsway of March 13, 2003, see Ex. D (AC-25750)).

Hon. Henry B. Pitman, p. 3

were established in accordance with GAAP as of each of the relevant dates. Moreover, while the TAC alleges that ACHI's internal actuary Christine Gennett told CEO John Dore in January 2002 (after the end of fiscal year 2001) that the reserves would need bolstering (at some unspecified time), see TAC ¶ 315, Mr. Dore himself has testified that Ms. Gennett never informed him of a belief that the reserves were misstated, and documents produced in discovery indicate that as late as May 2003, one month after Mr. Dore had left ACHI, Ms. Gennett believed the reserves were accurately stated as of the fiscal year ending 2001. See Ex. E (KFS-DC-074188).[6] Quite simply, the allegation has no foundation.[7]

Instead, there is an alternative reason why the reserves were bolstered – albeit one that does not support Kingsway's claims. In 2002 and 2003, Kingsway's insurance reserves deteriorated for earlier accident years across a wide range of its businesses – primarily in Ontario and the southeastern United States. Thus, as with Kingsway's other subsidiaries, the bolstering of the reserves made by Kingsway for ACHI in 2002 was as a result of events occurring in 2002 or that became known in 2002 and was not as a result of any concealment of facts by ACHI pre-tender offer. Accordingly, the bolstering of the reserves should have been accounted for as a current expense in 2002 and should not have been accounted for as a restatement. This was the view of PwC, which continued to audit ACHI's books though 2001, and was a view that KPMG was prepared to accept until Kingsway asked it to do a re-audit under the circumstances described herein.[8] The true reason why ACHI's reserves were bolstered is relevant both to liability and damages (and mitigation of damages). Defendants are entitled to pursue it by the requests in the First Document Request baselessly objected to by plaintiffs.

● Whether Kingsway's restatement was fraudulent and improperly motivated by earnings management. Kingsway's claim would collapse, of course, if Kingsway restated not because it was necessary but because it had an illegal desire to manage earnings. A document recently produced by Kingsway strongly suggests that Kingsway had precisely that improper motivation. In a high level, and hitherto secret, letter dated October 31, 2003 – which was only produced earlier this month – James R. Zuhlke, head of Kingsway America Inc. (the U.S. subsidiary of Kingsway that ultimately held ACHI), describes in vivid terms to F. Michael Walsh, Kingsway's independent Lead Director, that Kingsway's CEO (William G. Star) and CFO (W. Shaun Jackson) had directed that insurance reserves be "take[n] down" to manage earnings.[9] A copy of the letter is attached as Exhibit H. In it, Mr. Zuhlke states:

---

[6]    This document was produced on March 10, 2006 and only after Kingsway's outside auditor KPMG LLP ("KPMG") had produced a version of this document in February 2006 in response to our subpoena duces tecum. That this highly relevant email was not produced in September 2005 demonstrates our concern about the completeness of production.

[7]    Discovery is making clear that the other bases for Kingsway's claims similarly lack foundation. For example, plaintiffs allege that "PwC determined that its numbers and Miller Herbers's numbers were too far apart, and PwC could never agree with Miller Herbers's actuarial certifications." TAC ¶ 208. In fact, the conference call notes record a general statement by PwC – "two actuaries are never going to agree" – and ACHI was within the reserves ranges for both PwC and Miller Herbers. Ex. F (AC-76431).

[8]    It was also the position of the SEC in its letter to Kingsway of March 13, 2003. See Ex. D at 2 (AC-25750).

[9]    The document is preceded in the production by a "Bill Star, Personal Correspondence" file folder. See Ex. G (AC-110148).

Hon. Henry B. Pitman, p. 4

> I was more than a little concerned by David's [Atkins, Chairman of
> Kingsway's Audit Committee] willingness to continue to give Bill
> [Star] more operating latitude than the rest of the Board. ... I have
> in the past alerted David to the fact that the earnings were being
> managed. He seemed to shrug it off. Frankly, I would have
> expected a stronger bias for discipline from the head of the audit
> committee.
>
> Bill and Shaun [Jackson] don't often tell the President's [sic]
> explicitly to take down reserves. They call me and tell me to make
> the calls. Clearly however, pressure has been applied to manage
> the earnings while the company was in pursuit of capital. The bias
> has not been toward conservative reserve policy.

Ex. H (AC-WH-110262).

