DUPLICATE

Harold J. Ruvoldt (HR-6556)
Cathy Fleming (CF-2682)
EDWARDS & ANGELL, LLP
750 Lexington Avenue
New York, New York 10022
(212) 308-4411
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KINGSWAY FINANCIAL SERVICES, INC.,
AMERICAN COUNTRY HOLDINGS INC.,
AMERICAN SERVICE INSURANCE COMPANY,
LINCOLN INSURANCE COMPANY AND
UNIVERSAL CASUALTY COMPANY

                Plaintiff,

  - against -

PRICEWATERHOUSECOOPERS, LLP., MARTIN
L. SOLOMON, EDWIN W. ELDER, WILLIAM J.
BARRETT, WILMER J. THOMAS, JR., JOHN A.
DORE, AND KARLA VIOLETTO,

                Defendants.

03 Civ. 5560 (RMB)

**JURY TRIAL DEMANDED**

## THIRD AMENDED COMPLAINT

       Plaintiff Kingsway Financial Services, Inc. ("Kingsway") American Country Holdings Inc.,

American Service Insurance Company, Lincoln Insurance Company and Universal Casualty

Company (collectively Kingsway Subsidiaries"), by their undersigned attorneys, brings this Third

Amended Complaint ("Complaint") against Defendants PricewaterhouseCoopers, LLP ("PwC"),

Martin L. Solomon, Edwin W. Elder, William J. Barrett, Wilmer J. Thomas, Jr., John A. Dore, and

Karla Violetto (collectively "Defendants") alleging as follows:

## NATURE OF THE CLAIM

1.    This action was commenced by Plaintiff Kingsway: (i) as a securities purchaser against Defendants for common law fraud, securities fraud and negligence in connection with Plaintiff's tender offer for the acquisition of a publicly held company known as American Country Holdings, Inc. ("ACHI"), which commenced on or before February 27, 2002 and closed on or about April 1, 2002 ("Tender Offer"); (ii) as a pre-acquisition stockholder of ACHI against Defendants Dore, Solomon, Barrett, Thomas, Elder and Violetto for making materially false and misleading statements to stockholders in connection with the tendering of their stock during the Tender Offer; (iii) as a securities purchaser against Defendant Dore and Defendants Violetto, Barrett, Thomas, Elder and Solomon for concealing Defendants' fraud from Kingsway during Kingsway's negotiations to make an offer for the acquisition of ACHI; and (iv) as ACHI's new parent company against Defendant Dore during Kingsway's post-acquisition investigation of his fraud committed in violation of his fiduciary and contractual obligations.

2.    ACHI commences this action against Dore for: (i) declaratory relief, (ii) damages and recoupment of salary, (iii) benefits and securities provided to Dore in connection with his agreement with other conspirators to enter into an employment contract for the purpose of defrauding Kingsway, ACHI's stockholders, and potential suitors of ACHI.  Count VI specifically deals with Dore's breach of fiduciary duty prior to, during, and after the Tender Offer.

3.    The Tender Offer involved the purchase and acquisition of the outstanding stock of ACHI and the merger of Kingsway's wholly owned subsidiary KFS Acquisition Corp. into ACHI (the "Acquisition").  Because Defendants Violetto, Barrett, Thomas, Elder, Dore and Solomon orchestrated the Tender Offer to be a hostile takeover of ACHI, Kingsway was forced to rely on

NYC_206950_2

ACHI's public filings and press releases to assess ACHI's financial condition. Defendants Violetto, Barrett, Thomas, Elder, Dore and Solomon employed an unlawful scheme to make false statements and to conceal material information from Kingsway that would have been available in a non-hostile environment. Defendants Violetto, Barrett, Thomas, Elder, Dore and Solomon were aware that providing truthful information and/or access to other material information would lead to the discovery of the true value of ACHI and disclose their fraudulent activities. In addition, Defendants Violetto, Barrett, Thomas, Elder, Dore and Solomon had denied this material information to Kingsway.

4.      From 1999 through 2002 (the "Relevant Period"), Defendants Thomas, Elder, Violetto, Barrett, Dore and Solomon fraudulently caused and maintained an inflated stock price of ACHI through their actions and/or omissions of willfully, fraudulently and/or negligently understating the insurance loss reserves ("reserves") of ACHI's wholly-owned subsidiary American Country Insurance Company ("ACIC," collectively referred to as the "Company") to such a distorted degree as to be beyond any actuarially sound range.

