responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud. This section establishes standards and provides guidance to auditors in fulfilling that responsibility, as it relates to fraud, in an audit of financial statements conducted in accordance with generally accepted auditing standards (GAAS). PwC violated AU 316, as more fully set forth in, but not limited to, ¶ 229 of the Complaint.

86.    AU Section 110 governs the Responsibilities and Functions of the Independent Auditor. The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states whether his audit has been made in accordance with generally accepted auditing standards. These standards require him to state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.

87.    AU Section 336 governs using the Work of a Specialist. The purpose of this section is to provide guidance to the auditor who uses the work of a specialist in performing an audit in accordance with generally accepted auditing standards. For purposes of this section, a specialist is a person (or firm) possessing special skill or knowledge in a particular field other than accounting or auditing. Specialists to which this section applies include, but are not limited to, actuaries, appraisers, engineers, environmental consultants, and geologists.

NYC_206950_2

88.     Section AU 333 governs Management Representations.  The objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles. The auditor's report is the medium through which he expresses his opinion or, if circumstances require, disclaims an opinion. In either case, he states whether his audit has been made in accordance with generally accepted auditing standards. These standards require him to state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed in the preparation of the financial statements of the current period in relation to those of the preceding period.

89.     Section AU 342 governs Auditing Accounting Estimates.  This section provides guidance to auditors on obtaining and evaluating sufficient competent evidential matter to support significant accounting estimates in an audit of financial statements in accordance with generally accepted auditing standards. For purposes of this section, an *accounting estimate* is an approximation of a financial statement element, item, or account. Accounting estimates are often included in historical financial statements because:

    a.   The measurement of some amounts or the valuation of some accounts is uncertain, pending the outcome of future events.

    b.   Relevant data concerning events that have already occurred cannot be accumulated on a timely, cost-effective basis.

PwC violated AU 342, as more fully set forth in, but not limited to, ¶¶ 268 and 274 of the Complaint.

NYC_206950_2

90.    Auditors are *required* "to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 311.04. Similarly, AU §§ 110.02, 316.01 and 316.09 provide that "[a]lthough fraud is usually concealed, *the presence of risk factors or other conditions may alert the auditor to the possibility that fraud may exist. For example, a document may be missing... or an analytical relationship may not make sense....*" (emphasis added). Therefore, auditors are *required* to "specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed...." AU § 316.12.

91.    In making this assessment, auditors are required to thoroughly investigate fraud risk factors – that is, "red flags" – that are apparent from the financial statements themselves or from the characteristics of ACHI. These red flags are specifically described in AU § 316.17. In addition, GAAS emphasizes that "fraud risk factors may be identified while performing procedures . . ., during engagement planning or while obtaining an understanding of an entity's internal control, or while conducting fieldwork." AU § 316.25. That section then goes on to list additional "red flags" relating to (a) "discrepancies in accounting records," (b) "conflicting or missing evidential matter," and (c) "problematic or unusual relationships between the auditor and client" that an auditor must thoroughly investigate if he is going to represent that he conducted his audit in compliance with GAAS.

92.    Defendant PwC violated AU 316.17 as more specifically set forth hereinafter, but not limited to ¶ 227.

**Accounting Rules of the SEC**

93.     Rule 2-01 of the Exchange Act, 17 CFR § 210, is designed to ensure that auditors are qualified and independent of their audit clients both in fact and in appearance. Accordingly, the rule sets forth restrictions on financial, employment, and business relationships between an accountant and an audit client and restrictions on an accountant providing certain non-audit services to an audit client.

94.     Rule S-X Article 7, 17 CFR §210.07 to 210.7-05, governs the reporting of financial statements of insurance companies, including the standards for balance sheets, liability and stockholder's equity, income statements including revenues, benefits, losses, and expenses, and what schedules are to be filed.  Defendants Violetto, Barrett, Dore, Thomas, Elder and Solomon violated Rule S-X Art. 7, as set forth more fully in but not limited to ¶¶ 226, 238, 270, 271, 272, 274 and 279 of the Complaint.

