165.    At or about the time of the Board resolution to separate the accounting and auditing roles was passed, Defendants Solomon, Elder, Barrett and Thomas intended to adopt the resolution but not implement the resolution.

166.    At or about the time of the August 17, 1997 Annual Meeting, Elder informed the Board of Directors that AM Best ("Best"), an insurance rating company, had reconfirmed ACHI's rating of "A-" based upon its presentation to Best.  A Best rating of "A-" means Excellent with Positive Implications.  Best assigned ACHI a rating of "A-" due to ACHI's consistent profitability, favorable reserve development and reduced financial leverage position.  Best concluded that ACHI's highly favorable profitability over the previous five years stemmed from, among other things, ACHI's favorable expense factor, favorable reserve development and ACHI's leadership in the Chicago public transportation market.

167.  ·  Despite reaffirming ACHI's positive rating of "A-" in 1997, Best was concerned with Defendants Elder, Solomon, Thomas and Barrett owning an insurance company.  As a public insurance company, Best's rating was critical to ACHI's ability to retain its clients and maintain its viability.  Defendants Elder, Solomon, Barrett and Thomas, with more than a 50% share in ACHI had an immediate incentive to maintain its Best rating in order to sell ACHI on the most favorable terms.

168.    Defendant Elder informed ACHI's Vice President of Claims, Patrick Lynch ("Lynch"), of his conversation with Best concerning Best's concern with Elder, Solomon, Barrett and Thomas in 1997 and Elder made Lynch aware of the fact that he and Solomon were concerned with maintaining ACHI's all important "A-" rating because an unfavorable rating by Best would negatively affect ACHI's value and stock price, as well as make it difficult to sell ACHI.  In this same conversation Defendant Elder informed Lynch that both he and Solomon recognized that

NYC_206950_2

ACHI would look more attractive to a potential purchaser if it could show greater profits. Defendant Elder stated that such profits were to be obtained by reducing the amount of ACHI's balance sheet liabilities, i. e., reducing ACHI's reserves.

169.    Reserves are a critical aspect of an insurance company's financial statements and crucial to an outside investor's valuation of such a company. ACHI, as the holding company of ACIC, set reserves for payment of losses and loss adjustment expenses for ACIC's lines of insurance business. According to its public filings, American Country:

> ...maintains reserves for the payment of losses and loss adjustment expenses ("LAE") for all lines of business. The determination of reserves for losses and LAE is based on information reported to it regarding claims and the historical loss experience of the business. The vast majority of losses are reported to American Country by its insureds in a timely fashion; however, there are always a certain percentage of losses which have occurred but not been reported ("IBNR") to American Country at any given time. American Country establishes reserves for IBNR claims, and this reserve also includes amounts for the potential adverse development of losses known to American Country (in other words, subsequent developments may occur that require that previously established reserves be increased). Upon receipt of a claim, American Country establishes a reserve, which is an estimate of the amount, which will be paid upon conclusion of the claim. The reserves for the known losses, IBNR reserve and the loss adjustment expense reserve, represent the total amount American Country estimated would be needed to satisfy all losses (known and unknown), which may be paid by American Country. These reserves are reflected as liabilities on American Country's balance sheet.
>
> * * *
>
> Most claims are investigated, supervised, and adjusted by personnel of American Country. In-house counsel for American Country handle the defense of most cases for insureds located in the Chicago Metropolitan Area. All outside counsel are chosen by American Country, and American Country's staff monitors all cases and grants settlement authority on all files.

170.    ACHI's board members and senior executive officers set reserves each year to satisfy all losses, known and unknown, which would have to be paid by ACHI. The reserves are

NYC_206950_2

then reflected as liabilities on ACHI's balance sheet. The board members and officers set reserves that are required to be reviewed and then certified by an actuary at the end of each year. By intentionally setting reserves below an appropriate level, a company can artificially decrease its balance sheet liabilities, thereby making a company seem more valuable. Due to the nature of reserve adjustments, the true nature of a company's reserve deficiencies will not be discovered until months or years after the initial reserves are set. In each jurisdiction, including New York, ACHI was licensed to underwrite insurance, and ACHI was required by law in each jurisdiction, including New York, to submit yearly filings to each state's respective insurance commissioner.

171.    On or about January 15, 1998, Defendants Solomon, Elder, Barrett and Thomas discussed and decided to end ACHI's approximately five-year relationship with E&Y and instead hire PwC effective fiscal year ending December 31, 1998, to perform ACHI's actuarial and auditing services. Defendants Solomon, Elder, Barrett and Thomas voted to retain PwC as both actuary and auditor for ACHI notwithstanding the Board's resolution on or about August 7, 1997 and their duty to preserve the auditor's independence by splitting the roles between two different entities.

172.    In its role as actuary, PwC was responsible for conducting the actuarial analysis of ACIC's reserves to determine whether reserves set by Defendant Board Members Solomon, Elder, Barrett and Thomas to pay claims for ACHI were within an amount or range of amounts at which reserves would be set. PwC was also responsible for determining whether the reserves set were actuarially sound. In other words, PwC was obligated to review the reserves set by Defendants Solomon, Barrett, Elder and Thomas to determine whether they would adequately provide for future claims paid by ACHI and accurately reflect ACHI's liabilities. PwC partners Tom Brown and Jeff Johnson, along with PwC's senior associate Karla Violetto, until 1999, performed PwC's

NYC_206950_2

auditing services of ACHI from 1998 through 2002. PwC's Terence O'Brien and Donald P. Skrodenis prepared ACHI's actuarial report and the required actuarial certification from 1998 through 1999.

