contained false and inaccurate information which was used in certifying ACHI's reserves for the year ending December 31, 1999.

246.    Best was not convinced that Miller Herbers's reserve presentation was accurate. After evaluating the information presented by Miller Herbers, Best informed Defendants Solomon, Barrett, Elder, Dore, Violetto and Thomas that ACHI's reserves were materially deficient and needed bolstering. These Defendants knew that failure to heed Best's recommendation to increase reserves could result in a lower rating and, therefore, agreed to conceal Best's findings from the public.

247.    Best required that ACHI strengthen ACHI's reserves in order to avoid reduction to its "A-" rating. To obtain additional capital to do this, Defendants Solomon, Barrett, Elder and Thomas decided at a board meeting on or about November 14, 2000 to do a Private Placement to raise capital.

248.    At the Board meeting attended by and participated in by Defendants Solomon, Thomas, Elder, Barrett, Dore and Violetto, Violetto discussed with the Board Miller Herbers's and PwC's certification with respect to the actuarial numbers, concluding that PwC's numbers were correct. Based on several factors, among them Best's negative response to Miller Herbers's presentation of ACHI's reserves, Defendants Solomon, Barrett, Elder, Thomas and Dore knew that PwC's actuarial ranges were correct, knowing the Miller Herbers' estimates were false and unreliable. Defendants Solomon, Dore, Thomas, Elder, Barrett and Violetto utilized Miller Herbers' reserve range in formulating the financial forecast they would provide in their Private Placement, as ACHI's financial statements and filings for the year ended December 31, 2000. In so doing, these Defendants knew their private placement memorandum would be materially false.

NYC_206950_2

249.    On or about December 1, 2000, Defendants Solomon, Barrett, Dore, Violetto, Elder and Thomas requested that a Philadelphia investment bank with an office in New York render a written fairness opinion to ACHI and its public shareholders on the proposed private placement of $5.475 million in equity financing securities. ACHI's proposed financing was to have two components: (i) 4.05 million of Series A 6% convertible preferred stock, and (ii) 1.425 million units with each unit consisting of a one share of common stock and one five-year common stock purchase warrant which would entitle a holder to purchase one additional share of common stock.

250.    After reviewing the financial offering documents, analyzing public business information and speaking to ACHI management about the financing, the investment firm provided ACHI with a written opinion on or about December 28, 2000, stating that the "proposed Financing taken as a whole, is fair to ACHI and its shareholders from a financial point of view." Defendants Solomon, Barrett, Elder, Violetto, Dore and Thomas intentionally provided the investment firm with false information concerning ACHI's reserves and the problems with their failure to disclose that Miller Herbers's actuarial numbers portrayed a completely inaccurate portrayal of ACHI's financial portrait.

251.    ACHI prepared a Confidential Business Description Memorandum ("Confidential Memorandum") to those seeking to participate in a private placement offering. The Confidential Memorandum prepared by the investment firm provided that potential investors in ACHI should review ACHI's prior public filings. The Confidential Memorandum also informed the public that management believed ACHI's estimated loss and loss adjustment liabilities were reasonable when Defendants Solomon, Barrett, Dore, Thomas, Elder, Violetto, PwC and Miller Herbers knew they were not.

NYC_206950_2

252.    Kingsway became aware of the Private Placement and, through its subsidiaries, was interested in taking part in the Private Placement. Kingsway's Chief Financial Officer, Shaun Jackson ("Jackson"), sent an e-mail to Defendant Violetto concerning various issues relating to ACHI's financial strength, including reserve estimates and tax issues based on ACHI's public filings. In the December 18, 2000 e-mail, Jackson inquired: "Looking at last year's 10-K (page 16), the loss reserve run off has consistently showed adverse development. What has been the experience in 2000?"

253.    Defendant Violetto informed Defendants Solomon, Barrett, Elder, Thomas and Dore about Jackson's inquiry and Defendants agreed that Kingsway should be informed that ACHI was committed to taking a "conservative" approach to reserving. Defendants Solomon, Elder, Thomas, Dore, Violetto and Barrett knew this statement was materially false.

254.    In a December 2000 memorandum in response to Jackson's inquiry, Defendant Violetto intentionally misinformed Jackson that ACHI "was committed to taking a conservative approach to loss reserving, and will not allow its reserves to become deficient going forward." Defendant Violetto knew this statement was material to Kingsway's decision to invest and that the information she conveyed was false.