The timing of this letter could not be more significant; it is necessary to set it out
in some detail. As mentioned, Kingsway acquired ACHI in April 2002; as of that date, the
Outside Director Defendants had no further involvement with the company. Nonetheless,
Kingsway did not restate the reserves in April 2002 or any time in calendar year 2002 or the first
half of calendar year 2003.

On October 22, 2002, Kingsway filed an initial registration statement with the
SEC for a proposed issuance in the United States of Trust Preferred securities in order to raise
necessary capital. It included the original ACHI financial statements for the periods alleged to
be fraudulent in the TAC. During one of the nine amendments, Kingsway withdrew the ACHI
statements and replaced them with Kingsway's consolidated 2002 financial statements. Ex. I
(AC-23461).

In connection with those filings, Kingsway took the position that the deterioration
that it had observed in ACHI's reserves in the latter half of 2002 should be included, in effect, in
the purchase price for ACHI, effectively burying those costs in earlier years rather than taking
them as a charge in a current year. As Mr. Star stated in a July 16, 2002 email, the bolstering of
reserves should be included in the purchase accounting because "[i]t would be better for them to
book the additional reserves required at the time of purchase even if it means that we carry good
will on the books. It is better than taking a charge against income in future quarters," Ex. J (AC-
77807), which would, as ACHI Vice President Paul Romano noted, "possibly jeopardize a
favorable AM Best grading." Ex. J (AC-77808). At that time, there had been no decision made
or analysis conducted that ACHI's earlier financial statements were in error. As noted, both
ACHI's internal actuary (Ms. Gennett) and its auditor PwC believed that the financial statements
were consistent with GAAP. Rather, Kingsway appears to have decided what it wanted its
financial statements to look like and then established its accounting to meet that predetermined
desire.

The SEC disagreed with Kingsway's accounting. In a comment letter on
Kingsway's registration statement, the SEC stated, "We maintain that the adjustments made in
the purchase price allocation appear to be related to new information obtained subsequent to the

Hon. Henry B. Pitman, p. 5

date of acquisition" and further advised that, if Kingsway believed that the adjustments to reserves needed to be back-dated to the purchase date, "a restatement of ACHI's historical financial statements may be required." Ex. D (AC-25750). It was only at that time – in May 2003 – that Kingsway hired KPMG to conduct a re-audit and to give a clean opinion to the result it had already decided that it wanted to take as a matter of management discretion – that the bolstering of ACHI's reserves should be reflected as an expense in earlier years via a restatement and not be included as a 2002 expense in the financial statements Kingsway would be filing with its registration statement for the Trust Preferred securities. Even then, Kingsway provided the SEC with a 10-page explanation of why the restatement was appropriate without once mentioning the word "fraud" or "conspiracy," Ex. K (AC-23584-93), and without mentioning that ACHI's internal actuary vigorously disagreed with the restatement, Ex. E (KFS-DC-074188). Kingsway's August 11, 2003 letter describing the history of communications with PwC, ACHI's former auditor, similarly failed to mention that ACHI's internal actuary did not participate in the July 17, 2003 conference call with PwC and KPMG on the purported need to restate ACHI's financials. Compare Ex. L (AC-23892), with Ex. M (AC-24202).[10]

On September 17, 2003, five days after it filed the restatement of ACHI's numbers with the SEC on Form 6-K, Kingsway announced that it had commenced marketing of an offering of Trust Preferred securities in the United States with a registration statement that did not include the bolstering of ACHI's reserves as an expense.

Less than a month later, concerns were raised about earnings management in a sequence of events that ultimately led to the Zühlke memorandum. On October 17, 2003, following an October 15 meeting of the independent directors (see Ex. N (AC-WH-110300)), Mr. Walsh (the Lead Director recipient of the Zuhlke memorandum) wrote to Mr. Star on behalf of Kingsway's independent directors regarding "necessary changes in the operations of the Company." Those "necessary changes" included the following:

> As discussed with you, we are concerned about the frequency with which the Company has experienced adverse development on its prior years. As a policy matter, it is the position of the independent directors that the reserving practices of a public insurance company, such as Kingsway, should very infrequently result in significant adverse development. Its "reserving culture" must be seen by its managers, employees, and ultimately by its shareholders and other interested parties to be biased towards conservatism and fully adequate reserving for prospective claims. To that end, we believe that management's plan should allow for all subsidiaries reaching a position at the mid-point or better of their respective actuarial ranges in a reasonably short time-frame.

Ex. O (AC-WH-110303-04).