5.      Kingsway made its Tender Offer to ACHI in reliance on (i) oral and written representations made by Defendants Thomas, Elder, Violetto, Barrett, Dore and Solomon concerning ACHI's financial condition; (ii) ACHI's financial statements, as represented in public filings which were audited by ACHI's purportedly "independent" auditors; (iii) press statements by Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto and other false statements which were made by Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto to regulators and the investing public and to Kingsway; (iv) Defendant PwC's false statements holding itself out as an "independent" auditor, even though Defendant PwC had knowledge of the artificially inflated and manipulated stock price because it was knowingly involved in the conspiracy as a vital acting

NYC_206950_2

participant. The representative financial statements and public filings were prepared by Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto acting individually and in concert.

6.    Unaware of Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto's fraud and Dore's role in it, Dore was appointed ACHI's Chairman, President and CEO after the Acquisition. Defendant Dore breached his fiduciary duty as CEO of Kingsway's subsidiary, ACHI, after the Acquisition and failed to perform his duties as a faithful employee. Dore instead fraudulently concealed his role in the conspiracy to grossly understate ACHI's reserves in order to keep the stock price fraudulently and artificially inflated and manipulated.

7.    Unbeknownst to Kingsway, the SEC, and the general public, but known to the individual Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto, and PwC, ACHI's public filings prior to the Acquisition contained fraudulent and material misstatements and omissions concerning ACHI's true financial condition. Defendants including Solomon, Elder, Barrett, Thomas, Dore and Violetto were responsible for manipulating financial information and causing and maintaining an inflated stock price by filing materially false and misleading statements concerning ACIC's reserves as reflected on ACHI's balance sheets.

8.    By virtue of the unsolicited nature of the Tender Offer, Defendants' fraud was not discovered until after Kingsway had acquired ACHI's stock. Only after the acquisition was Kingsway able to obtain accurate financial information. Kingsway has been damaged as a result of Defendants' actions because Kingsway purchased ACHI's stock at an artificially fraudulently manipulated and inflated price by acquiring a company whose value was severely less than the publicly available information would have led a reasonable investor to conclude.

NYC_206950_2

9.    Upon discovering that the reserves were grossly, actuarially unsound, Kingsway and ACHI launched an inquiry to ascertain ACHI's true financial condition. Defendant Dore continued to cover up the conspiracy and continued to misrepresent ACHI's pre-acquisition financial condition by supplying false information. Defendant Dore's conduct in covering up Defendants' conspiracy was a breach of his fiduciary duties to Kingsway and ACHI. On or about April 15, 2003, Defendant Dore resigned precipitously because he was aware that he was about to be terminated "for cause" by ACHI under the terms of his Employment Contract due to (i) his failure to discharge his duties properly after the Tender Offer, and (ii) his knowledge that his active participation in the securities fraud conspiracy was about to be uncovered.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, and 1367, and Section 27 of the Securities Exchange Act [15 U.S.C. § 78aa].

11.    In addition, jurisdiction and venue are proper in this District pursuant to Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), insofar as many of the acts and omissions complained of herein occurred in this District, including but not limited to: (i) the board meetings where the discussions and decision to understate grossly ACHI's reserves as a means to inflate falsely the stock price occurred in this District; (ii) the annual meetings where the purportedly independent auditors were elected took place in this District; (iii) the meetings at which the co-conspiring actuaries were retained, and the second set of actuaries were retained to

NYC_206950_2

understate the reserves occurred in this District; (iv) the investment banking firm ACHI used in connection with the Tender Offer maintained an office in this District; (v) ACHI acquired licenses in New York and submitted required, yearly insurance filings to the New York State Insurance Commissioner beginning in 1999, all of which occurred in this District; (vi) ACHI underwrote insurance in New York and was required to keep insurance reserves sufficient to pay out all insurance claims underwritten in New York, (vii) ACHI was subject to and violated New York regulations relating to the issuance of insurance; (viii) ACHI's grossly, actuarially unsound reserves placed at risk the property rights of New York citizens; (ix) the Tender Offer closed in New York; (x) annual reports were sent to stockholders in the District through the United States mails. The annual reports contained false and misleading statements and were signed by the Defendant PwC and other individual Defendants as more specifically set forth hereinafter; and (xi) numerous false statements necessary to perpetuate and conceal the Defendants' fraud were disseminated in this District.