95.     Securities and Exchange Guide 6 governs Disclosures Concerning Unpaid Claims and Claim Adjustment Expenses of Property Casualty Insurance Underwriters, which requires the Company's management to state the amount of the difference, if any, between GAAP basis P/C reserves for claims and claim adjustment expenses for each of the groups mentioned in the next to last paragraph of Item 1 of this Guide and statutory P/C reserves for claims and claim adjustment expenses in total for each of those groups.

**Accounting Principles Promulgated Under the Financial Accounting Standards Board ("FASB")**

96.     The following accountant standards applied to PwC and Violetto and was violated by PwC and Violetto as more specifically set forth herein, but not limited to, ¶¶ 211, 212, 213, 214, 215, 216, 217, 218, 220, 226, 238, 270, 271, 272, 274 and 279 of the Complaint.

NYC_206950_2

97.    FASB No. 5 sets forth the standards governing accounting contingencies, including accrual of loss contingencies, disclosure of loss contingencies, general or unspecified business risks and appropriation of retained earnings.

98.    FASB No. 60 sets forth the specialized principles and practices from the AICPA insurance industry related Guides and Statements of Position and establishes financial accounting and reporting standards for insurance enterprises other than mutual life insurance enterprises, assessment enterprises and fraternal benefit societies.

99.    FASB No. 109 sets forth the standard governing income taxes.

100.    Additional FASB Statement of Concepts include:

a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

b.    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶ 132);

c.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that

NYC_206950_2

management offers securities of the enterprise to the public, it voluntarily accepts

wider responsibilities for accountability to prospective investors and to the public in

general. (FASB Statement of Concepts No. 1, ¶ 50);

d.  The principle that financial reporting should provide information about an

enterprise's financial performance during a period. Investors and creditors often use

information about the past to help in assessing the prospects of an enterprise. Thus,

although investment and credit decisions reflect investors' expectations about future

enterprise performance, those expectations are commonly based at least partly on

evaluations of past enterprise performance. (FASB Statement of Concepts No. 1,

¶ 42);

e.  The principle that financial reporting should be reliable in that it represents what it

purports to represent. The notion that information should be reliable as well as

relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶ 58-59);

f.  The principle of completeness, which means that nothing is left out of the

information that may be necessary to ensure that it validly represents underlying

events and conditions. (FASB Statement of Concepts No. 2, ¶ 80);

g.  The principle that conservatism be used as a prudent reaction to uncertainty to try to

ensure that uncertainties and risks inherent in business situations are adequately

considered. The best way to avoid injury to investors is to try to ensure that what is

reported represents what it purports to represent. (FASB Statement of Concepts No.

2, ¶¶ 95, 97); and

h.  The principle that contingencies that might result in gains are not reflected in

accounts since to do so might be to recognize revenue prior to its realization and that

31

care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies. (FASB No. 5, Accounting for Contingencies).

**The Actuarial Standards**

101.    The Actuarial Standards Board promulgates the standards to be followed by actuaries, and governed Defendant PwC's non-party Miller Herbers conduct as actuaries during the Relevant Period.  Defendant PwC's violated these standards as set forth in but not limited to ¶ 204.

102.    Actuarial Standard of Practice ("ASP") No. 21 sets forth the actuary's responsibility to an auditor.  The preparing actuary should be prepared to disclose to the auditor the sources of data and the assumptions and methods underlying any elements in the financial statements for which the actuary is responsible, including, where appropriate, an appraisal of their suitability for the purposes at hand.  As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 21.

103.    Pursuant to ASP No. 21, the reviewing actuary should use a written plan clearly setting forth the nature and scope of the actuary's responsibilities with respect to the review or audit. The actuary's communications to the auditor should be in accordance with Interpretative Opinion 3 of the ASB, *Professional Communications of Actuaries*.  As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 21.

104.    Pursuant to ASP No. 21, the preparing actuary and the reviewing actuary should disclose to the auditor their relationships with the organization being audited.  As more fully set forth in paragraphs of the Complaint, PwC and violated ASP No. 21.