173.    By performing both the roles of auditor and actuary, PwC compromised its independence and ceased to be in fact an independent auditor pursuant to the standards set forth under GAAS and the Code of Professional Conduct. PwC's conduct violated Rule 102-1, Rule 501, Rule 501-4 and AU 150, as set forth more fully above in ¶¶ 52, 54, 55 and 72.

174.    In or about July 1998, Lynch, Vice President of Claims, was in the process of preparing ACHI's financial forecasts for the year of 1998, projecting potential profits of $3.1 million. Defendant Elder advised Lynch that he, together with Defendants Solomon, Barrett and Thomas desired to increase profits to at least $5.8 million by the end of 1998 by any means. The goal of showing higher profits was to mislead the investing public as to ACHI's performance and thereby keep the stock price artificially inflated.

175.    In this same July 1998 conversation Lynch informed Defendant Elder that ACHI was actually showing profits of $450,000 from January 1, 1998 through July 1998 and could not reach the profit level desired by Defendants Elder, Solomon, Barrett and Thomas. When Defendant Elder learned this he stated that ACHI needed to appear financially better to the investing public and the profits would be increased. Defendant Elder directed that Lynch get ACHI's profits up to $650,000 for the period January 1998 – July 1998 by reducing the level of ACHI's reserves for the sole purpose of adjusting ACHI's stock price to an artificially inflated number. Lynch made the adjustment at Elder's request in July 1998.

NYC_206950_2

176. Lynch then told Elder that he would not continue to make the adjustments because ACHI would eventually be required to put capital back into the reserves in order to satisfy claims against these actuarially unsound reserves.

177. Lynch left ACHI in or about July 1998. At the time Lynch left ACHI, his projected profits for ACHI for year ending December 31, 1998 was $3.1 million. After Lynch's departure, Defendants' Elder, Solomon, Thomas and Barrett reduced the Company's reserves by $2.7 million to make ACHI's profits appear artificially higher. This conduct violated Rule 102-1, Rule 501-3, AU 150, as set forth more fully in ¶¶ 52, 55 and 72 of the Complaint. Defendants Elder, Solomon, Thomas and Barrett did this for the sole purpose of artificially inflating the value of ACHI for the year ending December 31, 1998. These false profits were subsequently reported in ACHI's 10-K for the period ended December 31, 1998 ("1998 10-K"), which was subsequently filed with the SEC. Defendant Violetto, as a senior associate at PwC during this time, participated in PwC's audit of ACHI's financials and provided information to ACHI's counsel for preparation of the 1998 10-K.

178. In or about mid-February 1999, ACHI began underwriting insurance for a number of states, including New York. The effective date for the New York transportations renewals was on or about February 28, 1999. ACHI had agreed to underwrite New York's yellow cab medallion, which would represent approximately $4.6 million in revenues, a material portion of ACHI's revenues for the year.

179. Between March 1997 and March 1999, ACHI's stock price dropped from $6.75 to $4.75. Faced with this declining stock price and fearful of a reduction of its "A-" Best rating, Defendants' Solomon, Elder, Barrett and Thomas knew that their individual net worth declined since their net worth was tied directly to ACHI's stock price.

NYC_206950_2

180.    Concerned with their ability to sell ACHI, Defendants Solomon, Thomas, Elder and Barrett discussed and entered into an agreement to understate ACHI's reserves thereby artificially inflating ACHI's stock price. Defendants Solomon, Elder, Barrett and Thomas, led by controlling shareholders Solomon and Thomas, determined to keep the stock price artificially high by intentionally setting actuarially unsound reserves. Defendants Solomon, Thomas, Elder and Barrett intended to sell ACHI based on a manipulated inflated stock price. In fact, the Defendants did and deliberately understated reserves.

181.    At an Audit Committee meeting on or about March 8, 1999, Defendants Solomon, Barrett and Thomas discussed ACHI's actuarial and audit findings for the year ended December 31, 1998 was discussed with PwC representatives. At the time of the discussion, Defendant Violetto was a senior associate at PwC working with Defendant PwC on ACHI's audit and was responsible for examining ACHI's financial statements. Prior to the Audit Committee meeting, PwC circulated a draft actuarial study of ACHI's reserves for the year ending December 31, 1998. The Audit Committee, consisting of Defendants Solomon, Barrett and Thomas, was dissatisfied with PwC's proposed reserves because of the negative effect it would have on ACHI's stock price and the individual Defendant's net worth. These Defendants, who were members of the Audit Committee, discussed their dissatisfaction at the Audit Committee meeting.

182.    PwC's preliminary actuarial findings concluded that ACHI would have to set a substantially higher reserve than ACHI's previous actuary, E&Y, for the period ending December 31, 1997, i.e., ACHI would have to increase reserves by at least $3.0 million to be within PwC's actuarially sound reserve range. At all times, Defendants Solomon, Barrett, Elder and Thomas were aware that such an increase in reserves would decrease the balance sheet assets of ACHI, thereby decreasing ACHI's stock price, their net worth and their ability to market ACHI.