255.    Defendant Violetto, a certified CPA, and Defendants Solomon, Barrett, Dore, Elder and Thomas knew that the statement that ACHI took "a conservative approach to loss reserving" was a material, fraudulent misstatement made to Kingsway. At the time the statement was made, Defendant Violetto knew of the major difference in PwC's and Miller Herbers's actuarial reports and that Defendants Solomon, Barrett, Elder, Violetto, Thomas and Dore chose Miller Herbers in 1999 to perpetuate ACHI's falsely inflated financial image and stock price.

NYC_206950_2

256.    Kingsway was forced to rely upon ACHI's public filings provided by ACHI and Violetto's statements in deciding to purchase shares of ACHI.

257.    Pursuant to a Preferred Stock Subscription Agreement ("Stock Subscription Agreement") executed on or about December 28, 2000, American Service Insurance Company, a Kingsway subsidiary, agreed to purchase 20,000 shares of ACHI stock at the offering price of $10 for a total price of $200,000.00.  Pursuant to a Stock Subscription Agreement executed on December 28, 2000, Lincoln Insurance Company agreed to purchase 40,000 shares of ACHI stock at the offering price of $10 for a total price of $400,000.00.  Pursuant to a Stock Subscription Agreement executed on December 28, 2000, Universal Casualty Company agreed to purchase 40,000 shares of ACHI stock at the offering price of $10 for a total price of $400,000.00. Kingsway (or its subsidiaries) also acquired 555,471 shares of ACHI, representing about 5.4% of ACHI's outstanding stock for a total price of $5,554,710.  Prior to, during and after the Acquisition of shares in ACHI, Defendants owed a fiduciary duty to Kingsway, through its subsidiaries, and its subsidiaries Amercian Service, Lincoln Insurance and Universal Casualty. to provide adequate information concerning ACHI's reserves and financials.  Defendants breached this duty.

258.    In or about early 2001, Defendants Solomon, Barrett, Dore, Violetto, Elder and Thomas, realizing that their scheme to fraudulently inflate the stock price may unravel, acknowledged that they needed to hire an internal actuary, at least in part to appease Best.

259.    Defendants Solomon, Barrett, Elder, Thomas and Dore, with the aid of Violetto, agreed to hire an internal actuary with as little relevant reserve experience as possible in the hope that they could mislead and control that actuary, or at least delay the setting of actuarially sound reserves until after they profit by selling their stock.  In or about March 2001, ACHI hired Christine Gennett, an actuary with little, if any, experience regarding reserve analysis.

NYC_206950_2

260.    Defendants Solomon, Barrett, Elder, Dore and Thomas utilized Miller Herbers's actuarial numbers in formulating ACHI's financials reported in its 2000 10-K. The 10-Ks therefore presented a materially false financial picture of ACHI. Miller Herbers's reserve point estimate for 2000 was $95.4 million, which was grossly underreported by $13 million.

261.    On or about March 30, 2001, ACHI filed its 10-K for the year ending December 31, 2000 (the "2000 10-K"). The 2000 10-K included financials based upon the balance sheets approved by Defendants Solomon, Barrett, Dore, Elder, Violetto and Thomas.

262.    The 2000 10-K filed by Defendants Solomon, Barrett, Elder, Thomas and Violetto contained the following material misstatements and omissions in violation of GAAP Standards of Reporting No. 1, No. 2, No. 3, No. 4 as set forth above but not limited to ¶¶ 78-81.

> The accompanying consolidated financial statements of ACHI have been prepared in conformity with generally accepted accounting principles ("GAAP") and include the accounts and operations of ACHI and its wholly owned subsidiaries, American Country, Financial Services and Professional Services. Significant inter-company accounts and transactions have been eliminated. American Country maintains its records in accordance with accounting practices prescribed or permitted by the Illinois Department of Insurance. In consolidating American Country, adjustments have been made to conform its accounts to GAAP.
>
> Losses and loss adjustment expenses (LAE) represent the estimated ultimate net cost of all reported and unreported losses incurred through December 31. The reserves for unpaid losses and LAE are estimated using individual case-basis valuations and statistical analyses and are not discounted. Those estimates are subject to the effects of trends in loss severity and frequency. Although considerable variability is inherent in the estimates of reserves for losses and LAE, management believes that the reserves for losses and LAE are adequate. The estimates are continually reviewed and adjusted as necessary as experience develops or new information becomes known; such adjustments are included in current operations. Salvage and subrogation recoveries are accrued when the related losses are incurred.

NYC_206950_2

263.    The 2000 10-Ks were fraudulent and materially misleading because Defendants Solomon, Dore, Barrett, Elder, Violetto and Thomas utilized the actuarial certification of Miller Herbers despite being aware that that contained materially deficient reserves which substantially underreported ACHI's balance sheet liabilities in its 2000 10-K.