---

[10]     Upon information and belief, we note that Ms. Gennett remains the internal actuary for the company.

Hon. Henry B. Pitman, p. 6

At a meeting of Kingsway's full board on October 20, 2003, the directors unanimously agreed to six "guiding principles" to govern Kingsway's business in the future; number five was that "[r]eserves at each insurance subsidiary should be set at the mid point or better of the range recommended by the company's independent actuaries." Ex. P (AC-WH-110297). Two days later, Mr. Star wrote a memo to the management of Kingsway's U.S. subsidiaries about "Third Quarter Results" in which he noted that negative results for August 2003 (i.e., "the underwriting loss in August almost totally wiped out the underwriting profit for the month of July for U.S. operations") had caused the underwriters of Kingsway's public offering of Trust Preferred securities to delay that offering until after third quarter numbers were released (the numbers that did not include expenses for the ACHI reserves bolstering). Ex. Q (AC-WH-110269). Mr. Star noted that a pre-release of information concerning prior year claims of Kingsway General had "caused our stock to drop substantially" and then offered the self-serving statement that "[i]t has never been our intention or our instructions to reduce claims reserves but the indication to some of our independent directors was that our instructions may have inferred [sic] that reserves should be reduced." Id.[11]

Shortly thereafter, in an email to Mr. Walsh, Mr. Zuhlke stated that he had reviewed Mr. Star's memo and that his denial of managing earnings through reserves adjustments was "untrue":

On the face of [the memo from Mr. Star], it is fairly objective. However, his assertion that he and Shaun have not asked them to take down reserves remains untrue and self delusional. If he calls me again to squeeze earnings I'll suggest that we get on the phone together so as to avoid confusion both as to content and source.

Ex. R (AC-WH-110267).[12] Mr. Zuhlke then wrote the October 31, 2003 letter to Mr. Walsh excerpted above. A little more than two months later, Kingsway consolidated its reporting structure to remove Mr. Zuhlke's job and he resigned. Ex. S (press release dated Jan. 13, 2004).

We are still analyzing and organizing this data. Read together, however, the documents strongly suggest (and possibly conclusively establish) that, out of an urgent need to raise capital,[13] Kingsway made the decision to charge ACHI's reserves bolstering against earlier

---

[11]   We have not found the following page of this memo in the production, and there is no document with the Bates number following AC-WH-110269 in the production or in the privilege log, which raises further concerns as to the completeness of the production. In short, pages AC-WH-110270-71 are missing. We have attempted to meet-and-confer on document production issues but have been rebuffed in this effort by plaintiffs' counsel.

[12]   The fact that these Kingsway documents and communications from a Kingsway executive to a Kingsway director were identified with the Bates stamp prefix for ACHI (i.e., "AC") – and not that for Kingsway (i.e., "KFS") – is of great concern to us given the representation by plaintiffs' counsel that documents were "produced as they are maintained in the ordinary course [of business]." Tr. of Mar. 22, 2006 Conference ("Tr.") at 8; see Fed. R. Civ. P. 26(b). Our attempts to discuss production-related questions with plaintiffs' counsel have been ignored to date.

[13]   Kingsway vigorously pleaded with the SEC for a waiver of the requirement to restate ACHI's financial results, due to the delay this would cause in issuing the Trust Preferred securities, "delaying Kingsway's ability to raise capital at a critical time," and claimed that the "delay in raising capital has been a primary

Hon. Henry B. Pitman, p. 7

years well before it ever thought that there was an error, commissioned an investigation to reach the predetermined result that the reserves bolstering should be accounted for as a restatement only after the SEC stated that that would be the only way it could avoid reporting the expense on its 2002 income statement, and then asked for the registration statement to be approved and attempted to offer the Trust Preferred securities in the United States without ever telling the SEC or the investing public that ACHI's own internal actuary thought that the historical numbers were correct. Thereafter, it reorganized the complaining executive out of a job. Under those circumstances, there could be no claim against the Outside Director Defendants or indeed against any party in this case.