12.    In connection with the acts and omissions alleged in this Third Amended Complaint, Defendants, acting alone or in concert, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets, including trading on the NASDAQ small cap market, to mislead and defraud the public concerning the true nature of ACHI's financials.

<u>**THE PARTIES**</u>

<u>**Plaintiff**</u>

13.    Plaintiff Kingsway Financial Services, Inc. is a financial services holding company engaged in the business of property and casualty insurance, organized under the laws of the

NYC_206950_2

province of Ontario, Canada, with the address 5310 Explorer Drive, Suite 200, Mississauga, Ontario, L4W 5H8.

14.    Plaintiff Lincoln General Insurance Company ("Lincoln") is a wholly owned subsidiary of Kingsway with an address at 3350 Whiteford Road, P.O. Box 3709, York, Pennsylvania 17402-0136.

15.    Plaintiff American Country Holdings Inc. ("ACHI") is a wholly owned subsidiary of Kingsway with an address at 150 Northwest Point Boulevard, Suite 300, Elk Grove Village, Illinois 60007-1040.

16.    Plaintiff American Service Insurance Company Inc. ("American Service") is a wholly owned subsidiary of Kingsway with an address at 150 Northwest Point Boulevard, Elk Grove Village, Illinois 60007.

17.    Plaintiff Universal Casualty Company ("Universal Casualty") is a wholly owned subsidiary of Kingsway with an address at 150 Northwest Point Boulevard, Elk Grove Village, Illinois 60007.

**Audit and Actuarial Defendant**

18.    Defendant PricewaterhouseCoopers, LLP ("PwC") is an accounting firm incorporated under the laws of Delaware, with numerous offices across the United States and around the world. PwC's principal place of business is 1177 Avenue of the Americas, New York, New York 10036. PwC maintains an office at 203 North LaSalle Street, Chicago, Illinois 60601. The Chicago offices of PwC purported to be the independent auditors for ACHI's publicly filed financial statements while at the same time providing actuarial services to ACHI from 1998 to 2002. PwC was a member of the Board of American Institute of Certified Public Accountants

7

NYC_206950_2

(AICPA). PwC issued unqualified and purportedly independent audit opinions on ACHI's

consolidated financial statements for the years ending December 31, 1998, December 31, 1999,

December 31, 2000, and December 31, 2001.

### Individual Board Member and Control Person Defendants

### John Dore

19.     Defendant John A. Dore ("Dore") was the Chairman, Chief Executive Officer

("CEO") and Director of ACHI, and President of ACHI from on or about August 28, 2000 through

April 15, 2003. Dore served as a consultant for ACHI prior to his role as CEO. As a Director,

Dore signed ACHI's 10-Ks for the years ending December 31, 2000, and 2001. At the time of the

Acquisition, Dore owned 10.6% of the common stock and 17.54% of the Class A Warrants of

ACHI. Defendant Dore held stock in the total amount of $2,169,301.57, which exceeded the value

of his interest had the true value of the company been determined based upon truthful financial

information.

20.     After the Acquisition, Dore, in furtherance of his agreement with the other

Defendants Thomas, Barrett, Elder, Solomon, and Violetto, continued to conceal the fraud that he

and the other defendants were perpetrating on the public, generally, and on Kingsway, specifically.

Dore abruptly resigned on or about April 15, 2003 because he was aware that he was about to be

terminated "for cause." Dore knew that Kingsway's discovery of the existence of the securities

fraud conspiracy, and his role in it, was imminent. Defendant Dore is domiciled at 286 Sheridan

Road, Winnetka, Illinois 60093.

NYC_206950_2

**Martin L. Solomon**

21.    Defendant Martin L. Solomon ("Solomon") was the Chairman and CEO of ACHI from on or about July 25, 1997 through August 28, 2000 and remained a director of ACHI through the Acquisition. Solomon was a member of ACHI's audit committee during the Relevant Period. Solomon was also a controlling shareholder of ACHI during the Relevant Period, owning 27.8% of ACHI's stock prior to the Acquisition. Defendant Solomon held stock in the total amount of $5,980,497.60 which exceeded the value of his interest had the true value of the company been determined based upon truthful financial information.

22.    As a director, Solomon signed ACHI's 10-Ks for the years ending December 31, 1998, 1999, 2000, and 2001.

23..    Defendant Solomon is domiciled at Brickell Avenue, Apt. 4902, Miami, Florida 33156.