32

105.    Pursuant to ASP No. 21, an actuary to whom this standard applies should clearly document the work done in relation to the financial statements.

a.    The quantity, type and content of documentation should fit the actuary's needs and the circumstances of the engagement to which the documentation applies. Factors to be considered include the nature and scope of the work undertaken and any report or opinion required pursuant to it, and the nature and condition of the actuary's and/or the organization's records. The actuary's documentation should be prepared so that it can be reviewed and objectively appraised by another actuary practicing in the same field. Although the quantity, type and content will vary with the circumstances, documentation should generally include or show the procedures followed, assumptions made, tests performed, conclusions reached and documentary evidence collected to support findings and conclusions. In addition, the reviewing actuary's documentation should generally include or show:

i.    information sufficient to demonstrate that the items audited or reviewed were in agreement with (or reconciled with) the company's records unless the absence of such reconciliation is disclosed in the actuary's report;

ii.    that the reviewing actuary's activities had been planned and coordinated with the auditor engaged in the audit or review, and

iii.    the resolution of exceptional or unusual matters.

106.    In accordance with Interpretative Opinions 3(c)(4) and 3(c)(5) of the ASB, the actuary should adopt reasonable procedures for the safe custody of such documentation with particular regard for the provisions of Precept 10 of the American Academy of Actuaries ("AAA")

NYC_206950_2

Code of Professional Conduct. The actuary should retain the documentation for a period of time sufficient to meet work needs and to satisfy any pertinent legal requirements for record retention.

107.    As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 21.

108.    Pursuant to ASP No. 21, when an actuary's work is within the scope of this standard, any actuarial report or opinion prepared in connection with such work should identify the actuary, the actuary's relationship with the organization being audited, and the scope of the actuary's activity in relation to the financial statements involved. In situations where a number of actuaries who are responsible to a principal actuary participate in work relating to any such financial statement, any actuarial report or opinion should include the signature of the principal actuary. As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 21.

109.    Pursuant to ASP No. 21, an actuary must be prepared to defend the use of any procedure that departs materially from this standard and must include, in any actuarial communication disclosing the result of the procedure, an appropriate statement with respect to the nature, rationale, and effect of such use. As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 21.

110.    Pursuant to ASP No. 21, the actuary should be aware of the context in which the discounted reserves are to be used, should use assumptions and methodology in the discounting process that are appropriate for that context. As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 21.

111.    Pursuant to ASP No. 20, the determination of a full-value reserve is generally, though not necessarily, the first step in the determination of a discounted reserve by requiring that:

NYC_206950_2

a. All principles and considerations that apply to the calculation of a full-value reserve as an end product should also apply to the calculation of a full-value reserve that will form the basis of a discounted reserve.

b. The actuary should give special attention to the specification of the reserve provision by its components (e.g., line of business, accident year, etc.), to the extent such specification has a material effect on the amount of reserve discounting.

c. The actuary should be aware of the assumptions and considerations underlying the selection of the full-value reserve, in order to ensure that material assumptions and considerations are consistent throughout the process of calculating the discounted reserve.

d. The actuary should be aware of the differences between full-value and discounted reserves in the relative materiality of various considerations. For example, a development factor at an advanced maturity (i.e., a "tail factor") is less material to a discounted reserve than to a full value reserve. Conversely, a change in the timing of loss payments may be more material to a discounted reserve. To the extent that the materiality of a reserve consideration determines the amount of analysis that an item receives, the evaluation of a discounted reserve may require a change in emphasis on the items analyzed.

112.    As more fully set forth in, but not limited to, paragraphs of the Complaint, PwC violated ASP No. 20 at ¶¶ 204 and 206 of the Complaint.

NYC_206950_2

113.    Pursuant to ASP No. 20, in order to derive a discounted reserve, the actuary necessarily projects the timing of future payments. A range of payment-timing estimates may be reasonable.

    a.  The actuary should use the entity's own historical payment data to project the timing of payments, to the extent that credible data are available. Any supplementary data that are used should reflect the payment-timing characteristics of the category of business under consideration, to the extent possible.

    b.  The actuary should reconcile payment-timing estimates with the estimates of ultimate amounts to be paid, even if the latter have not been derived by techniques based on paid losses and loss adjustment expenses.

    c.  When a full-value reserve has been estimated, the actuary should use assumptions and considerations in developing payment-timing estimates that are consistent with the assumptions and considerations used in developing the full-value reserve estimates.