NYC_206950_2

183.    At the same March 8, 1999 Audit Committee meeting, Defendant Solomon, ACHI's then President and CEO, demanded that PwC amend its reserve range estimates to reduce the level of ACIC's required reserves in order to maintain the inflated stock price, which would be reported in ACHI's 1998 10-K, for the period ending December 31, 1998. This conduct violated Rule 102-1, Rule 501, Rule 501-4 and AU 150, as set forth more fully above in ¶¶ 52, 54, 55 and 72. After a discussion, during which the specter of replacing PwC with E&Y was discussed with PwC, PwC changed their proposed reserve numbers to an actuarially unsound range acceptable to Defendants Solomon, Barrett, Elder and Thomas to maintain ACHI's stock price. PwC adjusted its reserve range without any basis knowing that, as a result, the reserves would be actuarially unsound and would artificially and fraudulently inflate the stock price. In addition to PwC reducing the reserves PwC knew that Defendants Solomon, Thomas, Barrett and Elder refused to implement sufficient internal controls to adequately evaluate reserves and pricing of its insurance product. This conduct violated AU 150 as set forth above in paragraph 72.

184.    Defendants Solomon, Thomas, Barrett and Elder refused to hire an internal actuary to accurately track ACHI's reserve levels on a consistent basis. In being aware of the aforementioned refusal PwC breached its obligation under GAAP and GAAS. The breach of the standards were not disclosed in the audits thereby rendering the audits materially false. This conduct violated AU 150 as set forth above in paragraph 72.

185.    At a Board Meeting on or about March 9, 1999, the Audit Committee's findings were presented to ACHI's full board consisting of Defendants Solomon, Elder, Barrett, and Thomas. These Board members agreed to accept PwC's revised, actuarially unsound reserves and expressed their disappointment with PwC's setting of reserves. Also present at the meeting was non-Board member and non-party Silver.

NYC_206950_2

186.    On or about April 22, 1999, Defendant Solomon sent a Notice of Annual Meeting to ACHI's shareholders by the United States mails. The Meeting was set to be held on May 18, 1999 in New York. The agenda for the Annual Meeting included ratifying the appointment of PwC as independent auditors for the year ending December 31, 1999, and a declaration of certain amendments to ACHI's stock option plan. The notice was sent through the mails to stockholders in New York including Frontier Insurance Company, a 25% shareholder of ACHI stock.

187.    At ACHI's Annual Meeting on or about May 18, 1999 attended by and participated in by Defendants Solomon, Barrett, Elder and Thomas, ACHI's financials, including the reserves of ACHI, were discussed. During the Annual Meeting, Defendants Solomon, Elder, Barrett, and Thomas, as collective majority shareholders of ACHI, were aware that ACHI would present a better financial picture and sustain an artificially higher stock price if ACHI could reduce the reserve liabilities on its balance sheet and were aware that the reserves set were actuarially unsound and presented a false and misleading material statement of the company's financial status.

188.    At or about the May 1999 meeting, Defendants Solomon, Elder, Barrett, Thomas and non-party Silver amended ACHI's stock option plan by, among other things, increasing the number of options that could be granted by the Board of Directors under the stock option plan and giving the Board significantly more authority with respect to the terms and the issuance of options there under. In addition, the grant of specific options to purchase 1.1 million shares of common stock on or about April 20, 1999 was authorized, with Solomon receiving 500,000 shares and Barrett and Thomas receiving 250,000 shares of stock options, respectively. Defendants Solomon, Thomas, Barrett and Elder voted for his or her own option. By granting themselves the options, these Defendants breached their duties as directors and officers of ACHI to personally profit.

NYC_206950_2

189.    Defendants Solomon, Elder, Barrett and Thomas selected PwC as ACHI's purported independent auditors and actuary at the May 18, 1999 Annual Meeting in New York. Defendants Solomon, Barrett, Elder and Thomas did this knowing that the Board's earlier August 7, 1997 resolution, which had not been repealed during the Relevant Period, required the auditor and actuary to be separate.

190.    In furtherance of their need to decrease ACHI's reserves, Defendants Solomon, Barrett, Elder and Thomas on or about July 1999, hired Defendant Violetto, who at the time was PwC senior associate responsible for ACHI's audits, as ACHI's head Manager of Corporate Reporting and Financing. Violetto was granted stock options and warrants. At all times, the goal of Defendants Solomon, Barrett, Thomas and Elder in retaining Violetto was to continue manipulating ACHI's financial statements and grossly understate and set ACHI's reserves at an actuarially unsound level in order to keep the stock price artificially high and the warrants valuable. Violetto was selected because of her knowledge of how to manipulate PwC's actuarial procedures and to influence PwC's purportedly independent auditors. This conduct was in violation of Rule 102, Rule 102-1, Rule 102-3, Rule 501 and ISB Standard No. 3, as set forth in ¶¶ 51, 52, 53, 54, 59.

191.    In or about July 1999, ACHI's CFO Byrne issued his preliminary findings of ACHI's reserve sufficiency level, which showed that ACHI was operating at a statutory loss of $1.9 million for the month ending June 1999. Defendants Solomon, Barrett, Elder, Violetto and Thomas knew that the $1.9 million loss would require ACHI to increase its balance sheet liabilities, thereby reducing ACHI's profits, the stock price and their net worth and their ability to sell ACHI.