264.    ACHI's loss reserves, as originally reported for the period ended December 31, 2000, were false based upon the following primary reasons: (1) case reserve weakening in the workers compensation line was not adequately factored into the selected loss indications; (2) in 1997, ACHI entered a number of new markets for public auto and taxicabs. The loss data failed to appropriately segregate public auto liability coverage in newly entered states which were significantly impacted by PIP coverages and longer statutes of limitations, as discussed above; and (3) the selected loss adjustment expense selections failed to reflect the change in ACHI's operations for the use of legal counsel for claims litigation. Historically, ACHI had used inside staff counsel for its Illinois based public auto business. When ACHI expanded into new states it began using outside attorneys for claims litigation, which carries a higher cost structure and thus translates into higher expected future development.

265.    At the time of the filing of the 2000 10-K, Defendants Solomon, Barrett, Dore, Elder, Violetto and Thomas had been told by ACHI's auditor PwC that Miller Herbers's actuarial ranges were grossly understated and actuarially unsound. Defendants, however, still utilized the Miller Herbers's ranges for the sole purpose of artificially inflating the balance sheet assets of ACHI, thereby fraudulently inflating ACHI's stock price.

266.    As the purported independent auditor for ACHI for the period ending December 31, 2000, PwC was required to check and verify the financial condition of ACHI under GAAS. This conduct was in violation of AU 150 as set forth in paragraph 68.

NYC_206950_2

267.    In accordance with the requirements of GAAS, PwC was also required to conduct a

review of ACHI's financials, consolidated balance sheets, actuarial estimates and certifications, and

review ACHI's board minutes and notes from the year ending 1999, which included a discussion by

Solomon, Dore, Violetto, Barrett, Elder and Thomas as to why ACHI retained Miller Herbers

instead of continuing PwC to do the actuarial certifications, the potential sale of ACHI's stock to

Kingsway and the grossly inadequate and actuarially unsound reserves.

268.    PwC, as an independent auditor, was also required to conduct its own review of

ACHI's actuarial certification of reserves for the same period in accordance with AU 150, AU 312

and AU 342 as set forth in paragraph 72, 84 and 89.

269.    In its Statement of Independent Auditors included in the 2000 10-K, PwC rendered

the following unqualified audit opinion on ACHI's financials, stating:

> In our opinion, the accompanying consolidated balance sheets and the
> related consolidated statements of income, stockholders' equity, and
> cash flows present fairly, in all material respects, the financial
> position of American Country Holdings Inc. and Subsidiaries (the
> "Company") at December 31, 2000 and 1999, and the results of their
> operations and their cash flows for each of the three years in the
> period ended December 31, 2000, in conformity with accounting
> principles generally accepted in the United States of America. These
> financial statements are the responsibility of ACHI's management;
> our responsibility is to express an opinion on these financial
> statements based on our audits. We conducted our audits of these
> statements in accordance with auditing standards generally accepted
> in the United States of America, which require that we plan and
> perform the audit to obtain reasonable assurance about whether the
> financial statements are free of material misstatement. An audit
> includes examining, on a test basis, evidence supporting the amounts
> and disclosures in the financial statements, assessing the accounting
> principles used and significant estimates made by management, and
> evaluating the overall financial statement presentation. We believe
> that our audits provide a reasonable basis for our opinion.

NYC_206950_2

270.    PwC's audit opinion contained numerous materially false and misleading statements and omissions concerning ACHI's financials, in breach of its duty as an independent auditor. These statements include opining that: (i) the financial statements presented fairly in all material respects the financial position of ACHI when PwC knew the grossly understated and actuarially reserves inflated the true financial condition of the Company; (ii) the audits were conducted in accordance with GAAS when in fact PwC was violating GAAS's basic standards by ignoring the financials' materiality, reliability, consideration of risk, completeness, and usefulness to investors; (iii) the audits provided a reasonable basis for their opinion, when in fact PwC ignored the red flags it was obligated to investigate; (iv) and, failing to disclose its dual role as auditor and actuary. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55 and SSAP No. 65, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63 and 67.

271.    At the time of issuing the audit, PwC knew that the financial statements provided by Company's management consisting of Defendants Dore, Solomon, Thomas, Elder, Violetto and Barrett, contained false and materially misleading information and not in accordance with GAAP and the statutory accounting principles. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55 and SSAP No. 65, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63 and 65.

272.    PwC was required to, and did not, give the investing public notice that the actuarial certification was actuarially unsound, false and misleading. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55 and SSAP No. 65, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63 and 67.

NYC_206950_2

273.    PwC was required to, and did not, inform the public of the fact that after PwC had analyzed ACHI's reserves and could never agree with the reserves set.