• Whether Kingsway's $106 million claim is supported. Kingsway's damages claim as it relates to reserves deficiencies is based on the total shortfall from the point estimate of the reserves range computed by KPMG one year after the acquisition. Plaintiffs have alleged certain damages (i.e., the $67.3 million claimed for "Understatement of Unpaid Losses and LAE's" in plaintiffs' initial disclosures) equaling exactly the sum of the differences between the new point estimates (chosen by Kingsway near the mid-point of the range provided by KPMG in 2003) and the actual reserves carried[14] by ACHI for 1998, 1999, 2000, 2001 and the first quarter of 2002.[15] See Ex. U at 5 (AC-24215). If Kingsway had chosen a different (lower) point estimate in the actuarial range, its calculation of damages would have necessarily been lower. Likewise, its claim that the defendants were reckless in not knowing of the alleged need to adjust the reserves would be weaker. It is very unclear how Kingsway arrived at its figures, making Request Nos. 22, 23, and 24 concerning the guidelines for reserves at Kingsway's other subsidiaries, which plaintiffs objected to producing, highly relevant.

The documents discussed above, however, powerfully suggest that as late as October 2003, Kingsway itself did not have a policy of setting reserves at the middle of the actuarial range and that, if it did so in connection with the restatement of ACHI's numbers, it did so because it believed that such an adjustment was beneficial to it in its financial reporting and not because it was required by GAAP. For, if Kingsway already had a policy of setting reserves at the mid-point, there would have been no need for Kingsway's independent directors to make that "necessary change" and no need for Mr. Star to write to his managers about it in October 2003.

---

factor in the actions [i.e., downgrading of some Kingsway subsidiaries] taken by A.M. Best." Ex. X (AC-25767).

[14] There are numerous flaws in Kingsway's damages analysis. Among other problems, Plaintiffs' method for calculating damages is the equivalent of assuming that if your personal checkbook register is $5 different from the bank's statement of your account in January and then is $8 different from the bank's statement in February, then you have a $13 difference with the bank statement on March 1st. Also, Kingsway did not contribute anything near $67 million to ACHI's capital; it simply increased ACHI's reserves by $15.7 million following the deterioration of those reserves in 2002.

[15] See TAC ¶¶ 347, 352; see also Ex. T (Kingsway Form 6-K filed with the SEC on Sept. 12, 2003) (representing that reserves at December 31, 2000 were understated by $21.8 million, rather than $21.0 million as alleged in TAC).

Hon. Henry B. Pitman, p. 8

## DISCUSSION OF PARTICULAR REQUESTS

Despite plaintiffs' broad allegations of a widespread conspiracy involving numerous individuals and wrongdoing from at least 1998, the First Document Request asks for a relatively narrow production of documents relevant to the claims and defenses in this case. In responding to the First Document Request, plaintiffs specifically objected to eight of the sixty-five requests and refused to produce documents responsive to them (i.e., Request Nos. 1, 15, 26, 27, 28, 29, 36,[16] and 62).[17] We note that plaintiffs control essentially all of the relevant documents in this action. Plaintiffs have not claimed that the First Document Request is "unreasonably cumulative or duplicative," and they cannot claim that the discovery sought could be obtained elsewhere. Fed. R. Civ. P. 26(b)(2)(i), (ii). Their only argument, other than that certain requested documents are privileged, is one of undue burden. See Fed. R. Civ. P. 26(b)(2)(iii). Plaintiffs cannot support a claim of burdensomeness for the following reasons.

A.    General Standards

Under the Federal Rules, the Outside Director Defendants are entitled to any non-privileged discovery "that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b)(1). "Relevance for discovery purposes is an extremely broad concept which has been construed ... to encompass any matter that bears on, or reasonably could lead to other matters that could bear on, any issue that is or may be in the case." Mitchell v. Fishbein, 227 F.R.D. 239, 248 (S.D.N.Y. 2005) (quotation omitted); Degulis v. LXR Biotech., Inc., 176 F.R.D. 123, 125 (S.D.N.Y. 1997) ("The discovery rules are to be given a broad and liberal construction to effectuate their purpose of ensuring that civil trials are not conducted in the dark."). "Once any possibility of relevance sufficient to warrant discovery is shown, the burden shifts to the party opposing discovery to show the discovery is improper." Condit v. Dunne, 225 F.R.D. 100, 106 (S.D.N.Y. 2004) (quotation omitted).

In addition, documents are discoverable if they could be used for impeachment purposes, because "it is the credibility of the testimony of live witnesses that is at the heart of the proof of a party's claim or defense." 6 Moore's Federal Practice – Civil § 26.41[9][a][ii] (3d ed. 1997); see Hamilton v. Kerik, No. 01 Civ. 6934 (GEL) (HBP), 2002 WL 31834428, at *4 (S.D.N.Y. Dec. 17, 2002) (Pitman, M.J.) (observing that "facts relevant to credibility are discoverable"; "Parties may utilize discovery to obtain information for impeachment purposes.") (quotation omitted).