**Edwin Elder**

·24.    Defendant Edwin Elder ("Elder") was a Director and the Executive Vice President of ACHI and President of ACIC from on or about July 25, 1997 through August 17, 2000. Elder remained a director through the Acquisition. At the time of the Acquisition, Elder owned 43,853 shares of ACHI's common stock. Defendant Elder held stock in the total amount of $92,091.30, which exceeded the value of his interest had the true value of the company been determined based upon truthful financial information.

25.    Elder signed ACHI's materially misleading 10-Ks for the years ending December 31, 1998, 1999, 2000, and 2001.

26.    Elder is domiciled at 447 Tanasi Way, Loudon, Tennessee 37774.

NYC_206950_2

**William J. Barrett.**

27.    Defendant William J. Barrett ("Barrett") was a Director and the Secretary of ACHI from 1997 until 1999. Barrett served as the Chairman of ACHI's Audit Committee from 1999 through the Acquisition.

28.    Barrett signed ACHI's materially misleading 10-Ks for the years ending December 31, 1998, December 31, 1999, December 31, 2000, and December 31, 2001. At the time of the Acquisition, Barrett owned 3.5% of the common stock of ACHI. Defendant Barrett held his stock in the total amount of $720,203.20, which exceeded the value of his interest had the true value of the company been determined based upon truthful financial information.

29.    Defendant Barrett is domiciled in St. Barthelemy, French West Indies.

**Wilmer J. Thomas, Jr.**

30.    Wilmer J. Thomas, Jr. ("Thomas") was a Director and the Vice Chairman of ACHI and a member of ACHI's Audit Committee through the Acquisition. Thomas was a controlling shareholder of the ACHI, owning 28.8% of ACHI's common stock through the Acquisition. Defendant Thomas held stock in the total amount of $5,825,580.60, which exceeded the value of his interest had the true value of the company been determined based on truthful financial information.

31.    As a director, Thomas signed ACHI's materially misleading 10-Ks for the years ending December 31, 1998, December 31, 1999, December 31, 2000, and December 31, 2001.

32.    Defendant Thomas is domiciled at 101 Selleck Hill Road, Salisbury, Connecticut 06068.

**Karla Violetto**

33.    Defendant Karla Violetto ("Violetto"), a Certified Public Accountant, was a senior associate at PwC and in that role was an active participant in the audit of ACHI for 1998 to 1999. Violetto was ACHI's Manager of Corporate Reporting and Financing between July 1999 until March 2000, and was the Vice President and Chief Financial Officer ("CFO") of ACHI through the Acquisition.

34.    At the time of the Acquisition, Violetto owned 53, 271 shares of the common stock of ACHI. Defendant Violetto held stock in the total amount of $111,869.10, which exceeded the value of her interest had the true value of the company been determined based on truthful financial information. As an officer, Violetto signed ACHI's 10-Ks for the years ending December 31, 1999, December 31, 2000, and December 31, 2001.

35.    Defendant Violetto is domiciled at 1 South 509 Leahy Road, Oakbrook Terrace, Illinois 60181.

**Non-Defendants Named In Third Amended Complaint**

36.    Miller, Herbers Lehman & Associates ("Miller Herbers") is an actuarial and consulting firm incorporated under the laws of Illinois and its principal place of business is 2817 Reed Road, Suite No. 2, Bloomington, Illinois 61704. The Bloomington offices of Miller Herbers were responsible for providing actuarial services, including the issuance of yearly reserve certifications, to ACHI between 1999 – 2001.

NYC_206950_2

<u>Robert Silver</u>

37.    Robert Silver ("Silver") was the Vice President of Operations Control of ACIC during the Relevant Period, and was responsible for pricing ACHI's insurance. The pricing function performed by Silver was linked to the setting of reserves.


## THE SECURITIES LAW CLAIMS

38.    This case involves the purchase of securities issued by the Company.

39.    The Defendants, acting in concert as co-conspirators, violated the Securities Exchange Act of 1934.

40.    Specifically, the Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission, which imposed a duty upon the Defendants not to employ any device, artifice, or scheme to defraud; or to make any untrue statements of material fact or to omit to state a material fact which is necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon Kingsway.