    d.  Payment-timing estimates should be consistent with internal and external conditions expected to prevail during the future payment period. If such conditions are expected to be different from those prevailing during the historical evaluation period, the actuary should make appropriate adjustments.

    e.  The actuary should determine whether better payment-timing estimates are obtained by treating various data components separately or in some combination. Examples are losses, allocated loss adjustment expenses, and unallocated loss

NYC_206950_2

adjustment expenses. This determination typically is influenced by the nature of the available data.

    f.  In estimating discounted reserves net of ceded reinsurance, salvage, and subrogation, the actuary should consider the timing of the expected reinsurance, salvage, and subrogation recoveries.

114.    As more fully set forth in, but not limited to, paragraphs of the Complaint, PwC violated ASP No. 20 at ¶¶ 204 and 206 of the Complaint.

115.    Pursuant to ASP No. 20, the actuary should be aware of the historical relationship between reserve discounting and risk margins and include appropriate risk margins. Discounting a reserve diminishes the risk margin implicit in a full-value reserve by the difference between the full-value and the discounted reserve. The discounting process itself introduces additional uncertainties. The actuary should be aware that a discounted reserve is an inadequate estimate of economic value unless appropriate risk margins are included. Considerations with regard to the inclusion of risk margins follow. It is not intended that this standard address the amount of risk margin necessary, nor the appropriate treatment of risk margin in a particular context.

    a.  In determining the amount of risk margin, the actuary should consider the increase in uncertainty associated with the discounting calculation, as well as the decrease in the margin implicit in the full-value reserve.

    b.  Implicit margins may be introduced at one or more steps in the discounting process, including the estimation of the full-value reserve and the selection of the payment pattern from a range of reasonable estimates. Explicit margins may be

NYC_206950_2

included as an absolute amount and/or through an explicit adjustment to the selected interest rate(s).

116.    As more fully set forth in, but not limited to, paragraphs of the Complaint, PwC violated ASP No. 20 at ¶¶ 204 and 206 of the Complaint.

117.    Pursuant to ASP No. 23, in undertaking any analysis, an actuary should consider what data to use. The actuary should understand the intended use of the analysis being performed. The intended use will indicate the nature and extent of review needed and the number of alternatives to be reviewed. In evaluating these alternatives, the actuary should:

    a.  consider the data elements that are desired, and possible alternative data elements; and

    b.  select the data with due consideration of:

        i.  appropriateness for the intended purpose of the analysis, including whether the data are sufficiently current;

        ii.  reasonableness and comprehensiveness of the necessary data elements, with particular attention to internal and external consistency;

        iii.  any limitations of the data, and modifications or assumptions needed in order to use the data;

        iv.  the cost and feasibility of alternatives, including the ability to obtain the information in a reasonable time frame (the benefit to be gained from an alternative data element or data source should be balanced with its relative availability and the cost to collect and compile it); and

        v.  sampling methods, if used to collect data.

NYC_206950_2

118.    As more fully set forth in, but not limited to, paragraphs of the Complaint, PwC violated ASP No. 23 at ¶¶ 204 and 206 of the Complaint.

119.    Pursuant to ASP No. 23, the actuary may be aware that the data are incomplete, inaccurate, or not as appropriate as desired. In such cases, the actuary should consider whether the use of such imperfect data may produce material biases in the results of the study, or whether the data are so inadequate that the data cannot be used to satisfy the purpose of the study. As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 23.

120.    Pursuant to ASP No. 23, the actuary may rely on data supplied by another. In doing so, the actuary should disclose such reliance. The accuracy and comprehensiveness of data supplied by others are the responsibility of those who supply the data. However, the actuary should, when practicable, review the data for reasonableness and consistency. The nature and extent of the review should be based on the circumstances of the actuarial assignment.

     a.    The actuary should review the data used directly in the actuary's analysis for the purpose of identifying data values that are questionable or relationships that are materially inconsistent. The actuary is not expected to develop additional data compilations solely for the purpose of searching for questionable or inconsistent data.

     b.    If the actuary has reason to believe that the data may contain material defects, the actuary should determine, if possible and practicable, the nature and extent of any checking, verification, or auditing that may have been performed on the data. Then, if in the actuary's judgment the actuary should perform a more extensive review, this should be done if practicable.