192.    Defendants Solomon, Barrett, Elder, Thomas and Violetto agreed to a "thorough review" of ACHI's statutory reserves for the sole purpose of reducing the reserves. Defendants

NYC_206950_2

Solomon, Elder and Barrett, based on Violetto 's manipulation of the reserve setting process reduced the reserves from $1.9 million to $540,000 for the month ending June 1999. Violetto in fact caused ACHI's balance sheet liabilities to be reduced in order to artificially inflate ACHI's stock price.

193.    On or about July 16, 1999, Defendants Barrett, Elder, Violetto, Solomon and Thomas participated in a conference call in which the reduction was reported to the full board. Defendants Solomon, Elder, Thomas, Barrett and Violetto agreed that these numbers be finalized so that they could be included in ACHI's 10-Q for the period ending September 31, 1999 to accompany the consolidated financial statements for the period ending December 31, 1999. In order to accomplish this goal, Defendants Barrett, Elder, Solomon, Thomas and Violetto made false statements concerning reserves to other Board members.

194.    In or about September 1999, PwC provided ACHI's Audit Committee, consisting of Defendants Barrett, Solomon and Thomas, with its preliminary report on the actuarial report on the required amount of reserves ACHI would need to set for the period ending December 31, 1999. Upon reviewing the projections, Defendants Solomon, Barrett, Elder, Thomas and Violetto knew that ACHI was setting reserves at a level at least $4.9 million through August 1999 below any actuarially sound range.

195.    Defendants Solomon, Barrett, Elder, Thomas and Violetto also knew that the Company's current reserve levels would never reach PwC's recommended reserve levels that were necessary for certification. Defendants Solomon, Barrett, Elder, Thomas and Violetto refused to allow reserve levels to rise.

NYC_206950_2

196.    Defendants Solomon, Barrett, Elder, Thomas and Violetto also knew that PwC's reserve estimates would require a cash influx of ACHI's reserves which would result in an increase in ACHI's balance sheet assets and a reduction in stock price.

197.    Defendant Violetto spoke to Defendants Thomas, Elder, Barrett and Solomon and informed these Defendants that in order to continue setting the reserve numbers at a range that would maintain the artificially high stock price would be to find an actuary willing to take unorthodox and actuarially unsound factors into account, such as interested anecdotal information, when determining ACHI's reserve range. Instead of increasing ACHI's reserves as required by their fiduciary duty, Defendants Solomon, Barrett, Elder, Thomas and Violetto began "shopping around" for an actuary that would allow them to set the reserve numbers to keep ACHI's stock price artificially inflated.

198.    Defendant Violetto undertook at the direction of Elder, Barrett, Thomas and Solomon to find an actuary willing to provide ACHI with an artificially low and actuarially unsound range of reserves. As a former auditor at PwC who had worked on ACHI's audit, Violetto had an intimate knowledge of ACHI's financials and knew that anecdotal factors were unpredictable and unreliable. Defendant Violetto, as the former auditor of ACHI, knew that understated reserves could artificially inflate the stock price. Defendants Solomon, Barrett, Elder, Thomas and Violetto were aware that the stock was artificially inflated because of the manipulation of reserves.

199.    Defendants Elder, Barrett, Violetto, Thomas and Solomon were also aware that even PwC's recommended reserve range was actuarially unsound. Defendants Elder, Barrett, Violetto, Thomas and Solomon knew that ACHI was writing insurance in new, unfamiliar markets, including New York. At all times when ACHI insured claimants in New York, Defendants Solomon, Barrett,

Violetto, Elder and Thomas knew that failing to set actuarially sound reserves to pay claims underwritten in New York State placed claimants in jeopardy. They were aware that New York State would be compelled to satisfy ACHI's claims in the event of insolvency. Defendants Elder, Barrett, Violetto, Thomas and Solomon pursued this course of conduct for personal profits despite this knowledge.

200.    At a board meeting on or about October 13, 1999, Defendants Elder, Barrett, Violetto, Thomas and Solomon discussed that Best was reviewing ACHI's financial condition, and specifically ACHI's growth in comparison to its surplus.

201.    In particular, Defendant Violetto made a presentation to the Audit Committee on October 13, 1999, during which she explained the effect that lower reserves had on ACHI's balance sheet. Defendants Solomon, Barrett, Elder, Thomas and Violetto, with that knowledge, agreed with Violetto and undertook to implement a system utilizing the anecdotal factors thereby artificially setting and reducing the reserve to well below an actuarially sound range.

202.    In or about the fall of 1999, Defendants Solomon, Barrett, Elder, Thomas and Violetto held a series of board meetings in New York and Illinois to create a memorandum of "anecdotal factors" that they would require an actuary to use in determining ACHI's reserve estimates to manipulate the reserve setting level. The subjective factors included, among others, relying on information from ACIC's employees concerning the nature of reserves, instead of relying on the historical development of reserves. The failure to take historical development into account was critical to the new markets ACHI was underwriting. Defendants Solomon, Barrett, Elder, Thomas and Violetto agreed to select an actuary prior to the filing of ACHI's 10-K for the year ending December 31, 1999 so that they could set actuarial ranges which would allow them to keep ACHI's stock price falsely inflated. Defendants Solomon, Elder, Barrett, Thomas and

62

Violetto knew that PwC had a history and extensive knowledge of the claims and reserve record of ACHI.