274.    PwC failed to disclose that the reserve certification was well below PwC's ranges and would materially affect the financial statements filed by Defendants Solomon, Barrett, Elder, Dore, Violetto and Thomas in the 2000 10-K. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55, SSAP No. 65, AU 336, AU 312 and AU 342, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63, 67, 84, 87 and 89.

275.    PwC did not meet the standards for auditing under GAAS.

276.    Despite having direct knowledge that Defendants Solomon, Dore, Violetto, Barrett, Elder and Thomas were setting actuarially unsound reserves for the sole purpose of maintaining an artificially high stock price, PwC issued an unqualified audit opinion-without any footnotes.

277.    As detailed below, PwC acted negligently because its audit of ACHI's financial statements violated at least the following basic standards of GAAS:

   a.  PwC failed to exercise due professional care in the performance of its audit and the preparation of its reports because it did not test the evidence supporting the financial statements including the estimates of reserves by management. PwC also knew that the reserves certified by Miller Herbers, and used by management in its financial statements were not actuarially sound. PwC failed to note it or investigate this fact. (General Standard No. 3 at ¶ 71)

   b.  PwC failed to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for its opinions.

NYC_206950_2

PwC provided an unqualified opinion when "red flags" obligated it to further investigate the reserve setting process employed by the Board Members and Miller Herbers. (Standard of Field Work No. 3 at ¶ 74)

c.  PwC's reports incorrectly stated that ACHI's financial statements were presented in conformity with GAAP because it ignored the financials' materiality, reliability, risk, completeness, conservatism, and usefulness to investors. (Standard of Reporting No. 1 at ¶ 75)

d.  PwC's financial statements omitted or inadequately disclosed material information required by GAAP when it failed to disclose that reserves were not actuarially sound, and that PwC was both actuary and auditor in violation of its purportedly independent role. (Standard of Reporting No.3 at ¶ 77)

e.  PwC had an insufficient basis for expressing its unqualified opinions, for its audits had not been conducted in accordance with GAAS because it failed to identify fraud risk factors including the discrepancies in reserve certifications between Miller Herber's and its own actuarial analysis and Gennett's actuarial analysis. GAAS requires the auditor to thoroughly investigate the "red flags" which PwC ignored. (Standard of Reporting No.4 at ¶ 78)

278.  In or about March 2001, Defendants Solomon, Dore, Barrett, Elder, Violetto and Thomas filed ACIC's Quarterly Statement for period ending March 31, 2001.

279.  On or about June 7, 2001, the Annual Meeting for American Country Holdings Inc. was held. Defendants Barrett, Dore, Elder, Solomon, Thomas and Violetto were in attendance. Defendants decided to continue PwC as independent auditors based on the fact that PwC issued an unqualified audit opinion to the Company, despite being aware that the reserves were grossly below

NYC_206950_2

any reasonable range and actuarially unsound. This conduct was in violated of AU 150, Rule 101, Rule 101-2, Rule 102-1, Rule 501, Rule 501-4, S-X Art. 7, FASB No. 5, SSAP No. 55 and SSAP No. 65, as set forth more fully in ¶¶ 72, 50, 51, 52, 54, 55, 94, 100(h), 63 and 67.

280.    In or about June 2001, Defendant Solomon telephoned William Star ("Star") of Kingsway to encourage Kingsway to purchase certain shares of common stock held by Frontier Insurance Group.

281.    Defendants Solomon and Thomas had subsequent telephone conversations with Star about purchasing some of the shares of common stock. Star spoke with Defendant Barrett on the telephone on a number of occasions during June 2001 concerning the purchase. In each of these conversations these Defendants encouraged Star to have Kingsway purchase stock, and assured him of the accuracy of the publicly filed financial information. Despite each of them knowing it was materially false.

282.    On or about July 2, 2001, Kingsway, through its wholly-owned indirect subsidiaries, American Service, Lincoln General, and Universal Casualty, acquired 555,471 shares of common stock from affiliates of Frontier Insurance Group at a price of $1.9035 per share through a cross trade executed by the investment firm that provided the firm with a valuation in 2000. The common stock was acquired by the Kingsway subsidiaries for investment purposes. In purchasing ACHI's stock, Kingsway relied upon ACHI's public filings, including but not limited to its 1999 10-K, and 2000 10-K and various state filings.

283.    In a letter dated July 25, 2001 to Elder, the State of Illinois Department of Insurance expressed concern regarding ACHI's financial condition "as evidenced by the very low surplus/insurance liabilities ratio, significant underwriting losses in three of the past four years, and indications of probable loss reserve deficiencies."

NYC_206950_2

284.    In or about August 2001, Defendants Solomon and Thomas informed Kingsway that they would be receptive to a tender offer for their shares in the range of $3.00 per share.