---

[16]    Plaintiffs nonetheless produced documents responsive to Request No. 36 (contracts between Kingsway or ACHI and any taxi-cab company). See Letter from Harold J. Ruvoldt to Defense Counsel, dated Nov. 1, 2005, at 2.

[17]    Plaintiffs raised specific objections to four additional requests but indicated that they would produce documents responsive thereto (i.e., Request Nos. 18, 22, 23, and 24). The parties have agreed to table the issue of documents responsive to Request No. 18, which concerns sales of Kingsway stock by its directors and officers. Request Nos. 22, 23, and 24 are discussed below.

Hon. Henry B. Pitman, p. 9

B.    Discussion

Request No. 1 (document retention notices). The Outside Director Defendants seek the document retention policies of both Kingsway and ACHI.[18] These documents are plainly relevant. Plaintiffs have not made a showing that they reflect legal advice or constitute attorney work product, and the Outside Director Defendants are entitled to their production. See, e.g., Champion Int'l Corp. v. Liberty Mut. Ins. Co., 129 F.R.D. 63, 68 (S.D.N.Y. 1990) (affirming order to produce document retention or destruction policies); cf. Trugman-Nash, Inc. v. New Zealand Dairy Board, No. 93 Civ. 8329 (CSH), 1995 WL 66636, at *1 (S.D.N.Y. Feb. 16, 1995) (imposing sanctions for failure to produce attachments to document produced in response to document request for document retention policy); In re "Agent Orange" Prod. Liability Litig., 98 F.R.D. 558, 559-60 (E.D.N.Y. 1983) (approving special master's order directing discovery of defendant's document retention policy through depositions, "to aid in determining whether any documents relevant to this litigation were destroyed"; "The special master's order is consistent with the philosophy of the Federal Rules of Civil Procedure that a party should be able to obtain information relevant to the subject matter of the action and that relevancy should be construed liberally.").[19]

Request No. 15 (claims files). Plaintiffs appear to concede the relevance of the claims files.[20] They now resist production based upon alleged privacy and privilege issues. Those objections are without merit. The regulations for the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936, "unequivocally permit[] health care providers and other covered entities to disclose protected health information without patient consent in judicial proceedings." Bayne v. Provost, 359 F. Supp. 2d 234, 237 (N.D.N.Y. 2005). Under 45 C.F.R. § 164.512(e)(1), confidential medical information may be disclosed under either (1) a court order or (2) a subpoena or document request, subject to certain conditions. One such condition is a qualified protective order, to which the Outside Director Defendants will stipulate. Alternatively, the Court could order plaintiffs to produce the claims files. We also would have no objection to plaintiffs' redaction of the claims files to exclude privileged information.[21]

---

[18]    To date, plaintiffs have disclosed nothing more than (1) that "neither Kingsway nor ACHI had a written e-mail retention [sic] in effect during the relevant period prior to the start of this litigation," and (2) that "plaintiffs' management, at the inception of this litigation, was directed by appropriate persons to preserve all documents." Letter from Harold J. Ruvoldt to Hon. Henry B. Pitman, dated Mar. 20, 2006 ("Mar. 20 Letter"), at 7 (quotation omitted).

[19]    Defendants also claim that plaintiffs waived their claim of privilege by failing to include the document retention policies in a timely privilege log. That claim is to be the subject of separate briefing.

[20]    Although plaintiffs originally expressed the "belie[f that] individual claims files may not be relevant to the issues of this case," Letter from Harold J. Ruvoldt to Defense Counsel, dated Nov. 1, 2005, at 1, they now state that the claims files are "an additional basis of plaintiffs' damages," Mar. 20 Letter at 6.

[21]    The software licensing issue that plaintiffs have raised is another strawman that does not preclude production. Your Honor has directed plaintiffs to advise defense counsel of the cost of producing the claims files as hard copy print-outs, see Tr. at 66, and we await that information. In the meantime, we note that plaintiffs would bear the burden of producing the claims files in a computer readable format under Rule 26(a)(1)(B) as well as Rule 34. Cf. Super Film of Am., Inc. v. UCB Films, Inc., 219 F.R.D. 649, 656-57 (D. Kan. 2004) (ordering the production of "electronic versions of e-mail, documents, databases and