41.    Section 20(a) of the Securities Exchange Act of 1934 provides that "[e]very person who directly or indirectly controls any person liable under any provision of this chapter or any regulation thereunder shall also be liable jointly and severally with and to the same extent as such controller person to any person to whom such controller person is liable."

NYC_206950_2

42.     The concept of "control" is broadly defined in this section and includes any "indirect

means of discipline or influence short of actual direction" or "ability to exert influence, directly or

indirectly, over the decision making process of another person."

.43.     Defendants Dore, Barrett, Solomon, Thomas, Elder and Violetto, individually and as

co-conspirators, exercised great control over each other as fellow officers and directors.  These

Defendants directed and oversaw the preparation of the fraudulent public financial statements the

Company filed with the SEC and state agencies, and released to the public, in order to understate

the reserves, at an actuarially inadequate level. This caused the artificially high stock price that

Kingsway had to pay for the stock, thus embellishing their own financial stakes in the Company's

prospects while PwC made handsome and undeserved fees.

44.     Section 14(e) prohibits the making of untrue or misleading statements of material

fact and the misleading omissions of material fact in connection with any tender offer.

45.     Defendants Barrett, Thomas, Elder, Solomon, Dore and Violetto made numerous

false and material statements and omissions of material fact in connection with the public filings

that grossly set and understated the Company's reserves at an actuarially unsound level and thereby

materially distorted the Company's true financial state and worth.

46.     Moreover, Defendant PwC made materially false statements in relation to (i) the

alleged independence of its yearly audit opinions, (ii) the accuracy of financials being consistent

with accounting principles generally accepted in the United States of America ("GAAP"), and

(iii) the audits were performed in accordance with auditing standards generally acceptable in the

United States of America ("GAAS").

47.     Defendants Barrett, Thomas, Elder, Solomon, Dore and Violetto clearly had the

intent to deceive.  The tender process was orchestrated by the Defendants Barrett, Thomas, Elder,

NYC_206950_2

Solomon, Dore and Violetto to be hostile and they knew that Kingsway's only access to any information about the Company's financial standing was through the public filings and statements which the Defendants knew to be false.

48.     Kingsway relied upon these materially false statements and omissions by the Defendants in all of its stock purchases, up to and including the Tender Offer, to its great detriment. On account of Defendants Barrett, Thomas, Elder, Solomon, Dore and Violetto's violations of Section 14(e), Kingsway was forced to pay more per share prior to and in the Tender Offer than was actually warranted had Defendants Barrett, Thomas, Elder, Solomon, Dore and Violetto filed honest, truthful and accurate information.

## DUTIES AND STANDARDS

### Code of Professional Conduct of American Institute of Certified Public Accountants

49.     The following standards for professional conduct of Certified Public Accountants applied to PwC and Karla Violetto. The American Institute of Certified Public Accountants ("AICPA") sets forth the accounting standards, in the rules section of the Code of Professional Conduct ("Rule"), to be followed by Certified Public Accountants, and governed Accounting defendant PwC's and Karla Violetto's conduct during the Relevant Period.

50.     Rule 101 requires that a member in public practice shall be independent in the performance of professional services as required by standards promulgated by bodies designated by Council. PwC violated Rule 101 as more fully set forth but not limited to ¶¶ 226, 238, 270, 271, 272, 274 and 279 of the Complaint.

51.     Rule 102 requires that in the performance of any professional service, a member shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not

14

knowingly misrepresent facts or subordinate his or her judgment to others. PwC violated Rule 102 as more fully set forth but not limited to ¶¶ 173,177, 226, 270, 265, 272 and 279 of the Complaint.

52.    Rule 102-1 requires that a member shall be considered to have knowingly misrepresented facts in violation of rule 102 when he or she knowingly-

      a.    Makes, or permits or directs another to make materially false and misleading entries in an entity's financial statements or records; or

      b.    Fails to correct an entity's financial statements or records that are materially false and misleading when he or she has the authority to record an entry; or

      c.    Signs, or permits or directs another to sign, a document containing materially false and misleading information.

PwC violated Rule 102-1, as more fully set forth but not limited to ¶¶ 173, 177, 183, 190, 226, 238, 271, 272, 273, 274, and 279.

53.    Rule 102-3 requires that in dealing with his or her employer's external accountant, a member must be candid and not knowingly misrepresent facts or knowingly fail to disclose material facts. This would include, for example, responding to specific inquiries for which his or her employer's external accountant requests written representation. Karla Violetto violated Rule 102-3 as more fully set forth but not limited to ¶¶ 190 of the Complaint.