39

121.    As more fully set forth in, but not limited to, paragraphs of the Complaint, PwC violated ASP No. 23 at ¶ 204 and 206.

122.    Pursuant to ASP No. 23, the actuary's report should include the following disclosures:

    a.   the source(s) of the data;

    b.   the materiality of any potential biases of which the actuary is aware that are due to imperfect data;

    c.   adjustments or modifications made because of imperfect data, other than routine corrections made by reference to source documents;

    d.   the extent of reliance on data supplied by others;

    e.   in the event that the actuary has not sufficiently reviewed the data, any resulting limitation on the use of the actuarial work product; and

    f.   any unresolved concern the actuary may have about the data that could have a material effect on the actuarial work product.

123.    As more fully set forth in, but not limited to, paragraphs of the Complaint, PwC violated ASP No. 23 at ¶¶ 204 and 206.

124.    Pursuant to ASP No. 23, an actuary must be prepared to justify the use of any procedures that depart materially from those set forth in this standard and must include, in any actuarial communication disclosing the results of the procedures, an appropriate statement with respect to the nature, rationale, and effect of such departures. As more fully set forth in paragraphs of the Complaint, PwC violated ASP No. 23.

NYC_206950_2

125.    Pursuant to ASP No. 9, documentation of an actuarial work product, whether or not there is a legal or regulatory requirement for the documentation, is required. Appropriate records, worksheets, and other documentation of the actuary's work should be maintained by the actuary and retained for a reasonable period of time. Documentation should be sufficient for another actuary practicing in the same field to evaluate the work. The documentation should describe clearly the sources of data, material assumptions, and methods. Any material changes in sources of data, assumptions, or methods from the last analysis should be documented. The actuary should explain the reason(s) for and describe the impact of the changes.

126.    Pursuant to ASP No. 9, information prepared by an actuary may be used by another person in a way that may influence the actions of a third party. If someone other than an actuary might convey such information to any such indirect users, the actuary should recognize the risk of misquotation, misinterpretation, or other misuse of its actuarial aspects. The actuary should take reasonable steps to ensure that an actuarial work product is presented fairly, that the presentation as a whole is clear in its actuarial aspects, and that the actuary is identified as the source of the actuarial aspects and as the individual who is available to answer questions. An actuarial report is customarily considered to be presented fairly if it describes the data, material assumptions, methods, and material changes in these with sufficient clarity that another actuary practicing in the same field could make an appraisal of the reasonableness and validity of the report.

127.    Pursuant to ASP No. 9, if the service requested by a client or employer produces a result that conflicts materially with the actuary's professional judgment, the actuary should advise the client or employer of the conflict and should include appropriate qualifications or disclosures in any related actuarial communication. When an actuary acts, or may seem to be acting, as advocate

NYC_206950_2

- for a client or employer, the nature of that relationship should be disclosed to directly interested parties.

128.    Pursuant to ASP No. 9, documentation should be available to the actuary's client or employer, and it should be made available to other persons when the client or employer so requests, assuming appropriate compensation, and provided such availability is not otherwise improper. Ownership of documentation is normally established by the actuary and the client or employer, in accordance with law.

## THE DIRECTORS' AND CONTROL PERSONS' DUTIES

129.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto were officers and controlling persons of ACHI, a publicly held company, that was (i) registered with the SEC pursuant to the Exchange Act (ii) traded on the NASDAQ and (iii) governed by federal securities laws. Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto each had a duty to promptly disseminate accurate and truthful information with respect to ACHI's financial condition, performance, growth, operations, business, markets, management, earnings, and present and future business prospects. Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto also each had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of ACHI's publicly-traded common stock would be based upon truthful and accurate information. Each individual Defendant knowingly and materially breached those duties.

130.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto participated in the preparation and approval of the various public shareholder and investor reports, public filings and other communications complained of herein. Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto knew the omissions and misstatements were in fact false. Defendants Solomon, Elder,

NYC_206950_2

Barrett, Thomas, Dore and Violetto were aware that the false statements contained therein and were aware of their materially false and misleading nature.