203.    After a targeted search to find an actuary to join Defendants Solomon, Barrett, Elder, Thomas and Violetto in their scheme of fraudulently setting the reserves using an actuarially unsound methodology and an actuarially unsound number, Defendants chose Miller Herbers, an Illinois based firm. Defendants with the aid of Violetto and non-party Silver, provided Miller Herbers, via communications and memorandums, with a number of anecdotal and unconventional factors that they insisted the actuary take into account in determining a reserve range. Miller Herbers, an actuarial services company that was required to satisfy established actuarial standards, knew that a fraudulently low reserve would be set by reliance on the anecdotal factors as required by Defendants Solomon, Barrett, Violetto, Thomas and Elder.

204.    At all times, Miller Herbers (i) knew that the Defendants Barrett, Elder, Solomon, Thomas and Violetto had hired two previous actuaries within a two year period; (ii) knew that the SEC had previously commenced an inquiry into the setting of reserves by the Company; and (iii) knew that Defendants Solomon, Thomas, Barrett, Elder and Violetto insisted on the use of these unorthodox and unreliable factors to set grossly inadequate and actuarially unsound numbers which caused an artificially inflated stock price and caused fraudulent financial statements to be disseminated to the regulators, stockholders (which included Kingsway) and the investing public. This conduct was in violation of ASP No. 9, ASP No. 20, ASP No. 21 and ASP No. 23, as set forth more fully in ¶¶ 125-127, 115, 102-110 and 117-124.

205.    Miller Herbers reviewed PwC's September 30, 1999 Reserve Report and thereafter using the "anecdotal factors" dictated by Defendants Solomon, Barrett, Violetto, Thomas and Elder relying on (i) the information provided to them by ACIC's claims department that ACIC's claims

NYC_206950_2

were closing faster, while they had no basis to rely on this; (ii) refused to rely on documentation contained in the PwC analysis but relied upon the statements provided to them by ACIC exclusively; (iii) Miller Herbers instead knowingly created false forecasts and reserves despite the fact that ACHI was underwriting insurance in new markets; and (iv) failed to rely on information that actuaries relied on in conducting an actuarial analysis and reaching an actuarially sound reserve.

206. Miller Herbers stated that PwC's estimates for ACHI's actuarial range to date were "conservative." Miller Herbers and the Defendants Elder, Barrett, Violetto, Thomas and Solomon agreed to use "conservative" as a code word for actuarially sound reserves. Miller Herbers conducted a review study of PwC's December 31, 1999 Reserve Report. Miller Herbers's set a reserve range drastically lower than PwC's reserve estimates for the same time period. Defendant Miller Herbers's report indicated that the acceptable point for the reserves for 1999 was $91.3 million. Miller Herbers grossly set actuarially unsound reserve estimates for 1999 by $2.3 million, which was below any reasonably acceptable range and far below an actuarially sound reserve range. Miller Herbers did this knowingly and with disregard for actuarial standards. This conduct was in violation of ASP No. 9, ASP No. 20, ASP No. 21 and ASP No. 23, as set forth more fully in ¶¶ 125-127, 115, 102-110 and 117-124.

207. Because they were provided the numbers they required to continue to manipulate stock prices, Defendants Solomon, Barrett, Elder, Violetto and Thomas retained Miller Herbers. Defendants Solomon, Barrett, Elder, Violetto and Thomas refused to hire a full time in-house actuary to accurately evaluate the adequacy of the reserves on a continuing basis, they refused to do so as part of a continuing scheme to understate ACHI's reserves and artificially inflate the stock price.

NYC_206950_2

208.    PwC's actuarial and auditing partners met with Miller Herbers between December 1999 and January 2000 to discuss Miller Herbers's actuarial range.  PwC determined that its numbers and Miller Herbers's numbers were too far apart, and PwC could never agree with Miller Herbers's actuarial certifications.  PwC communicated to the Defendants but not to Kingsway, the regulators or to the investing public that they could "never" agree with Miller Herbers's range.

209.    In a conference call on or about February 25, 2000, Defendants Solomon, Barrett, Elder, Thomas and Violetto agreed to utilize Miller Herbers's unsound numbers in order to maintain artificially inflated stock prices.

210.    On or about March 30, 2000, Defendants Solomon, Violetto, Barrett, Thomas and Elder caused ACHI to file its 10-K for the year ending December 31, 1999 ("1999 10-K") including the unsound Miller Herbers's reserves.  Defendants Solomon, Barrett, Elder, Thomas and Violetto signed the 1999 10-K certifying that the information provided in the 10-K was true and accurate when in fact they each knew the information on reserves and the financial information contained therein were materially false.

211.    In preparing financial statements, Defendants Solomon, Barrett, Elder, Thomas and Violetto were required to take into consideration the fundamental objectives and concepts on which GAAP are based, which include: FASB Statement of Concepts No. 1, ¶34 at ¶94a; No. 2, ¶132 at ¶94b; No.1, ¶50 at ¶94c; No.1, ¶42 at 94d; No.2, ¶¶58-59 at ¶94e; No.2, ¶80 at ¶94f; No.2, ¶¶95,97 at ¶94g; FASB No.5 at ¶94h.