285.    Thereafter, in or about September 2001, Defendants Violetto and Dore made a presentation to the Illinois Department of Insurance stating that ACHI's reserves were actuarially sound. The statements made to the Illinois Department of Insurance about reserves were known to Violetto and Dore to be materially false in that they did not disclose their knowledge of how the reserves had been manipulated.

286.    From the outset, Defendants Solomon, Barrett, Elder, Violetto, Dore and Thomas made a conscious decision to withhold from their newly hired internal actuary, Gennett, the information necessary to make a valid analysis of the reserves, and to continue to manipulate the reserve findings. Specifically, these Defendants determined to slow the amount of information to which Gennett had access for as long as possible.

287.    After only a few months of employment, Gennett discovered that ACHI's reserves had been actuarially unsound and concluded that ACHI would need to increase its reserves by at least $15 million for the period ended September 30, 2001.

288.    Gennett promptly provided her findings to Defendant Dore, the CEO and President of ACHI at the time, as well as to Defendant Violetto, ACHI's Chief Financial Officer.

289.    Once again, Defendants Solomon, Barrett, Elder, Dore and Thomas, with the aid of Violetto, immediately sought to discredit Gennett's findings knowing that such a dramatic increase in reserves could and would affect ACHI's Best rating, thereby reducing ACHI's stock price and their personal net worth. Defendants Solomon, Barrett, Elder, Dore, Thomas and Violetto immediately called for a peer review by PwC and Miller Herbers of Gennett's findings in order to avoid the need to increase reserves by $15 million or disclose her findings to the public.

NYC_206950_2

290.    Miller Herbers and Defendant PwC could not contest Gennett's findings. At an Audit Committee meeting on or about November 9, 2001, attended by and participated in by Defendants Barrett, Thomas, Dore, Elder, Violetto and PwC's Tom Brown, Terrance O'Brien, and Jim Svab, PwC agreed with Gennett's findings that the $15 million was needed for reserve bolstering.

291.    Defendants Solomon and Thomas, owning 50% of ACHI's stock, knew that the selling of their shares to Kingsway at the price they wanted would not be possible if Kingsway discovered the necessity of the $15 million reserve increase.

292.    Defendants Solomon, Barrett, Elder, Thomas, Violetto and Dore, realizing their scheme would be discovered once the public learned of the reserve deficiencies, these Defendants became desperate to sell ACHI. Defendants Solomon and Thomas began to aggressively sell their shares.

293.    On or about November 12, 2001, Dore met with Kingsway's agents, Star, Jackson, and James Zuhlke ("Zuhlke") at Kingsway's subsidiary American Service to discuss the possible acquisition of ACHI by Kingsway. Defendant Dore concealed, as he encouraged Kingsway to pay, ACHI's imminent increase in reserves by $15 million. Defendants Solomon and Thomas also concealed from Kingsway's agents the imminent increase.

294.    While Dore was meeting with Kingsway's agents, Solomon, Barrett, Elder, Dore, Thomas and Violetto formulated and drafted a press release to be distributed to the investing public to allay any concerns about ACHI. Defendants Solomon, Barrett, Elder, Thomas, Violetto and Dore knew that a Best rating downgrade was going to occur on the basis of its actuarially unsound reserve estimates. These defendants did not want to miss the opportunity to sell their shares to Kingsway at a maximum price for their own personal profit.

NYC_206950_2

295.    Thereafter, on or about November 14, 2001, as a result of their concern regarding the reduced Best rating, Defendants Solomon, Barrett, Elder, Dore, Violetto and Thomas caused ACHI to issue a press release in which Defendant Dore was quoted as stating:  "ACHI's management was determined to put reserve loss development of prior years behind ACHI."  At all times, the press release and the statements made by Defendant Dore were materially false and misleading because the Defendants Solomon, Barrett, Elder, Thomas and Dore knew but failed to inform the public that ACHI's reserves were still actuarially unsound by millions of dollars.

296.    In the same press release, Defendants Solomon, Barrett, Dore, Violetto, Elder and Thomas announced that the reserve problems resulting in ACHI's rating downgrade were "isolated to a few lines of business" and could be corrected, notwithstanding Gennett's warning of the need to supplement ACHI's reserves based on her review of additional lines.

297.    Even following her original finding of a $15 million reserve deficiency, Gennett later advised that a further increase in reserves would be needed in 2002 to compensate for the actuarially unsound reserves over the past two years.  Violetto informed Dore that ACHI's reserve estimates were still actuarially unsound.