Hon. Henry B. Pitman, p. 10

        <u>Request Nos. 22 (claims payment guidelines created or used by Kingsway's outside actuaries), 23 (guidelines for setting reserves created or used by Kingsway's outside actuaries), and 24 (documents relating to Kingsway's measurement, establishment, and evaluation of reserves for losses and loss adjustment expenses).</u> These requests are highly relevant to several issues in the case, including the reasons for Kingsway's restatement, whether that restatement was required by GAAP, and Kingsway's claim of damages. Kingsway itself has stated that "[o]ur provisions for unpaid claims do not represent an exact calculation of our actual liability, but are estimates involving actuarial and statistical projections at a given point in time of what we expect to be the cost of the ultimate settlement and administration of known and unknown claims. The process for establishing the provision for unpaid claims reflects the uncertainties and significant judgmental factors inherent in predicting future results of both known and unknown claims and as such, the process is inherently complex and imprecise." Ex. Y at 18-19 (Kingsway Form F-3/A filed with the SEC on Aug. 14, 2003). If, as the documents seem to suggest, Kingsway applied different actuarial standards and had different guidelines for measuring reserves for similar businesses and adjusted ACHI's reserves by a high amount only because it was able to charge that reserves bolstering on earlier financial statements, such evidence would powerfully establish that the restatement was not necessary but only discretionary and, accordingly, that the financial statements were not fraudulently in error as reported as of December 31, 2001. Likewise, the small number of documents produced thus far in the litigation powerfully suggest that the decision to set the reserves at the mid-point of the actuarial range was made not because it was required by GAAP but because Kingsway itself deemed it advantageous to set the reserves at such a high level – as long as it could bury the expense in earlier years and blame defendants for it. If such facts are true (and that is what the documents responsive to Request Nos. 22, 23, and 24 will help defendants establish), Kingsway would at a minimum have failed to mitigate damages and its claim for $106 million in damages would be significantly overstated. At a maximum, evidence that the reserves were adjusted to a higher level than would have been required in 2001 would defeat a claim that such adjustment was obvious and thus that the defendants were reckless in not making it and therefore would defeat liability. <u>Cf.</u> <u>Goldberg v. Household Bank, F.S.B.</u>, 890 F.2d 965, 967 (7th Cir. 1989) (affirming summary judgment for defendants, whom facts indicated to be negligent at most in stating semi-annual earnings at $8.65 million rather than $7.83 million, due to incorrect computation of interest on portion of loan portfolio); <u>Druskin v. Answerthink, Inc.</u>, 299 F. Supp. 2d 1307, 1327-28 (S.D. Fla. 2004).

        In any event, plaintiffs have waived their specific objections to these requests by stating that responsive, non-privileged documents will be produced. <u>See</u> Fed. R. Civ. P. 24(b) ("The response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated."); 23 Am. Jur. 2d <u>Depositions and Discovery</u> § 165 (2005) ("Objections to the production of documents are also waived by the voluntary production of such documents.").

---

spreadsheets ... that fall within the scope of [Rule 26]," after observing that "simply turning over ... two computers ... for inspection would unfairly shift the burden and expense of discovery to [the defendant] and could potentially result in relevant and otherwise discoverable information being shielded from [the defendant]").

Hon. Henry B. Pitman, p. 11

        <u>Request No. 26 (Kingsway's valuation of other acquisition targets)</u>.  We believe that issues regarding this request have been resolved.  Plaintiffs have agreed to produce non-privileged documents responsive to Request No. 26 that concern completed acquisitions upon execution of a proposed confidentiality stipulation.

        <u>Request No. 27 (opinions of Advest, Inc. concerning any proposed Kingsway acquisition)</u>.  Advest, Inc. ("Advest") is a financial services firm that has served in various capacities for Kingsway, including dealer manager of the tender offer by which Kingsway acquired ACHI and underwriter in public offerings of Kingsway securities.  Advest's opinions concerning proposed Kingsway acquisitions are highly relevant to the claims and defenses in this case because they relate to the required elements of materiality, reliance, and damages.  Specifically, the Outside Director Defendants seek to prove that in valuing and deciding to tender for ACHI, Kingsway did not base its offer on the size of the reserves or on any calculation with respect to the balance sheet of ACHI, but rather on the value of certain contracts that ACHI had with taxicab companies in the City of Chicago.  The Outside Director Defendants also seek to establish, as a general matter, that Kingsway understood that reserves for insurance companies are inherently subjective, that it knowingly assumed the risk that the reserves of companies it acquired would have to be adjusted, that it was a sophisticated purchaser able to do its own analysis of reserves, and that it did not make its purchase decision based on analyses of reserves.