54.    Rule 501 requires that a member shall not commit an act discreditable to the profession. PwC and Karla Violetto violated Rule 501 as more fully set forth but not limited to ¶¶ 173, 183, 190, 226, 238, 270, 271, 272, 274 and 279 of the Complaint.

NYC_206950_2

55.    Rule 501-4 addresses negligence in the preparation of financial statements or records.  Karla Violetto and PwC violated Rule 501-4, as more fully set forth in, but not limited to, ¶¶ 173, 177, 183, 226, 238, 270, 271, 272, 274 and 279 of the Complaint.  A member shall be considered to have committed an act discreditable to the profession in violation of rule 501 when, by virtue of his or her negligence, such member:

      a.  Makes, or permits or directs another to make, materially false and misleading entries in the financial statements or records of an entity; or

      b.  Fails to correct an entity's financial statements that are materially false and misleading when the member has the authority to record an entry; or

      c.  Signs, or permits or directs another to sign, a document containing materially false and misleading information.

**Standards of the Independence Standards Board**

56.    The following standards applied to PwC and were violated by them as more fully set forth but not limited to ¶ 192 of the Complaint.

57.    Beginning in around July of 1999, the Independence Standards Board ("ISB") was developed from discussions between the American Institute of Certified Public Accountants ("AICPA"), other representatives of the accounting profession, and the U.S. Securities and Exchange Commission ("SEC"), and governed Defendant PwC's conduct during the Relevant Period.

58.    ISB Standard No. 1 applies to any auditor intending to be considered an independent accountant with respect to a specific entity within the meaning of the Securities Acts ("the Acts") administered by the SEC.  At least annually, such an auditor shall:

NYC_206950_2

a.  disclose to the audit committee of the company (or the board of directors if there is no audit committee), in writing, all relationships between the auditor and its related entities and the company and its related entities that in the auditor's professional judgment may reasonably be thought to bear on independence;

b.  confirm in the letter that, in its professional judgment, it is independent of the company within the meaning of the Acts; and

c.  discuss the auditor's independence with the audit committee.

59.    ISB Standard No. 3 Employment with audit client sets forth that an audit firm's independence is impaired with respect to an audit client that employs a former firm professional who could, by reason of his or her knowledge of and relationships with the audit firm, adversely influence the quality or effectiveness of the audit, unless the firm has taken steps that effectively eliminate such risk.

60.    An established program of safeguards including the following procedures, when conscientiously administered, are deemed to constitute steps that effectively eliminate the risk of independence impairment:

a.  Pre-change in employment safeguards:

i.  Firm professionals are required promptly to report to the firm conversations between themselves and an audit client respecting possible employment.

ii.  Firm professionals engaged in negotiations respecting possible employment with an audit client are immediately removed from the audit engagement.

NYC_206950_2

    iii.  Upon removal of a professional from the audit engagement as provided above, the firm reviews the professional's work to assess whether he or she exercised appropriate objectivity while working on the audit engagement.

b.  Post-change in employment safeguards:

    i.  If a professional accepts employment with the audit client, the on-going engagement team gives active consideration to the appropriateness or necessity of modifying the audit plan to adjust for risk of circumvention.

    ii.  When a former firm professional joins an audit client and will have significant interaction with the audit team, the firm takes appropriate steps to provide that the existing audit team members have the stature and objectivity to effectively deal with the former firm professional and his or her work.

    iii.  When a former firm professional joins an audit client within one year of disassociating from the firm and the professional has significant interaction with the audit team, the next following annual audit is separately reviewed by a firm professional uninvolved in the audit to determine whether the remaining engagement team maintained the appropriate skepticism when evaluating the representations and work of a former firm professional.  The extent of this review should be tailored based on the position that the former professional has assumed at the audit client and other facts and circumstances that would heighten or mitigate threats to independence.

    iv.  The firm requires the prompt (1) liquidation of all capital balances of former firm partners who become employed by an audit client;  (2) settlement of all retirement balances of former firm professionals who become so employed

NYC_206950_2

that are not both immaterial to the firm and fixed as to amount and timing of

payment; and (3) settlement of retirement balances of any firm professional,

regardless of the financial immateriality of such balances to the firm, when,

within five years of disassociating from the firm the identity of such former

firm professional as an officer or employee of the audit client is required to

be disclosed in the audit client's proxy statement or annual report filed with

the Securities and Exchange Commission (SEC) pursuant to its regulations.