131.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto, because of their positions of control and authority as officers and directors of ACHI, were able to and did in fact control the content of the various SEC filings, filings with state regulators, annual reports, press releases and other public statements pertaining to ACHI during the Relevant Period. Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto had copies of the misleading documents prior to or shortly after their issuance. Each individual Defendant had the ability and opportunity to either prevent their issuance or cause already issued statements to be corrected. Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto took affirmative steps to continue issuing materially false statements and to conceal the truth.

## PUBLIC FILINGS

SEC and State Filings:

132.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto filed and caused to be filed on behalf of ACIC the required annual statements with its state of domicile, states in which it is licensed, and the National Association of Insurance Commissioners ("NAIC").

133.    In 1997, ACIC was licensed to conduct business in Illinois, Indiana, Wisconsin and Iowa. The Company's license in Michigan was pending at the time the 1997 10-K was issued. Pursuant to the state standard, ACHI was required to file quarterly and yearly filings with the state insurance commissioners.

134.    In 1998, ACIC was licensed to conduct business in Illinois, Indiana, Wisconsin, Iowa, Michigan, Minnesota, Pennsylvania, New York and Washington D.C. The Company's

NYC_206950_2

license in Connecticut was pending at the time the 1998 10-K was issued. Pursuant to the state standard, ACHI was required to file quarterly and yearly filings with the state insurance commissioners.

135.    In 1999, ACIC was licensed to conduct business in Connecticut, Illinois, Indiana, Wisconsin, Iowa, Michigan, Minnesota, Pennsylvania, New York, and Washington D.C. The Company's license in California and New Jersey was pending at the time the 1999 10-K was issued. Pursuant to the state standard, ACHI was required to file quarterly and yearly filings with the state insurance commissioners.

136.    In 2000, ACIC was licensed to conduct business in Connecticut, Washington D.C., Illinois, Indiana, Iowa, Massachusetts, Minnesota, New York, Pennsylvania, and Wisconsin. Pursuant to the state standard, ACHI was required to file quarterly and yearly filings with the state insurance commissioners.

137.    In 2001, ACIC was licensed to conduct business in Connecticut, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Michigan, Minnesota, New York, Ohio, Oklahoma, Pennsylvania, Wisconsin, and Washington D.C. ACIC was in the process of pursuing a license in Nevada when the 2001 10-K was issued. Pursuant to the state's standard, ACHI was required to file quarterly and yearly filings with the state insurance commissioners.

138.    ACIC made false and misleading statements in each of these filings as more specifically set forth hereinafter.

139.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto filed and caused to be filed on behalf of ACIC the required annual registration statement with its state of domicile as being a part of a holding company system. ACIC made false and misleading statements in each of these filings as more specifically set forth hereinafter.

44

140.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto filed and caused ACHI to file false and misleading documents with the SEC in the years 1998, 1999, 2000, and 2001. The fraudulent filings containing false and misleading statements as set forth hereafter were: the 1997 Annual Report (10-K) filed March 31, 1998, the 1998 Quarterly Report (10-Q) filed May 15, 1998, the 1998 Quarterly Report (10-Q) filed August 14, 1998, the 1998 Quarterly Report (10-Q) filed November 13, 1998, the 1998 Annual Report (10-K) filed March 31, 1999, the 1999 Quarterly Report (10-Q) filed May 6, 1999, the 1999 Quarterly Report (10-Q) filed August 11, 1999, the 1999 Quarterly Report (10-Q) filed November 15, 1999, the 1999 Annual Report (10-K) filed March 30, 2000, the 2000 Quarterly Report (10-Q) filed May 15, 2000, the 2000 Quarterly Report (10-Q) filed August 14, 2000, the 2000 Quarterly Report (10-Q) filed November 14, 2000, the 2000 Annual Report (10-K) filed March 30, 2001, the 2001 Quarterly Report (10-Q) filed May 15, 2001, the 2001 Quarterly Report (10-Q) filed August 14, 2001, the 2001 Quarterly Report (10-Q) filed November 14, 2001, the Amended 2001 Quarterly Report (10-Q/A) filed December 7, 2001, and the 2001 Annual Report (10-K) filed March 29, 2002.