212.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 1, ¶ 34 when they caused to be filed financial statements which contained grossly understated and deliberating actuarially unsound reserves for the sole purpose of inducing the investing public to purchase ACHI's stock at a artificially inflated stock price.  At the

time of the filing of ACHI's 10-K, Defendants Solomon, Barrett, Elder, Violetto, and Thomas intended that the investing public, including Kingsway, rely on the falsely stated financial position of ACHI.

213.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 2, ¶ 132 by filing financial statements which materially overstated the value of the Company, and omitting from the 1999 10-K that the balance sheets were materially misleading on the basis that ACHI's reserves were actuarially unsound and understated. At the time of the issuance of the 10-K, Defendants Solomon, Barrett, Elder, Violetto, and Thomas knew a reasonable investor, including Kingsway, would have been concerned about ACHI's grossly understated and actuarially unsound reserves.

214.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 1, ¶ 50 by filing financial statements which materially overstated the value of the Company, and omitting from the 1999 10-K that the balance sheets were materially misleading on the basis that ACHI's reserves were stated in a manner and an amount in violation of their duty to both ACHI's shareholders and the investing public. At the time of the filing, Defendants Solomon, Barrett, Elder, Violetto, and Thomas knew a reasonable investor including Kingsway, would have been concerned about ACHI's grossly understated reserves.

215.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 1, ¶ 42 at ¶ 96, *supra*, by filing financial statements which materially overstated the value of the Company, and omitting from the 1999 10-K that the balance sheets were materially misleading on the basis that ACHI's reserves were actuarially unsound in violation of their duty to both ACHI's shareholders and the investing public. At the time of the filing of ACHI's 10-K, Defendants Solomon, Barrett, Elder, Violetto and Thomas intended that the

NYC_206950_2

investing public and creditors rely on their materially false financial statements with respect to the future profitability of ACHI.

216.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 2, ¶¶ 58-59 by filing financial statements which materially overstated the value of the Company, and omitting from the 1999 10-K that the balance sheets were materially misleading on the basis that ACHI's reserves were grossly understated and actuarially unsound in violation of their duty to both ACHI's shareholders and the investing public. At the time of the filing, Defendants Solomon, Barrett, Elder, Violetto, and Thomas were aware that the filings failed to contain relevant information, did not accurately reflect the true financial position of ACHI, and were therefore unreliable.

217.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 2, ¶ 80 when they caused to be filed financial statements which contained grossly understated and actuarially unsound reserves for the sole purpose of inducing the investing public to purchase ACHI's stock at an inflated price, and omitted to inform the investment public of the true nature of ACHI's reserves. At the time of the filing of ACHI's 10-K, Defendants Solomon, Barrett, Elder, Violetto, and Thomas intended the investing public to rely on the grossly overstated financial condition of ACHI.

218.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB Statement of Concepts No. 2, ¶¶ 95, 97 when they caused to be filed financial statements which contained grossly understated and set actuarially unsound reserves for the sole purpose of inducing the investing public to purchase ACHI's stock at an inflated price, and omitted to inform the investment public of the true nature of ACHI's reserves. At the time of the filing of ACHI's 10-K,

NYC_206950_2

Defendants Solomon, Barrett, Elder, Violetto, and Thomas intended for the investing public to rely

the grossly overstated financial condition of ACHI.

219.    Defendants Solomon, Barrett, Elder, Violetto, and Thomas violated FASB

Statement of Concept No. 5 when they caused to be filed financial statements which contained

grossly understated and set actuarially unsound reserves for the sole purpose of inducing the

investing public to purchase ACHI's stock at an inflated price, and omitted to inform the

investment public of the true nature of ACHI's reserves. At the time of the filing of ACHI's 10-K,

Defendants Solomon, Barrett, Elder, Violetto, and Thomas intended the investing public to rely the

grossly overstated financial picture presented in the 10-K as an indicator of ACHI's future

profitability.

220.    Defendants Solomon, Barrett, Elder, Thomas and Violetto signed the 1999 10-K

which included the following material misstatements and omissions:

   a.    The accompanying consolidated financial statements of ACHI have been prepared in

         conformity with generally accepted accounting principles (GAAP) and include the

         accounts and operations of ACHI and its wholly owned subsidiaries, American

         Country, Financial Services and Professional Services. Significant intercom any

         accounts and transactions have been eliminated. American Country maintains its

         records in accordance with accounting practices prescribed or permitted by the

         Illinois Department of Insurance. In consolidating American Country, adjustments

         have been made to conform its accounts to GAAP. (F-19)

   b.    Losses and loss adjustment expenses (LAE) represent the estimated ultimate net cost

         of all reported and unreported losses incurred through December 31. The reserves

         for unpaid losses and LAE are estimated using individual case-basis valuations and

NYC_206950_2

statistical analyses and are not discounted. Those estimates are subject to the effects

of trends in loss severity and frequency. Although considerable variability is

inherent in the estimates of reserves for losses and LAE, *management believes that*

*the reserves for losses and LAE are adequate*. The estimates are continually

reviewed and adjusted as necessary as experience develops or new information

becomes known; such adjustments are included in current operations. Salvage and

subrogation recoveries are accrued when the related losses are incurred.