298.    Based on the materially misleading information communicated to Kingsway, on or about November 19, 2001, Star communicated by telephone with Defendants Thomas and Solomon and offered to purchase ACHI's shares for $1.85 per share.  Defendants Thomas and Solomon communicated this information to Defendants Dore, Barrett, Elder, Violetto and Barrett.

299.    On or about November 28, 2001, Defendants Elder, Barrett, Dore, Solomon, Thomas, and ACHI's internal actuary Gennett, among others, attended and participated in an ACHI Board Meeting during which Solomon, Barrett, Elder and Thomas discussed PwC's analysis for the year ending September 30, 2001.  During the Board Meeting, Defendants Elder, Barrett, Dore,

NYC_206950_2

Solomon, and Thomas met privately to discuss the sale of ACHI in light of the probable downgrade of ACHI by Best.

300.    Defendant Solomon stated that Kingsway had expressed interest in buying all or part of ACHI for $1.85 per share or via a 1 for 6 stock offer. He explained that the current stock price for ACHI was $1.91 and that he and Defendant Barrett thought that Kingsway's offer was very attractive. Barrett acknowledged that ACHI was likely to be downgraded by Best, but desired an offer of $2.25 per share. Defendants Elder and Dore agreed.

301.    Defendants Solomon and Barrett ultimately decided that any of Kingsway's offer exceeding $2.00 per share should be accepted. Defendants Solomon, Dore, Elder, Violetto, Thomas and Dore instructed Barrett to contact Kingsway concerning a possible transaction. Defendants Solomon, Dore, Elder, Violetto, Thomas and Dore determined that the transaction must take place in the form of an unsolicited tender offer.

302.    Thereafter, on or about November 29, 2001, Defendant Barrett contacted Kingsway to inform Kingsway that ACHI would be very interested in selling ACHI's shares, and that they would retain an investment bank to do an evaluation of ACHI if an offer was made of at least $2.00.

303.    In or about December 2001, ACHI's rating was downgraded when Best issued a press release announcing ACIC's rating had plummeted from A- to C++ due to failure of "management's ability to restore profitability and maintain adequate reserves."

304.    Defendants Dore, Solomon, Barrett, Elder, Violetto and Thomas knew that any further reduction in ACHI's rating by Best would cause ACHI's value to "tank", thereby making ACHI unmarketable and adversely affecting their own personal net worth. As of December 31, 2001, Solomon owed 29%, Thomas owned 29%, Dore owned 10% and Barrett owned 3.5% of

NYC_206950_2

ACHI's common stock. All directors and officers as a group owned approximately 75% of ACHI's outstanding common stock.

305.    In a desperate attempt to quickly sell ACHI before its true financial condition was revealed to the public, Defendants Solomon, Barrett, Elder, Dore, Thomas and Violetto, devised a scheme first discussed in their closed meeting to defraud the investing public by:

      a.   aggressively contacting potential purchasers of ACHI in an effort to get ACHI acquired before the true nature and extent of ACHI's financial condition was made public;

      b.   misleading acquirers of ACHI about the true nature and extent of ACIC's reserves problem by disseminating materially false information orally and in writing to potential buyers, Kingsway among them;

      c.   causing filings to be made with the SEC and state agencies, which contained materially false information or material omissions concerning ACHI's financials; and

      d.   prohibiting full access to company information.

306.    On or about December 23, 2001, in a telephone conversation with Thomas and Solomon, Star increased Kingsway's offer from $1.85 to $2.00 per share conditioned upon the approval of the Illinois Director of Insurance. Relying on the misleading, publicly-filed financial information Kingsway eventually increased its offer to $2.10 in its belief of ACHI's presented financial condition.

307.    On or about December 24, 2001, the Philadelphia investment firm retained in 2000 by the Defendant Board Members issued a valuation report of ACHI's financials for the period

NYC_206950_2

ending December 12, 2001, based on ACHI's publicly available financial information, as well as interviews of various ACHI Board Members and employees.

308.    Knowing that the investment firm would make its decisions solely based upon the publicly available information of ACHI, Defendants Solomon, Dore, Barrett, Elder, Violetto and Thomas directed ACHI employees to continue to understate the nature of ACHI's reserves.

309.    Based upon the incomplete, inaccurate and fraudulent information provided by Defendants Solomon, Barrett, Elder, Dore and Thomas, with the aid of Violetto, acting individually and in concert, the investment firm concluded that the fair value of ACHI's common stock was $2.40 to $2.90 per share for a total equity value of $27,750,000 to $34,000,000.

310.    Defendants Dore, Elder, Thomas, Violetto, Barrett and Solomon knew that the evaluation failed to take into account the substantial reserve deficiency uncovered by Gennett.