        In the meager production to date, the Outside Director Defendants have already acquired some evidence to support that theory.  Kingsway itself acknowledges that "[t]he establishment of provisions for unpaid claims is based on known facts and interpretation of circumstances and is, therefore, a complex and dynamic process influenced by a large variety of factors."  Ex. C at 57 (Kingsway Form 40-F for the fiscal year 2002).  In August 2001, Mr. Jackson, in a memo to the Kingsway Board recommending pursuing ACHI, noted that "[t]he company's operating results have been poor. ... In addition the company has a history of reserve deficiencies," but concluded, "[w]e feel that this could be an opportunity worth pursuing and to carrying out the necessary due diligence and to report back to the Board at a later date."  Ex. V (AC-21447).  There is no evidence that Kingsway re-evaluated its decision to pursue ACHI even after ACHI increased reserves in November 2001 and disclosed that earlier year reserves needed bolstering.

        Such proof would be relevant to the Outside Director Defendants' defenses with respect to several critical elements.  First, evidence that Kingsway based its offer on the value of other assets and not on the size of the reserves would defeat reliance; in short, defendants are entitled to prove that Kingsway would have made the offer for ACHI stock at the same price even if it had believed that the reserves needed bolstering.  See <u>duPont v. Brady</u>, 828 F.2d 75, 78 (2d Cir. 1987) ("If defendant can prove that plaintiff did not rely, that is, that plaintiff's decision would not have been affected even if defendant had disclosed the omitted facts, then plaintiff's recovery is barred.") (quotation omitted); <u>Miller v. Grigoli</u>, 712 F. Supp. 1087, 1094 (S.D.N.Y. 1989) (no reliance where plaintiff "was likely to make the investment, regardless of the risks").  Second, such evidence would be relevant to damages – if Kingsway valued the company based on the value of its cab contracts and not on the value of its reserves, then it cannot seek damages based on the value of the reserves.  Finally, such evidence is relevant to show that Kingsway is a sophisticated buyer.  See <u>Davidson Pipe Co. v. Laventhol & Horwath</u>, 120 F.R.D. 455, 460 (S.D.N.Y. 1988) (because sophisticated investors are "held to a higher duty of inquiry, ...

Hon. Henry B. Pitman, p. 12

evidence probative of the degree of sophistication of a plaintiff in a securities case is both admissible at trial ... and an apt subject for discovery") (internal citations omitted); see also Degulis, 176 F.R.D. at 124-25 (granting motion seeking brokerage and investment records, because plaintiff's investment sophistication and trading strategies were relevant to issue of reliance); In re The AES Corp. Sec. Litig., 849 F. Supp. 907, 909-10 (S.D.N.Y. 1994) (granting motion to compel discovery concerning past securities investments; "when direct reliance is alleged in the Complaint, plaintiffs' sophistication is relevant to the merits of these allegations and a defense of non-reliance"); In re Harcourt Brace Jovanovich, Inc. Sec. Litig. , 838 F. Supp. 109, 114 (S.D.N.Y. 1993) ("[D]iscovery relating to investment history is proper where direct reliance is alleged.").

 Request No. 28 (documents relating to adjustments in reserves and loss adjustment expenses for other companies acquired by Kingsway). Documents responsive to this request are relevant for two reasons. First, in the TAC, Kingsway suggests that it was forced to conduct an unsolicited tender offer for ACHI and that it was unaware that reserves might have to be adjusted in future years. In fact, Kingsway has engaged in a large number of acquisitions of insurance companies over the years and, on information and belief, has adjusted the reserves of those companies. Through this discovery, defendants seek to prove that Kingsway was well aware that the process of setting reserves was subjective, that no two actuaries would necessarily agree with one another, that inherent in purchasing insurance companies was the risk that the reserves would have to be adjusted, and that Kingsway could have chosen to ask for due diligence or to have negotiated a friendly merger (with a purchase price adjustment) had it had any desire to learn more information about the reserves. Second, Kingsway has engaged in a pattern of acquiring insurance companies and then adjusting their reserves and loss adjustment expenses for purposes of improving Kingsway's financial statements. In 1997, Kingsway acquired Jevco Insurance Company ("Jevco") and then brought a lawsuit against the seller and former shareholders and executives of Jevco for damages due to reserves deficiencies, even though it had been informed by Canada's insurance regulator prior to the acquisition that Jevco was undercapitalized and in danger of losing its permit. See Ex. W (JEV-000411). Kingsway similarly acquired ACHI in 2002 and then restated ACHI's reserves in 2003 in conjunction with a proposed offering of Trust Preferred securities, in which a restatement would better serve Kingsway's interests than any reduction of earnings. This sequence of events suggests that Kingsway's restatements of its acquired companies' reserves are based not on accounting requirements but on illegitimate business considerations, and Kingsway's prior reserves adjustments are directly related to the restatements at issue. See Davidson Pipe, 120 F.R.D. at 460-61 (information about plaintiffs' operation of offshore companies was relevant and subject to disclosure in case involving computer tax shelters; "where there is an adequate nexus with the investments at issue in the litigation, prior transactions will be pertinent to the question of sophistication").