61.    PwC was obligated to follow standards set by the Statement of Standard Accounting

Practices (SSAP).

## Statutory Accounting Principles

62.    Defendants PwC, Solomon, Elder, Barrett, Thomas, Dore and Violetto were

obligated to follow standards set by the Statement of Standard Accounting Practices (SSAP). PwC

and Violetto violated SSAP as more fully set forth in, but not limited to, ¶¶ 226, 270, 271, 272 and

279 of the Complaint.

### SSAP No. 55, Unpaid Claims, Losses, and Loss Adjustment Expenses

63.    Pursuant to SSAP No. 55, claims, losses, and gain/claim adjustment expenses shall

be recognized when a covered or insured event occurs. In most instances, the covered or insured

event is the occurrence of an incident which gives rise to a claim or the incurring of costs. For

claims made type policies, the covered or insured event is the reporting to the entity of the incident

that gives rise to a claim. Claim payments and related expense payments are made subsequent to

the occurrence of a covered or insured event and, in order to recognize the expense of a covered or

NYC_206950_2

insured event that has occurred, it is necessary to establish a liability. Liabilities shall be

established for any unpaid claims and unpaid losses (loss reserves), unpaid loss/claim adjustment

expenses (loss/claim adjustment expense reserves) and incurred costs, with a corresponding charge

to income. As more fully set forth in paragraphs 210, 222, 254, 258 and 263 of the complaint, PwC

and Violetto violated SSAP No. 55.

      64.    Pursuant to SSAP No. 55, for each line of business and for all lines of business in

the aggregate, management shall record its best estimate of its liabilities for unpaid claims, unpaid

losses and loss/claim adjustment expenses, because the ultimate settlement of claims (including

"IBNR" incurred but not realized for death claims and accident and health claims) is subject to

future events; no single claim or loss and loss/claim adjustment expense reserve can be considered

accurate with certainty. Management's analysis of the reasonableness of claim or loss and

loss/claim adjustment expense reserve estimates shall include an analysis of the amount of

variability in the estimate. If, for a particular line of business, management develops its estimate

considering a range of claim of loss and loss/claim adjustment expense reserve estimates bounded

by a high and a low estimate, management's best estimates of the liability within that range shall be

recorded. The high and low ends of the range shall not correspond to an absolute best and worst

case scenario of ultimate settlements because such estimates may be the result of unlikely

assumptions. Management's range shall be realistic and, therefore, shall not include the set of all

possible outcomes but only those outcomes that are considered reasonable. As more fully set forth

in paragraphs of the Complaint, PwC and violated SSAP No. 55.

      65.    Pursuant to SSAP No. 55, the financial statements shall include the following

disclosures for each year full financial statements are presented:

NYC_206950_2

a.  The balance in the liabilities for unpaid claims and unpaid losses and loss/claim adjustment expense reserves at the beginning and end of each year presented;

b.  Incurred claims, losses and loss/claim adjustment expenses with separate disclosures of the provision for insured or covered events of the current year and increases or decreases in the provision for insured or covered events of prior years;

c.  Payments of claims, losses, and loss/claim adjustment expenses with separate disclosures of payments of losses and loss/claim adjustment expenses attributable to insured or covered events of the current year and insured or covered events of prior years;

d.  The reasons for the change in the provision for incurred claims, losses and loss/claim adjustment expenses attributable to insured or covered events of prior years. The disclosure should indicate whether additional premiums or return premiums have been accrued as a result of the prior-year effects;

e.  A summary of management's policies and methodologies for estimating the liabilities for losses and loss/claim adjustment expenses including discussion of claims for toxic waste cleanup, asbestos-related illnesses, or other environmental remediation exposures;

f.  Disclosure of the amount paid and reserved for losses and loss/claim adjustment expenses for asbestos and/or environmental claims, on a gross and net of reinsurance basis (the reserves required to be disclosed in this section shall exclude amounts relating to policies specifically written to cover asbestos and environmental exposures); and

g.   Estimates of anticipated salvage and subrogation (including amounts recoverable from second injury funds, other governmental agencies, or quasi-governmental agencies, where applicable), deducted from the liability for unpaid claims or losses.