141.    In each of the false filings with the SEC or with various states one or more of the Defendants hereunder signed the filing knowing it to be false.

142.    On or about May 15, 1998, Defendants Barrett, Thomas, Elder, and Solomon caused ACHI to file its 10-Q for the period ending March 21, 1998. Defendant Elder signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

143.    On or about August 14, 1998, Defendants Barrett, Thomas, Elder, and Solomon caused ACHI to file its 10-Q for the period ending June 30, 1998. ACHI's Chief Financial Officer signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

NYC_206950_2

144.    On or about November 13, 1998, Defendants Barrett, Thomas, Elder, and Solomon caused ACHI to file its 10-Q for the period ending September 30, 1998.  ACHI's Chief Financial Officer signed the 10-Q, which contained material misstatements concerning ACHI'S financial condition.

145.    On or about March 15, 1999, ACHI issued its 1998 Annual Report to its shareholders.  The 1998 Annual Report was signed by Solomon, as Chairman and CEO of ACHI and Elder as Executive Vice-President of ACHI and President of ACIC.  PwC also signed the 1998 Annual Report as the independent auditors of ACHI, attesting: "In our opinion, the accompanying consolidated balance sheets as of December 31, 1998 and related consolidated statements of income, stockholders' equity, and cash flows for the year then ended present fairly, in all material respects, the financial position" of ACHI.

146.    On or about May 6, 1999, Defendants Barrett, Thomas, Elder, and Solomon caused American Country Holdings to file its 10-Q for the period ending March 31, 1999.  ACHI's Chief Financial Officer signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

147.    On or about August 11, 1999, Defendants Barrett, Thomas, Elder, Solomon, and Violetto caused American Country Holdings to file its 10-Q for the period ending June 30, 1999.  ACHI's Chief Financial Officer signed the 10-Q, which contained material misstatements concerning ACHI'S financial condition.

148.    On or about November 11, 1999, Defendants Barrett, Thomas, Elder, Solomon, and Violetto caused ACHI to file its 10-Q for the period ending September 30, 1999.  Defendant Elder signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

NYC_206950_2

149.    On or about March 30, 2000, ACHI issued its 1999 Annual Report to its shareholders. The 1999 Annual Report was signed by Solomon, as Chairman and CEO of ACHI and Elder as Executive Vice-President of ACHI and President of ACIC. PwC also signed the 1999 Annual Report as the independent auditors of ACHI, stating: "In our opinion, the accompanying consolidated balance sheets as of December 31, 1999 and related consolidated statements of income, stockholders' equity, and cash flows for the year then ended present fairly, in all material respects, the financial position" of ACHI.

150.    On or about May 15, 2000, Defendants Barrett, Thomas, Elder, Solomon, and Violetto caused American Country Holdings to file its 10-Q for the period ending March 31, 2001. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

151.    On or about August 14, 2000, Defendants Barrett, Thomas, Elder, Solomon, and Violetto caused ACHI to file its 10-Q for the period ending June 30, 2000. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

152.    On or about November 14, 2000, Defendants Barrett, Solomon, Thomas, Elder, Violetto, and Dore caused American Country Holdings to file its 10-Q for the period ending September 30, 2000. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

153.    On or about April 20, 2001, ACHI issued its 2000 Annual Report to its stockholders. The 2000 Annual Report was signed by Dore as Chairman, President and CEO of ACHI. The 2000 Annual Report included ACHI's 2000 10-K. On March 30, 2001, Dore signed the 2000 10-K as Chairman, President and CEO of ACHI; Violetto signed the 2000 10-K as Vice President and CFO; and Barrett, Elder, Solomon and Thomas signed as directors. On March 22, 2001, PwC signed the

NYC_206950_2

2000 10-K as the independent auditors of ACHI, stating: "In our opinion, the accompanying consolidated balance sheets as of December 31, 2000 and related consolidated statements of income, stockholders' equity, and cash flows for the year then ended present fairly, in all material respects, the financial position" of ACHI.