221.    These statements were false because Defendants Solomon, Barrett, Elder, Thomas

and Violetto intentionally retained Miller Herbers in November 1999 to provide ACHI with an

actuarial certification based on a grossly understated and actuarially unsound reserves. Miller

Herbers' actuarial certification required that ACHI maintain its reserves $2.3 million dollars less

than PwC would have required, thereby reducing ACHI's balance sheet assets and reducing

ACHI's stock price.

222.    As ACHI's independent auditor for the period ending December 31, 1999,

Defendant PwC was required to check and verify the financial condition of ACHI, including the

actuarial certification of Miller Herbers.

223.    PwC knew from its participation in the reserve setting and actuarial analysis of

ACHI for the year ending December 31, 1999 that ACHI's financials were grossly misstated,

materially false and actuarially unsound due to the actuarially unsound reserves included in ACHI's

1999 10-K. Further, Defendant PwC knew that the reserves were grossly misstated. In failing to

disclose reserve study, their disagreement with the Miller Herbers's reserve process and range, and

that they never could agree to the Miller Herbers reserve level, Defendant PwC breached their duty

under GAAS.

NYC_206950_2

224.   In accordance with the requirements of GAAS, AU, and SAS, PwC was required to conduct a review of ACHI's financials, consolidated balance sheets, actuarial estimates and certifications and review ACHI's board minutes and notes from the year ending 1999, which included the Defendants Solomon, Barrett, Elder and Thomas' discussions regarding why ACHI should retain Miller Herbers instead of PwC to do the actuarial certifications, the potential sale of ACHI's stock to Kingsway, and the grossly inadequate reserve estimates of PwC.

225.   In its Statement of Independent Auditors included in ACHI's 1999 10-K, PwC rendered the following unqualified audit opinion on ACHI's financials, stating:

> In our opinion, the accompanying consolidated balance sheets as of December 31, 1999 and 1998, and the related consolidated statements of income, stockholders' equity, and cash flows for the years then ended present fairly, in all material respects, the financial position of American Country Holdings Inc. and its subsidiaries (the "Company") at December 31, 1999 and 1998, and the results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States. These financial statements are the responsibility of ACHI's management. Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit of these statements in accordance with auditing standards generally accepted in the United States which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above. The consolidated statements of income, stockholders' equity, and cash flows of ACHI for the year ended December 31, 1997 were audited by other independent accountants whose report dated February 24, 1998 expressed an unqualified opinion on those statements.

226.   PwC's audit opinion contained numerous materially false and misleading statements and omissions concerning ACHI's financials, in direct violation of its duty as an independent

NYC_206950_2

auditor. They were required to include or disclaim or render a qualified opinion. At the time of issuing the audit, PwC knew that the financial statements provided by ACHI contained false and materially misleading information and that that information would be publicly disseminated and relied on by stock purchasers, including Kingsway. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55 and SSAP No. 65, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63 and 67.

227.   PwC failed to disclose to the investing public that it was not an "independent" auditor, as defined by the standards set forth in GAAP and GAAS, which resulted from its dual role as ACHI's actuary while at the same time conducting its "independent" audit of ACHI. At the time of the audit, PwC reviewed ACHI's financial projections, interviewed ACHI's officers, and reviewed ACHI's board minutes. The information learned in these interviews and review of documents provided PwC with "red flags" indicating that the Individual Defendants sought a certification of ACHI's reserves from Miller Herbers less than three months before ACHI's 1999 10-K was to be filed for the purpose of manipulating stock prices for their personal profit.

228.   PwC failed to disclose to the investing public that ACHI retained Miller Herbers to obtain an actuarial certification for the year ending December 31, 1999, at a range that was actuarially unsound and that the actuarial range had been determined and conveyed to Defendants Solomon, Barrett, Elder, Thomas and Violetto at a materially higher number. They also failed to inform the investing public that they would never agree to the lower range. They failed to disclose that PwC had been providing ACHI with actuarial certifications for two years, while Miller Herbers had been providing these services for less than three months.

229.   PwC failed to inform the public of Miller Herbers' relative inexperience with ACHI's financials.

NYC_206950_2

230. PwC failed to inform the public that it had notified ACHI's management that it would never agree with the reserve certification provided by Miller Herbers.

231. PwC failed to disclose to the investing public that Miller Herbers' certification of reserve numbers, which were at a range well below PwC's acceptable range and well below an actuarially sound range, would materially affect the financial statements in the 1999 10-K filed by Defendants Solomon, Barrett, Elder, Thomas and Violetto.

232. Despite having direct knowledge that Defendants Solomon, Barrett, Elder, Thomas and Violetto were utilizing Miller Herbers for the sole purpose of maintaining an artificially high stock price, PwC issued a unqualified audit opinion without qualifying footnotes or other notes.

233. PwC did not meet the standards for auditing under GAAS.

234. As detailed below, PwC acted intentionally because its audit of ACHI's financial statements violated the following basic principles of GAAS referred to in detail at but not limited to ¶¶ 72, 77, 78, 80, and 81.

     a. General Standard No. 3, in that PwC failed to exercise due professional care in the performance of its audit and the preparation of its reports;

     b. Standard of Field Work No. 3, in that PwC failed to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for its opinions;

     c. Standard of Reporting No. 1, in that PwC's reports incorrectly stated that ACHI's financial statements were presented in conformity with GAAP:

     d. Standard of Reporting No.3, in that PwC's financial statements omitted or inadequately disclosed material information required by GAAP; and

NYC_206950_2

e.  Standard of Reporting No.4, in that PwC had an insufficient basis for expressing its

unqualified opinions, for its audits had not been conducted in accordance with

GAAS.