311.    Knowing that the reserves were grossly inadequate and actuarially unsound, on or about January 16, 2002, Defendant Barrett telephoned Kingsway's CFO Shaun Jackson in an effort to increase Kingsway's offer price and assured him the reserve shortage had been corrected.

312.    On or about January 24, 2002, Defendant Dore contacted Kingsway to induce Kingsway to tender a bid in the range of $2.40 to $2.90 per share, based on the investment firm's valuation that Defendant Dore and other Defendants Solomon, Barrett, Elder, Thomas and Violetto knew was based on materially false and actuarially unsound reserves. Dore in this conversation reaffirmed that the reserve issue had been corrected knowing that this was a materially false statement.

313.    On or about January 25, 2002, Dore contacted Kingsway's Star to induce Kingsway to increase its price in light of the recent valuation of $2.40 to $2.90 per share. Star declined and

NYC_206950_2

reiterated Kingsway's offer of $2.10. Dore asserted the reserve issue was resolved and reiterated the financial picture contained in the public filing knowing them to be materially false.

314.    As Kingsway had been denied access to ACHI's non-public financial information during the time it was contemplating making an offer, it relied on ACHI's Annual Reports on Form 10-K filed with the SEC, including the financial statements attached therein, the valuation of the independent investment firm, and ACHI's actuarial reports from 1999 through 2001, all of which contained false and misleading information.

315.    In or about January 2002, Gennett advised Dore that ACHI's reserves, as reported to the public were grossly actuarially unsound by at least $3 million. Knowing what Gennett had told him, Defendant Dore contacted the investment-banking firm to prepare an updated valuation, but he intentionally failed to disclose that ACHI's reserves were materially inadequate based on the new information provided by Gennett, nor did he correct any of the materially false and misleading information upon which the original valuation was based.

316.    Each of ACHI's 10-K filings for the years 1998 through 2001 stated that "management believes that the reserves for losses and [loss adjustment expenses] are adequate." This statement and PwC's audits concerning them were intentionally false because management knew the reserves were in fact actuarially unsound.

317.    In or about February 2002, prior to the Tender Offer, Defendant Violetto informed Defendant Dore that ACHI's tax estimation was miscalculated, and that the Company would be required to adjust its taxes within the first quarter of 2002. Defendant Violetto further informed Defendant Dore that ACHI's statutory surplus would decrease to $25 million as a result of the tax adjustment and materially alter ACHI's balance. Defendant Violetto further explained that the tax adjustment would impact ACHI's surplus because the deferred tax asset was limited to 10% of

surplus and a large part was non-admitted. Defendant Dore informed Defendants Barrett, Elder,

Solomon and Thomas of ACHI's need for a tax adjustment.

318.    Defendants Violetto, Dore, Barrett, Elder, Solomon and Thomas agreed to and did in

fact conceal from Kingsway and the investing public news of the tax adjustment.

319.    On or about February 27, 2002, KFS Acquisition Corp., a wholly owned subsidiary

of Kingsway, delivered a Tender Offer to ACHI to acquire all of ACHI's common stock for $2.10

per share.

320.    Contemporaneous with the Tender Offer, Kingsway issued a press release stating

that, based on American Country's NASDAQ stock closing at $1.38 per share as of February 19,

2002, Kingsway believed that "the Offer represents full and fair value to the American Country

shareholders and encourage[d] American Country shareholders to tender into the Offer."

321.    By the time of the Tender Offer, Defendants Solomon, Barrett, Elder, Violetto,

Thomas, and Dore had an offer from at least one other suitor, who was at least offering $2.20 per

share, but opted to go with Kingsway's offer from the start based upon Kingsway's lack of access

to documents, its ignorance as to the true value of ACHI, and due to its reliance on the falsity these

Defendants made and caused to be made required for access to company information which would

have disclosed the true financial picture of the company.

322.    Under the terms of the Tender Offer, Kingsway's offer was subject to rescission if

"there shall have been any change, event, or development having, or that could reasonably be

expected to have, individually or in the aggregate, a material adverse effect on the condition

(financial or otherwise), business, assets, liabilities or results of operations of ACHI and its

subsidiaries taken as a whole."

NYC_206950_2

323.    Knowing that Kingsway's discovery of ACHI's ongoing actuarially unsound reserves could result in Kingsway rescinding its Tender Offer, Defendants Solomon, Thomas, Barrett, Elder, Dore and Violetto continued the conspiracy to conceal from Kingsway ACHI's true financial condition.

324.    ACHI's 2001 10-K, filed by Defendants Solomon, Dore, Elder, Barrett, Thomas and Violetto, failed to disclose that the required tax adjustment in early 2002, despite their knowledge that the financial statements did not adequately take the adjustment into account.