 Request No. 29 (Kingsway's other litigation related to reserves deficiencies at acquired companies). We believe that this issue has been resolved with Kingsway's production of February 2006 and its commitment to supplement this production.

Hon. Henry B. Pitman, p. 13

        Request No. 62 (documents concerning the resignation of James Zuhlke). Mr. Zuhlke was a member of Kingsway's board of directors at the time of the tender offer and served as President and CEO of Kingsway America Inc. until January 2004. As referenced above, see supra at 3-4, in late October 2003, one month after the ACHI restatement, Mr. Zuhlke and Lead Director Mr. Walsh challenged Mr. Star and Mr. Jackson and stated that the latter two were inappropriately reducing reserves to manage earnings. In response, Mr. Star acknowledged that Kingsway had been under pressure to report improved results and had been unable to proceed with a public offering of Trust Preferred securities based on substantial developments in the prior year claims of Kingsway General (with a dramatic effect on Kingsway's stock price). A little more than two months later, Kingsway reorganized Mr. Zuhlke out of a job and Mr. Zuhlke resigned.

        Documents concerning Mr. Zuhlke's resignation are highly relevant to this case and clearly calculated to lead to admissible evidence. First, if, as the evidence clearly suggests, Mr. Zuhlke's departure was related to his accusation that Kingsway engaged in earnings management with respect to its use of reserves, such documents may make it more likely that Kingsway restated its results – not because it was required to – but because it chose to in order to enhance its chances to raise capital through the Trust Preferred offering. Such evidence would undermine the central claim in the case – that the restatement proves that ACHI's reserves were understated as of the end of fiscal year 2001. Second, such evidence would also suggest that the amount by which Kingsway restated the ACHI reserves was dictated, not by the requirements of GAAP (GAAP would only require that the reserves be set at a number within the actuarial range) but at the number Kingsway chose in order to improve its current earnings and its chances to have a successful offering. Third, if, as the sequence of events seems to suggest, Kingsway's decision to reorganize Mr. Zuhlke out of a job was related to his decision to challenge Mr. Star regarding earnings management, such decision would tend to lend credibility to the accusation of earnings management. Why else get rid of Mr. Zuhlke so quickly if not because he raised valid concerns? On the other hand, if the decision was not based on Mr. Zuhlke's accusations but rather was based on his performance, that decision would tend to lend credibility to the defense that the issues regarding the reserves arose in the post-tender offer period and not, as Kingsway claims, prior to the offer. Either way, they are relevant. Finally, documents regarding Mr. Zuhlke's departure clearly are relevant to the impeachment of Messrs. Star and Jackson.

Hon. Henry B. Pitman, p. 14

## CONCLUSION

We respectfully request that the Court issue an order compelling the immediate production of the documents referenced above. We are available at the Court's direction for further briefing on the issues addressed above.[22]

Respectfully submitted,

Lewis J. Liman

Attachments

cc (via Fed Ex):
    Harold J. Ruvoldt, Esq. (by hand also)
    Christopher B. Turcotte, Esq. (by hand also)
    William R. Maguire, Esq.
    Jeffrey M. Greilsheimer, Esq.
    Scott O. Reed, Esq.
    Daniel V. Marsalli, Esq.
    John S. Siffert, Esq.
    Joseph Patrice, Esq.

---

[22] This application is necessarily limited as a result of the meager production of documents to date. In particular, defendants have not had access to email production from Kingsway and there are significant concerns about the completeness of hard copy document production. While we believe that our application is amply supported, we respectfully request that if the Court believes we have not yet made a sufficient showing with respect to any particular request, it deny our request without prejudice to our renewing it upon the discovery of additional documents.