66.     As more fully set out in paragraphs of the Complaint, all defendants violated SSAP No. 55 as set forth in, but not limited to, ¶¶ 226, 238, 270, 271, 272, 274 and 279 of the Complaint.

SSAP No. 65, Property and Casualty Contracts

67.     Pursuant to SSAP No. 65, the reporting entity shall provide an Actuarial Opinion and Report in conformity with the NAIC *Annual Statement Instructions for Property and Casualty Insurers*. The scope paragraph of the actuarial opinion shall include the following three items: the Reserve for Ceded Unearned Premiums (as reported on Page 3 of the Annual Statement), the Reserve for Direct Unearned Premiums (as reported on the State Page) and the Reserve for Net Unearned Premiums (as reported on Page 3). These three items must also be covered in the opinion and relevant comment paragraphs of the actuarial opinion. The actuarial opinion shall also disclose the following with regard to both direct insurance and reinsurance assumed subject to this rule:

a.   The provision for investment income in the projected future losses and expenses under expired policies; and

b.   The amount of reduction in unearned premium and loss reserves for each of the following: (i) salvage and subrogation; (ii) reinsurance; (iii) credits for deductibles and self-insured retentions; and (iv) other statutory approved credits.

68.     As more fully set forth in paragraphs of the Complaint, all defendants violated SSAP No. 65, as set forth in, but not limited to, ¶¶ 226, 238, 270, 271, 272, 274 and 279 of the Complaint.

NYC_206950_2

**The Auditing Standards**

69.     The following auditing standards applied to PwC and Violetto and were violated by

PwC and Violetto, as more specifically set forth in, but not limited to ¶¶ 226, 270, 271, 272, 277

and 279 of the Complaint.

70.     Statement of Auditing Standard ("SAS") 82 requires that auditors conduct audits

with a degree of professional skepticism when considering the possibility that a material mistake

due to fraud could be present.

71.     AU Section 315 governs Communications Between Predecessor and Successor

Auditors. This section provides guidance on communications between predecessor and successor

auditors when a change of auditors is in process or has taken place. It also provides

communications guidance when possible misstatements are discovered in financial statements

reported on by a predecessor auditor. This section applies whenever an independent auditor is

considering accepting an engagement to audit or reaudit financial statements in accordance with

generally accepted auditing standards, and after such auditor has been appointed to perform such an

engagement.

72.     AU Section 150 governs generally accepted auditing standards. An independent

auditor plans, conducts and reports the results of an audit in accordance with generally accepted

auditing standards. PwC and Violetto violated AU 150, as more fully set forth in, but not limited

to, ¶¶ 173, 177, 183, 184, 226, 238, 266, 268, 270, 271, 272, 274 and 279 of the Complaint. The

general, field work and reporting standards (the 10 standards) approved and adopted by the

membership of the AICPA; as amended by the AICPA Auditing Standards Board are as follows:

NYC_206950_2

**General Standards**

73.    No. 1.  The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

74.    No. 2.  In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.

75.    No. 3.  Due professional care is to be exercised in the performance of the audit and the preparation of the report.

**Standards of Field Work**

76.    No. 1.  The work is to be adequately planned and assistants, if any, are to be properly supervised.

77.    No. 2.  A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

78.    No. 3.  Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. (AU 326)

**Standards of Reporting**

79.    No. 1.  The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).

80.    No. 2.  The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

NYC_206950_2

81.    No. 3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

82.    No. 4. The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefor should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

83.    AU Section 220 requires that the auditor be independent; aside from being in public practice (as distinct from being in private practice), he must be without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be.

84.    AU 312 governs the Audit Risk and Materiality in Conducting an Audit Section 312 provides guidance on the auditor's consideration of audit risk and materiality when planning and performing an audit of financial statements in accordance with generally accepted auditing standards. Audit risk and materiality affect the application of generally accepted auditing standards, especially the standards of field work and reporting, and are reflected in the auditor's standard report. Audit risk and materiality, among other matters, need to be considered together in determining the nature, timing, and extent of auditing procedures and in evaluating the results of those procedures. PwC violated AU 312, as set forth in but not limited to ¶¶ 268 and 274 of the Complaint.

85.    AU Section 316 governs the Consideration of Fraud in a Financial Statement Audit. Section 110, *Responsibilities and Functions of the Independent Auditor,* states, "The auditor has a