154. On or about May 16, 2001, Defendants Barrett, Solomon, Thomas, Elder, Violetto, and Dore caused ACHI to file its 10-Q for the period ending March 31, 2001. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

155. On or about August 14, 2001, Defendants Barrett, Solomon, Thomas, Elder, Violetto, and Dore caused ACHI to file its 10-Q for the period ending June 30, 2001. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

156. On or about November 14, 2001, Defendants Barrett, Solomon, Thomas, Elder, Violetto, and Dore caused ACHI to file its 10-Q for the period ending September 30, 2001. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

157. On or about December 12, 2001, Defendants Barrett, Solomon, Thomas, Elder, Violetto, and Dore caused ACHI to file an amended 10-Q for the period ending September 30, 2001. Defendant Violetto signed the 10-Q, which contained material misstatements concerning ACHI's financial condition.

158. On or about March 29, 2002, ACHI issued its 2001 Annual Report to its shareholders on Form 10-K. On or about March 29, 2002, Dore signed the 2001 10-K as Chairman, President and CEO of ACHI; Violetto signed the 2001 10-K as Vice President and CFO; and Barrett, Elder, Solomon and Thomas signed as directors. On or about March 27, 2002, PwC

48

signed the 2001 10-K as the independent auditors of ACHI, stating: "In our opinion, the accompanying consolidated balance sheets as of December 31, 2001 and related consolidated statements of income, stockholders' equity, and cash flows for the year then ended present fairly, in all material respects, the financial position" of ACHI.

159.    Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto filed or caused to be filed on behalf of ACIC annual statements with its state of domicile, states in which it is licensed and the NAIC.

## FACTS COMMON TO ALL CAUSES OF ACTION

160.    Relationship of reserves to stock price:  A stock price can be fraudulently inflated by understating the reserves.  Understatement of a reserve results in a company reporting lower provisions for losses, thus increasing reported profits upon which the investing public determines a stock price.

161.    Role of the Actuary:  The role of the actuary is to determine an actuarially sound loss reserve for a group of claims as of a given valuation date, based on estimates derived from reasonable assumptions and appropriate actuarial methods.  The estimation process determines a range of values which must be determined based on the relative likelihood of the  assumptions employed and the context in which the reserve will be presented.

162.    Relationship of the Auditor and the Actuary:  It is the auditor's responsibility to evaluate the reasonableness of the loss reserve established by management.  In so doing, the auditor may rely upon the work of a specialist, in this case, an actuary, to evaluate the reasonableness of management's estimate.  Such reliance requires the auditor to evaluate the relationship of the specialist to management, including circumstances that might impair the specialist's objectivity.

49

Further, the auditor has the responsibility to obtain an understanding of the methods and assumptions used by the specialist to determine whether the specialist's findings are suitable for corroborating representations in the financial statements.

163.    In or about 1997, ACHI became a publicly traded company and its stock was listed and traded on the NASDAQ small cap market. ACHI was the holding company for ACIC, a well-established insurance company that specialized in the underwriting and marketing of commercial property and casualty insurance for the transportation sector, specifically taxi and limousines, and the hospitality industries. ACIC had been a writer of commercial and personal lines of business, focusing on public transportation risks, for almost twenty years prior to being publicly traded. From the time ACHI went public in 1997 until the Acquisition in 2002, Defendants Solomon, Elder, Barrett, Thomas, Dore, and Violetto owned a collective block of at least 50% of ACHI's stock. The Frontier Insurance Group, a New York based company, owned 25% of ACHI's stock until its shares were purchased in 2001.

164.    On or about August 7, 1997, ACHI held its Annual Board Meeting in New York with Defendants Solomon, Elder, Barrett and Thomas in attendance. At the meeting, ACHI's Chief Financial Officer ("CFO"), James P. Byrne, discussed ACHI's need for audit and actuarial services. At the time, Ernst & Young ("E&Y") had provided both actuarial and auditing services to ACHI since 1994. Based on Byrne's recommendation, the Board resolved, with Defendants Solomon, Elder, Barrett and Thomas's assent, that ACHI should retain different companies to perform its actuarial services and its auditing services. This resolution was disseminated to the stockholders and investing public. The resolution was never changed and the public was not informed that the policy embodied in it was not being followed. The failure of Defendants Solomon, Elder, Barrett, Thomas to correct the misstatements caused by the resolution was a breach of their duty.

NYC_206950_2