235.    In or about March 31, 2000, Defendants Solomon, Barrett, Elder, Thomas and

Violetto submitted on behalf of ACHI a quarterly financial statement to the New York

Commissioner of Insurance in accordance with New York State statutory requirements.  Like the

1999 10-K, Defendants Solomon, Barrett, Elder, Thomas and Violetto knew that the quarterly

statement was materially false and fraudulent in that it plainly stated that ACHI's reserves were

adequate and would be sufficient to pay all New York State claims when, in fact, the reserves were

inadequate and grossly actuarially unsound.

236.    On or about May 1, 2000, Defendant Solomon sent a notice of Annual Meeting to be

held on June 20, 2000 in New York to ACHI's shareholders.  The agenda items for the Annual

Meeting included appointment of PwC as independent auditors for the year ending December 31,

2000.  This Annual Meeting Notice was sent through the mail to various stockholders, including

Frontier Insurance Company in New York.

237.    Defendant Dore became a consultant for ACHI in or about May of 2000.  At the

time he became a consultant, Defendant Dore was familiar with reserving principles and insurance

company practices from his prior experience in the insurance industry.  Defendants Solomon,

Barrett, Elder, Violetto and Thomas hired Dore as a consultant for ACHI for the purpose of

maintaining ACHI's Best rating and keeping ACHI's price at an artificially high number.

238.    Thereafter, on or about June 20, 2000, ACHI's Annual Meeting took place in New

York and was attended by and participated in by Defendants Solomon, Thomas, Elder, Barrett and

Violetto.  At the time of the Annual Meeting, Defendants ratified PwC as ACHI's auditors.  PwC

NYC_206950_2

provided an unqualified opinion for ACHI's 1999 10-K despite the fact that they knew the 10-K was materially false because of the use of actuarially unsound reserves. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55 and SSAP No. 65, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63 and 67.

239.    At a Board Meeting in or about August 2000 attended by and participated in by Defendants Solomon, Thomas, Elder, Violetto and Barrett, Dore was appointed as ACHI's Co-Chairman, CEO and President.

240.    Defendant Dore understood reserves and reserve estimates and their effect on the financial appearance of ACHI and on its stock price. Defendant Dore conspired with Defendant Solomon, who stayed on as a director after his tenure as Chairman, and with Defendants Barrett, Elder, Thomas and Violetto to continue fraudulently misrepresenting ACHI's financial condition to the investing public.

241.    In return for participating in the conspiracy, Defendants Solomon, Barrett, Thomas, Elder and Violetto provided Dore with stock options and warrants and an employment agreement executed in August 2000. Being aware that Dore's employment could terminate in the sale of ACHI, and uncover the fraud the Director Defendants provided Dore with a change of ownership, a provision intended to keep him in place to continue the concealment of the fraud. Dore, therefore, had an immediate financial motive and incentive to monitor and maintain ACHI's artificially high stock price for his own profit. The change of ownership provision in Dore's employment agreement was created in or around the time Defendant Dore was hired and as a benefit for his participating in the conspiracy. Prior to August of 2000, ACHI did not have written employment agreements.

NYC_206950_2

242.    In or about August 2000, Miller Herbers conducted a Dynamic Financial Analysis ("DFA") in order to assist ACIC's strategic planning process, evaluate reinsurance options and assist in assessing the impact of operational decisions. The DFA relied upon data provided by ACIC to generate variables, including loss and loss adjusted expense patterns.

243.    Defendants Solomon, Barrett, Elder, Thomas, Violetto and non-party Silver knew that Miller Herbers's analysis, which based its reserve estimates on the anecdotal factors supplied by ACHI, was a falsely inaccurate statement of ACHI's financials. Miller Herbers's reserve ranges were set to enable these Defendants desire to artificially reduce ACHI's reserves and fraudulently inflate the stock price. On the basis of his experience, Dore knew that Miller Herbers's reserve study did not have a factual basis and was actuarially unsound because he had joined the conspiracy. Dore supported and assisted Miller Herbers in completing ACHI's actuarial certifications.

244.    In or about September 2000, Kingsway was approached by Barrett to have discussions with Defendants Solomon, Barrett, Dore, Elder, Violetto and Thomas about the possible acquisition of ACHI's stock. In determining whether to acquire ACHI and purchase its stock, Kingsway relied wholly on ACHI's public filings to determine the financial viability and reserve strength.

245.    In or about September 18, 2000, Defendants Solomon, Barrett, Elder, Dore, Violetto and Thomas made their yearly presentation to Best in an effort to maintain ACHI's "A-" rating. The presentation took place at ACHI's offices on September 18, 2000. To assist Best with its evaluation, Defendants Violetto, Dore, Barrett, Elder, Thomas and Solomon provided Best with public and private information about ACHI. Defendants also requested that Miller Herbers attend the Best meeting, despite the fact that Defendants knew that Miller Herbers's presentation

NYC_206950_2