325.    On or about March 7, 2002, aware that the offering price did not accurately reflect the true value of ACHI since it was based on the fraudulent and materially false information, Defendants Solomon, Barrett, Dore, Elder, Violetto and Thomas continued to solicit an even higher offer from Kingsway assuring Kingsway that the reserves were corrected.

326.    Defendants Dore, Barrett, Solomon, Thomas, Violetto and Elder received an offer from another suitor, which would have provided ACHI with an additional $.10 per share and purchase of warrants, resulting in 10 million dollars to ACHI. Defendants Solomon, Barrett, Elder, Dore, Violetto and Thomas refused to seriously consider the higher offer because the potential purchaser required ACHI to provide it with non-public information.

327.    Contemporaneously, the investment banking firm, relying on materially false information supplied by Defendants Dore, Solomon, Thomas, Barrett and Elder issued a fairness opinion as to Kingsway's proposed Tender Offer, concluding that "the proposed Tender is fair to the common shareholders of ACHI from a financial point of view."

328.    On or about March 22, 2002, in its role as auditor, PwC submitted a report to the Audit Committee of ACHI, indicating that ACHI had increased its reserves by $23 million over the course of 2001. PwC performed an "independent" review of reserves at December 31, 2001 and

NYC_206950_2

determined that "ACIC's reserves were well within our reasonably actuarially-determined range" -
- which still stated reserves at an actuarial unsound level. The knowledge of PwC as set forth
above including the reserve adjustment required PwC as an auditor to conduct a diligent
investigation before rendering an audit opinion. PwC knew that they had this obligation, knew that
the reserves were being manipulated to fraudulently sustain the stock price and knew that the
stockholders, including Kingsway and prospective stock purchasers, including Kingsway, would
receive and rely on their audit opinion. PwC knew that their audit opinion would convey to
stockholders and prospective stock purchasers false information upon which the stockholders and
stock purchasers would rely.

329.    On or about March 27, 2002, PwC knowing the reserves had been manipulated to
artificially inflate stock prices audited ACHI's 2001 financial statements, and consistent with their
audits from 1998 through 2000, PwC opined, "these financial statement schedules present fairly, in
all material respects, the information set forth therein."

330.    PwC failed to reveal in its independent audit that the information contained in
ACHI's 2001 financial statements did not fairly present ACHI's financials in accordance with
GAAP.

331.    On or about March 29, 2002, Defendants Solomon, Barrett, Elder, Dore Violetto and
Thomas caused ACHI to file its annual 10-K with the SEC for the year ending December 31, 2001
("2001 10-K"). The Defendants signed the 2001 10-K. Defendants, in connection with PwC's
audit, were required to formulate the Company's financial statements in conformance with GAAP.

332.    The 2001 10-K provides that "management believes that the reserves for losses and
[loss adjustment expenses] are adequate." Management's statement concerning loss reserves was
identical to the previous false statements it made in 10-K's for the years 1998, 1999 and 2000.

NYC_206950_2

Defendants Solomon, Barrett, Dore, Elder, Thomas, and Violetto's statements concerning reserves were materially false and misleading and contained material omissions of fact because the 10-K failed to disclose the fact that Gennett made management aware that the reserve estimates for the years ending December 31, 2001 did not accurately reflect ACHI's gross understatement of reserves, despite the fact that ACHI was required to supplement the reserves by $15 million for the period ending September 30, 2001.

333.    The loss reserves as originally reported for the period ended December 31, 2001, were false for the following primary reasons: (1) ACHI's loss reserves as of December 31, 2001 were set using data as of September 30, 2001 rather than data as of December 31, 2001. There were clearly observable adverse loss trends that emerged in the fourth quarter of 2001 that were not considered by ACHI's actuarial analysis when setting the December 31, 2001 loss reserves and (2) in 1997, ACHI entered a number of new markets for its public auto and taxicab lines of business and the actuarial loss projection data ignored public auto liability coverage in newly entered states whose development patterns are significantly impacted by personal injury protection ("PIP") coverages and longer statutes of limitations, neither of which were present in the historical data.

334.    Further, Defendants Dore, Violetto, Elder, Thomas, Solomon and Barrett failed to disclose in the 2001 10-K that Gennett also informed them that the reserves for previous lines would continue to have negative reserve development which could effect ACHI's balance sheet liabilities at a future date.

335.    Despite being aware of the material misleading information in the 2001 10-K, Defendants Solomon, Elder, Barrett, Thomas, Dore and Violetto continued to make false statements to Kingsway about the adequacy of reserves to encourage Kingsway to finalize its

NYC_206950_2